# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v. | DOCKET NO. |
| JESUS MARQUEZ-MARQUEZ,<br>DAVID JIMENEZ-PEDROZA,<br>JOSE ALFREDO JIMENEZ,<br>SERGIO ENRIQUE BELTRAN GUERRERO,<br>ISAIAS SERRANO,<br>DAVID SILVA BENAVIDES,<br>MARTIN GARCIA ANGULO,<br>JOSE ASCENCION GARCIA,<br>ALEJANDRO PEREZ MANZO,<br>MARGARO LNU,<br>HUMBERTO HUBERT P. BARRAZA,<br>SERGIO BELTRAN SARABIA,<br>URIEL VALDOVINOS GARCIA,<br>JUAN ALONSO AISPURO CHAGOYA,<br>JOSE PACHECO DURAN,<br>SERGIO CHAVEZ PULIDO,<br>JOSE LUIS MATA-GARCIA,<br>ILIANA FARIAS,<br>OCTAVIO FELIX GONZALEZ,<br>ANSELMA VEGA ROMERO,<br>JORGE VILLANUEVA,<br>BASILIO MALDONADO,<br>JAIRO ALEJANDRO RODELA,<br>LIZETH CARPIO HERNANDEZ,<br>JOSE PULIDO SANCHEZ,<br>ELIESER CENA GALLEGOS,<br>ERIKA CECILIA VALDOVINO,<br>JOSE LUIS NUNEZ,<br>JESUS ALVAREZ LARA,<br>JOANNELLE MIRASOL DELA CRUZ,<br>ALMA RODRIGUEZ,<br><br>Defendants. | MAGISTRATE'S CASE NO.<br><br>010- **10-0703M**<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br><br>MAR 30 2010<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY_____ DEPUTY |

Complaint for violation of Title 21, United States Code §§ 846, 841(a)(1), (b)(1)(A): conspiracy to distribute methamphetamine.

| NAME OF MAGISTRATE JUDGE<br>HONORABLE ANDREW J. WISTRICH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION |
|---|---|---|

| DATE OF OFFENSE<br>Unknown through April 1, 2010 | PLACE OF OFFENSE<br>Los Angeles, Riverside & San Bernardino Counties | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION

Beginning on a date unknown and continuing to on or about April 1, 2010, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, defendants JESUS MARQUEZ-MARQUEZ (aka "Don Chuy," aka "Chuchin"), DAVID JIMENEZ-PEDROZA (aka "Oscar Manuel Guerrero"), JOSE ALFREDO JIMENEZ (aka "Jose Alfred Jimenez," aka "Joselito"), SERGIO ENRIQUE BELTRAN GUERRERO (aka "Kique"), ISAIAS SERRANO (aka "Chaias"), DAVID SILVA BENAVIDES (aka "Prieto," aka "El Negro," aka "Tocayo"), MARTIN GARCIA ANGULO (aka "Fernando Garcia," aka "King Midas"), JOSE ASCENCION GARCIA (aka "Jose G. Aispuro," aka "Chon"), ALEJANDRO PEREZ MANZO (aka "Javier," aka "Antunes"), MARGARO LNU, HUMBERTO HUBERT P. BARRAZA (aka "Beto"), SERGIO BELTRAN SARABIA (aka "El Senior"), URIEL VALDOVINOS GARCIA (aka "Chente"), JUAN ALONSO AISPURO CHAGOYA, JOSE PACHECO DURAN, SERGIO CHAVEZ PULIDO (aka "Checo"), JOSE LUIS MATA-GARCIA, ILIANA FARIAS, OCTAVIO FELIX GONZALEZ (aka "Octavio Romero"), ANSELMA VEGA ROMERO (aka "Ancelma Vega Romero"), JORGE VILLANUEVA (aka "Jesus Verdusco-Nunez," aka "Jorjon"), BASILIO MALDONADO (aka "Chilo"), JAIRO ALEJANDRO RODELA, LIZETH CARPIO HERNANDEZ, JOSE PULIDO SANCHEZ (aka "Jose Sanchez Pulido," aka "Chespiro"), ELIESER CEJA GALLEGOS, ERIKA CECILIA VALDOVINO, JOSE LUIS NUNEZ (aka "Joe"), JESUS ALVAREZ JR., JOANELLE MIRASOL DELA CRUZ (aka "Janelle"), and ALMA RODRIGUEZ, conspired to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 50 grams or more of actual methamphetamine.

---

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
        (See attached affidavit which is incorporated as part of this Complaint)

---

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

---

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT  BENNETT O. SCOTT |
| | OFFICIAL TITLE  SPECIAL AGENT -FBI |

---

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE (1) | DATE  3.30.2010 |

1) See Federal Rules of Criminal Procedure rules 3 and 54.
Angela L. Sanneman        REC:DETENTION AND ARREST WARRANT

## TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................i

AFFIDAVIT ........................................................................................................4

PURPOSE OF AFFIDAVIT...................................................................................4

    I.    Criminal Complaint and Arrest Warrants............................................4

    II.   Places To Be Searched.......................................................................5

    III.   Items To Be Seized............................................................................11

TRAINING AND EXPERIENCE ..........................................................................13

PROBABLE CAUSE .............................................................................................19

    I.    Overview of the Drug Trafficking Organization ..................................19

    II.   Basis for Facts set Forth in this Affidavit..............................................21

    III.   Identification of Target Subjects..........................................................23

    IV.   Wire Interception .................................................................................30

    V.   The Narcotics Trafficking Conspiracy.................................................31

        A.    August 10, 2009 Delivery of 6,650g of Methamphetamine (Probable Cause for 1550 RIMPAU, MARQUEZ, DAVID, BELTRAN, and SARABIA) ..............................................................................31

        B.    August 11, 2009 Seizure of 3,185g of Methamphetamine (Probable Cause for MARQUEZ, DAVID, BELTRAN, JOSELITO, FELIX, and ROMERO)..........................................................................................32

        C.    August 31, 2009 Delivery of 7 kgs of Methamphetamine (Probable Cause for MARQUEZ, DAVID, and SARABIA)..............................36

        D.    Distribution of 2 lbs of Methamphetamine in August 2009; Seizure of $443,190 on September 1, 2009 (Probable cause for 1049 N. ORANGE BLOSSOM, MARQUEZ, DAVID, BARRAZA, PULIDO and ALMA)..38

        E.    Seizure of 208.2 grams of methamphetamine on September 5, 2009 (Probable cause for MARQUEZ and RODELA) .....................................43

        F.    Collection of approximately $40,000 on September 8, 2009 & Seizure of 2,237g Methamphetamine on September 9, 2009 (Probable Cause for 1550 RIMPAU, 2275 E. LAKESIDE, MARQUEZ, DAVID, JOSELITO, and

CHILO).........................................................................45

G.      Partial Delivery of 16 kgs Cocaine on September 18, 2009 (Probable
        Cause for BELTRAN and SARABIA).........................................47

H.      Seizure of 27.5g methamphetamine on September 30, 2009 (Probable
        Cause for BARRAZA and CRUZ)............................................49

I.      Distribution of approx. 3 lbs of Methamphetamine on October 22, 2009
        (Probable Cause for 1550 RIMPAU, MARQUEZ, DAVID, JOSELITO
        and ALMA).............................................................51

J.      Seizure of 11.14 kgs Methamphetamine on October 26, 2009 (Probable
        Cause for MARQUEZ, DAVID, JOSELITO, FARIAS, MATA-GARCIA,
        PRIETO and MARGARO)...................................................56

K.      Distribution of approx. 5lbs Methamphetamine on November 7, 2009
        (Probable Cause for 19974 JUSTICE MILL, MARQUEZ, DAVID,
        JOSELITO, CHON, and MARTIN)...........................................61

L.      Seizure of 4,968g of Methamphetamine on November 11, 2009 a $4,980
        on November 17, 2009 (Probable Cause for 1094 W. 15TH STREET,
        MARQUEZ, DAVID, JOSELITO, CHECO, JAVIER, JORJON, ISAIAS,
        and ALONSO)...........................................................65

M.      Seizure of 8,917g of Methamphetamine on December 2, 2009 (Probable
        Cause for MARQUEZ, CARPIO, and ALONSO)................................72

N.      Agreement to Distribute Additional Methamphetamine and Discussion
        regarding approx. $100,000 Narcotics Debt in December 2009 (Probable
        Cause for MARQUEZ, RODELA, and ALVAREZ)...............................76

O.      Seizure of $22,420 on December 31, 2009, Which was JORJON's
        Payment Toward a Narcotics Debt owed for 1 kg and 1 lb of
        Methamphetamine (Probable Cause for 1006 LANG, 8970 SPOHN,
        JORJON, and NUNEZ)....................................................79

P.      Delivery of approx. 10kg of methamphetamine on January 20, 2010;
        Narcotics Transportation Payment of $11,500 U.S. Currency on January
        21, 2010 (Probable Cause for MARQUEZ, JOSELITO, PACHECO, and
        ERIKA)................................................................85

Q.      Collection of $28,000 on February 1, 2010; Seizure of $65,810 on
        February 1, 2010; Delivery of methamphetamine on February 1, 2010
        (Probable Cause for 10430 54th STREET, MARQUEZ, JOSELITO,
        GALLEGOS, CHENTE, PACHECO, and MARGARO)...............................89

R.      Seizure of $39,800 U.S. Currency on February 17, 2010 (Probable Cause

for MARQUEZ, JOSELITO, and CHENTE ............................................. 93

VI.   Additional Information Pertaining to SUBJECT PREMISES .............................. 95

    A.   10430 54th STREET; Narcotics/narcotics proceeds stash location; JOSELITO's residence ........................................................................... 95

    B.   19974 JUSTICE MILL; Possible narcotics/narcotics proceeds stash location; MARTIN's residence ................................................................. 96

    C.   1550 RIMPAU; Possible narcotics/narcotics proceeds stash location; ALMA and DAVID's residence ................................................. 97

    D.   The 1049 N. Orange Blossom address; Possible narcotics proceeds stash location; PULIDO's residence ................................................. 98

    E.   2275 E. LAKESIDE; CHILO's residence ................................................. 98

    F.   1006 LANG; NUNEZ's residence ............................................................. 98

    G.   10733 BREEZY MEADOW; ERIKA's residence .................................... 99

    H.   126 LINDA WAY; BARRAZA's residence ............................................. 99

    I.   421 S. FERRIS; CHON's residence ......................................................... 100

    J.   515 S. HOPE; GALLEGOS's residence .................................................. 100

    K.   8970 SPOHN; JORJON's residence ......................................................... 101

    L.   1215 W. DIAMOND; PACHECO's residence ....................................... 101

CONCLUSION .......................................................................................................... 102

## AFFIDAVIT

I, Bennett O. Scott, having been duly sworn, hereby state:

1.    I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code Section 2510(7). As such, I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.    This affidavit is intended to show that there is sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of the investigation of this matter.

## PURPOSE OF AFFIDAVIT

### I.    Criminal Complaint and Arrest Warrants

3.    This affidavit is made in support of a complaint against, and arrest warrants for Jesus ALVAREZ Jr. (hereinafter "ALVAREZ"); MARTIN Garcia Angulo, aka Fernando Garcia, aka King Midas ("MARTIN"); Humberto Hubert P. BARRAZA, aka Beto ("BARRAZA"); David Silva Benavides, aka PRIETO, aka El Negro, aka Tocayo ("PRIETO"); Juan ALONSO Aispuro Chagoya ("ALONSO"); Joanelle Mirasol DeLa CRUZ, aka Janelle ("CRUZ"); Jose PACHECO Duran ("PACHECO"); Iliana FARIAS ("FARIAS"); Octavio FELIX Gonzalez, aka Octavio Romero ("FELIX"); Elieser Ceja GALLEGOS ("GALLEGOS"); Jose Ascencion Garcia, aka Jose G. Aispuro, aka CHON ("CHON"); Jose Luis MATA-GARCIA (MATA-GARCIA); Uriel Valdovinos Garcia, aka CHENTE ("CHENTE"); Sergio Enrique BELTRAN Guerrero, aka Kique ("BELTRAN"); Lizeth CARPIO Hernandez ("CARPIO"); Jose Alfredo Jimenez, aka Jose Alfred Jimenez, aka JOSELITO ("JOSELITO"); Basilio Maldonado, aka CHILO ("CHILO"); Alejandro Perez Manzo, aka JAVIER, aka Antunes ("JAVIER"); Jesus MARQUEZ-Marquez, aka Don Chuy, aka Chuchin ("MARQUEZ"); Jose Luis NUNEZ, aka Joe ("NUNEZ"); DAVID Jimenez-Pedroza, aka Oscar Manuel Guerrero ("DAVID"); Jose PULIDO Sanchez, aka Jose Sanchez Pulido, aka Chespiro ("PULIDO"); Sergio Chavez Pulido, aka CHECO ("CHECO"); Jairo Alejandro RODELA ("RODELA"); ALMA Rodriguez ("ALMA"); Anselma Vega ROMERO, aka Ancelma Vega Romero ("ROMERO"); Sergio Beltran SARABIA, aka El Senior

4

("SARABIA"); ERIKA Cecilia Valdovino ("ERIKA"); Jorge Villanueva, aka Jesus Verdusco-Nunez, aka JORJON ("JORJON"); Margaro LNU ("MARGARO"); and ISAIAS Serrano, aka Chaias ("ISAIAS"), for violations of 21 U.S.C. § 846, 841(a)(1): Conspiracy to Possess with Intent to Distribute, and to Distribute, methamphetamine.

## II.    Places To Be Searched

4.     This affidavit is also submitted in support of search warrants for the following locations and vehicles, which are further described below, and which are collectively referred to hereinafter as the "SUBJECT PREMISES."

5.     During this conspiracy, narcotics trafficking activities occurred at various locations on various dates over the course of at least eight months. These narcotics trafficking activities are set forth chronologically in Section V ("The Narcotics Trafficking Conspiracy") below. Thus, probable cause to search a particular SUBJECT PREMISES is often set forth in more than one subsection within Section V because some of the SUBJECT PREMISES were used repeatedly for narcotics trafficking activities. Additionally, Section VI, "Additional Information Pertaining to SUBJECT PREMISES," sets forth recent investigative efforts indicating that (1) the Target Subjects remain associated with the SUBJECT PREMISES, and (2) there is probable cause to believe that the Target Subjects continue to maintain the "Items To Be Seized" at the SUBJECT PREMISES.

a.     10430 54th STREET, MIRA LOMA, CALIFORNIA (hereinafter the "10430 54th STREET") is a single story, single family residence with an attached garage located at the southwest end of Pamela Court (an unimproved road), which is an offshoot of 54th Street, in Mira Loma, California. The residence is multi-colored (to include bluish grey and brown stucco) with a brown roof. The front yard of the residence is enclosed by a rock wall (approximately 2' in height) with red brick pillars evenly spaced in the rock wall. There is a walkway that leads from Pamela Court, through the rock wall, and to the front patio and front door. The residence has a driveway that leads from Pamela Court to an attached two-car garage with a white garage door. The top of the driveway (the garage door end) is attached to a cement area that is also attached to the front porch. The numbers "0430" are located on the brown front door of the residence. The

numbers "10430" are located on a silver mailbox which is located near the intersection of Pamela Court and 54th Street. (See attached "Photograph A");

    b.  19974 JUSTICE MILL ROAD, PERRIS, CALIFORNIA (hereinafter the "19974 JUSTICE MILL") is a single family residence with a detached garage located at the end of Justice Mill Road (an unimproved road) in Perris, California. The foundation of the residence is elevated in areas and supported by support beams. The residence is light brown in color with white trim and a grey roof. There is a cement walkway (large enough to be used as a driveway) that leads to the front door of the residence. The numbers "19974" are located above the door in black. The residence also has a large sliding door that opens up to a large wooden deck. The walkway is bordered by a cinder block wall that curves around the walkway. The two-car garage with a white garage door is located on the opposite side of the cinder block wall. The garage is light grey in color with white trim and a grey roof. To the south of the detached garage is a cement driveway that leads to an outdoor carport / covered patio, which is located to the rear of the residence and detached garage. (See attached "Photograph B");

    c.  1550 RIMPAU AVENUE SPACE 166, CORONA, CALIFORNIA (hereinafter the "1550 RIMPAU") is located in the "Villa Corona" Trailer Park in Corona, California. The numbers "1550" are located at the main entrance to the trailer park. The target location is a double wide manufactured home with an attached two-car garage. The residence is white in color with green trim and a brown composite roof. The numbers "166" are located on a black mail box near the front lawn of the residence. The door to the residence is located on the north side of the residence. (See attached "Photograph C");

    d.  1049 N. ORANGE BLOSSOM AVENUE, LA PUENTE, CALIFORNIA (hereinafter "1049 N. ORANGE BLOSSOM") is a single story, single family residence, with a detached two-car garage, located on the southwest corner of N. Orange Blossom Avenue and N. Feather Avenue in La Puente, California. The residence is white in color with bluish white trim and grey roof. The front of the property is enclosed by a cinder block and black wrought iron fence. The residence has a driveway that leads from N. Orange Blossom Avenue to the detached garage with a greenish garage door. There is a cement walkway that leads from N. Orange

Blossom Avenue, through the properties perimeter fence, and to the front door of the residence. The front door of the residence is secured by a black security screen that faces toward Orange Blossom Avenue. The numbers "1049" are painted on the curb of Orange Blossom Avenue where the walkway to the front door begins. (See attached "Photograph D");

e.   2275 E. LAKESIDE PLACE APARTMENT #206, CORONA, CALIFORNIA (hereinafter "2275 E. LAKESIDE") is located in the Deerwood Apartment complex in Corona, California. "2275 E. Lakeside Place" is printed on a sign to the front of the complex. Apartment #206 is located on the southeast part of the complex. The apartment building is multi-colored grey, tan, and a rust color, with a brown trim and a reddish brown tile roof. The apartment is located on the second floor and a rust colored stairway leads to the apartment door. The numbers "206" are posted on the east facing wall at the bottom of the stairs leading up to the apartment. The numbers "2275" are posted on the wall of the building. The front door of the residence is rust colored and faces east.   There is a small landing located at the top of the stairs. The apartment also has a patio with a glass sliding door that faces north. (See attached "Photograph E");

f.   1006 LANG AVENUE, LA PUENTE, CALIFORNIA (hereinafter "1006 LANG") is a single story, single family residence, with a two-car garage, located in the vicinity of the Shaver Street and Lang Avenue intersection in La Puente, California. The residence is beige in color with brown trim and brown roof. The residence has a driveway that leads from Lang Avenue to the attached garage with a white garage door. A pinkish cinder block wall lines the northern side of the driveway and separates the property from the property to the north. There is a cement walkway that leads from the top of the driveway (the garage door end) to the front porch and front door. There is also a walkway that leads from the Lang Avenue sidewalk that meets with the walkway from the garage in the vicinity of the front porch and front door. The numbers "1006" are painted on the curb of Lang Avenue where the southern part of the driveway meets with the street. (See attached "Photograph F");

g.   10733 BREEZY MEADOW DRIVE, MORENO VALLEY, CALIFORNIA (hereinafter "10733 BREEZY MEADOW") is a two story, single family residence with a three-car garage located in Moreno Valley. The residence is tanish beige in color with brown trim and

a tanish brown roof. The residence has a driveway that leads from Breezy Meadow Drive to the attached three-car garage. The three-car garage is comprised of a white single-car garage door and a white two-car garage door. There is a cement walkway that leads from the top of the driveway (the garage door end) to the front door of the residence. The numbers "10733" are also attached to the brown trim in the vicinity of the southern end of the garage in tan. The numbers "10733" are also painted on the curb of Breezy Meadow Drive where the southern part of the driveway meets with the street. (See attached "Photograph G");

h. 126 LINDA WAY APARTMENT #108, UPLAND, CALIFORNIA (hereinafter "126 LINDA WAY") address is an apartment located in the "Linda Vista" apartment complex on the first floor of a two story apartment building in Ontario, California. The apartment building is labeled "126" and is located at the end of Linda Way, which is a cul-de-sac. The numbers "126" are posted in front of the building and face south. The building is tan in color with brown trim and a brown roof. The front door of the residence is located on the east side of the building, is brown in color, and faces south. The numbers "108" are posted on the brown trim, below the numbers "208," on the eastside wall leading up to the apartment. (See attached "Photograph H");

i. 421 S. FERRIS AVENUE, LOS ANGELES, CALIFORNIA (hereinafter "421 S. FERRIS") is a single story, single family residence, with a detached garage (in the rear of the residence) located in Los Angeles, California. The residence is light grayish blue color with white trim and a grey roof. The front of the property is enclosed by a white wrought iron fence with brick pillars. The residence has a driveway that leads from S. Ferris Avenue, past the residence, to a detached garage with a bluish colored door at the rear of the property. There is a walkway that leads from the S. Ferris Avenue sidewalk, through a wrought iron fence gate, to the front porch and front door. The front porch is lined with a black wrought iron fence. The front door of the residence is secured with a black security screen. The numbers "421," in white, are located on the wrought iron fence supports for the front porch. The numbers "421" are also painted on the curb of S. Ferris Avenue where the northern part of the driveway meets with the street. (See attached "Photograph I");

8

      j.   515 S. HOPE AVENUE, ONTARIO, CALIFORNIA (hereinafter "515 S. HOPE") is a single story, single family residence, with a one-car garage (to the front of the residence) located in Ontario, California. The residence is yellowish in color with white trim and a brown roof. The front of the property is enclosed by a chain link fence. The residence has a driveway that leads from S. Hope Avenue, through a chain link fence vehicle gate, and to the attached one-car garage, with a white garage door. There is a walkway that leads from S. Hope Avenue, through the S. Hope Avenue sidewalk, through a chain link fence pedestrian gate, to the front door. The numbers "515" are in black above the front door on the white trim of the roof. (See attached "Photograph J");

      k.   8970 SPOHN DRIVE, FONTANA, CALIFORNIA (hereinafter "8970 SPOHN") is a single story, single family residence, with a two-car garage, located on the northwest corner of the intersection of Granada Avenue and Spohn Drive in Fontana, California. The residence is tan in color with white trim and a grey roof. The residence has a driveway that leads from Granada Avenue to the attached two-car garage, with a white garage door. There is a cement walkway that leads Spohn Drive to the front porch and front door. There is a mailbox with a cinder block base located where the cement walkway and Spohn Drive meet. The front door is secured by a white security screen door. The numbers "8970" are painted on the curb of Spohn Drive to the front of the residence. (See attached "Photograph K");

      l.   1215 W. DIAMOND STREET APARTMENT #4, ANAHEIM, CALIFORNIA (hereinafter "1215 W. DIAMOND") is an apartment located in an apartment complex comprised of three buildings in Anaheim, California. The building containing the 1215 W. Diamond #4 address is a two-story building that runs east / west and is the most northern building of the three buildings. Apartment 4 is located on the second floor of the two-story building. The apartment building is located between the addresses 1201 and 1221 W. Diamond Street. The building is beige in color with white trim. There is a staircase that leads up to the second floor, and apartment 4 is the second apartment door west of the aforementioned staircase. The front door of the apartment is white in color and has the number "4" in black. There is a white security door that covers the front door. The front door faces south toward Diamond

Street. The front of the apartment complex has enclosed garages with white doors on the southeast side of the property. The garage doors face south toward Diamond Street. To the rear of the apartment complex is an alley that is configured in an east / west direction. In that alley is a black wrought iron security gate leading into the apartment complex. On the iron gate are the numbers "1215" in gold font. (See attached "Photograph L");

m.   The silver 2003 Lincoln Sport Utility Vehicle bearing California license plate 6HEK357 is a vehicle utilized by BARRAZA. (See attached "Photograph M");

n.   The green 1998 Ford Sport Utility Vehicle bearing California license plate 5ZYN471 is a vehicle utilized by GALLEGOS. (See attached "Photograph N");

o.   The green 1999 Dodge four-door sedan bearing California license plate 4CVU622 is a vehicle utilized by JOSELITO. (See attached "Photograph O");

p.   The black 2008 GMC Sport Utility Vehicle bearing California license plate 6HLW889 is a vehicle utilized by NUNEZ. (See attached "Photograph P");

q.   The black 2002 Ford truck bearing California license plate 7S41892 is a vehicle that has been used by DAVID (hereinafter, "DAVID'S TRUCK"). (See attached "Photograph Q");

r.   The silver 1999 Lincoln Sport Utility Vehicle bearing California license plate 4HMV158 is a vehicle utilized by ERIKA. (See attached "Photograph R");

s.   The silver 2000 Dodge van bearing California license plate 6CBK589 is a vehicle utilized by CHON. (See attached "Photograph S");

t.   The red 2005 Ford Sport Utility Vehicle bearing California license plate 5PCT179 is a vehicle utilized by CHILO. (See attached "Photograph T");

u.   The white 1998 Nissan four-door bearing California license plate 5ZFE469 is a vehicle utilized by CHON;

v.   The silver 2003 Toyota four-door bearing California license plate 6JYJ498 is a vehicle utilized by JORJON;

w.   The white 1994 Jeep Sport Utility Vehicle bearing California license plate 5LWA049, a vehicle associated with 1550 RIMPAU, 10430 5TH STREET, and 4948 Rutile

Street, Riverside, CA (CHECO's former residence) (hereinafter, the "1994 JEEP"). (See attached "Photograph U");

     x.  I also request permission to search the vehicles at the SUBJECT PREMISES listed in paragraphs a through l above that the residents of the locations have access to, provided that prior to searching said vehicle, it is confirmed that said vehicle is registered to, owned by, possessed by, used by, or otherwise under the control of, an individual residing at the SUBJECT PREMISES.

     y.  Regarding the SUBJECT PREMISES described in paragraphs a though l above, I also request permission to search outbuildings, such as garages, carports and sheds to which the residents of the locations have access.

     6.  The SUBJECT PREMISES, also described in Attachment A, are believed to contain evidence, fruits, and instrumentalities of the following crimes: Conspiracy to possess with intent to distribute controlled substances, possession with intent to distribute, and distribution of, controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846; Unlawful use of a communication facility to facilitate an illegal drug trafficking offense in violation of 21 U.S.C. § 843(b); Importation of a controlled substance into the United States, in violation of 21 U.S.C. § 952; Conspiracy to import a controlled substance into the United States, in violation of 21 U.S.C. § 963; and Conspiracy to launder monetary instruments and laundering of monetary instruments in violation of 18 U.S.C. §§ 1956 and 1957.

## III.   Items To Be Seized

     7.  The following are the items to be seized from the SUBJECT PREMISES, which I believe constitute the fruits, instrumentalities, and evidence of violations of the Target Offenses:

     a.   Any controlled substance;

     b.   Paraphernalia commonly associated with the manufacture and packaging for sale or the transportation of controlled substances, to include cutting agents and diluents, chemical testing devices, packaging materials such as glycine or plastic bags, tupperware, cellophane, heat sealers, triple beam scales and other weighing devices, measuring devices, strainers, boxes, and compression devices;

    c.      Cash over $2,000 and stored-value cards;

    d.      Items used in the packaging of currency for consolidation and transportation, such as money counting machines, money wrappers, rubber bands, duct or wrapping tape, and plastic sealing machines;

    e.      Bank account records, wire transfer records, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances;

    f.      Drug or money ledgers, drug distribution or customer lists, correspondence, notations, logs, receipts, journals, books, records and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

    g.      Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents and other items reflecting names, addresses, telephone numbers, or communications of members and associates involved in drug trafficking activities.

    h.      Documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals and stones, jewelry or other items obtained with the proceeds of drug trafficking activities;

    i.      Records of off-site storage locations, including safe deposit box keys, records, receipts and rental agreements for storage facilities;

    j.      Telephones, including cellular telephones, pagers, beepers, answering machines, and other communication devices which evidence participation in drug trafficking and/or money laundering activity;

    k.      Records, items and documents reflecting travel for the purpose of participating in drug trafficking or money laundering activities, including passports, airline tickets, vehicle rental receipts, DMV registration and ownership records, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

12

l.     Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition silencers, components of firearms including components or tools which can be used to modify firearms, ammunition and ammunition components including gunpowder, primers, bullets, shells, wads, shot, and the tools used for the manufacture of ammunition including reloading devices, dies, scales, books, pamphlets and documentation, which may be used to facilitate money laundering and drug trafficking activities; and

m.     Indicia of occupancy, residency or ownership of the premises and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease of rental agreements, addressed envelopes, escrow documents and keys.

## TRAINING AND EXPERIENCE

8.     I am a Special Agent (SA) of the Federal Bureau of Investigation (FBI) and have been so employed since January 2006.  I am currently assigned to the Southern California Drug Task Force/High Intensity Drug Trafficking Area (SCDTF/HIDTA) in Los Angeles, California. The SCDTF/HIDTA conducts major narcotics investigations and is comprised of Special Agents from the FBI, Drug Enforcement Administration (DEA), the Bureau of Immigration and Customs Enforcement (ICE), the Internal Revenue Service (IRS), and local law enforcement personnel designated as Task Force Officers (TFOs).

9.     I have participated in investigations concerning the identification of co-conspirators through the use of telephone records and bills, financial records, photographs, and other documents.  I have directed and assisted in the handling of confidential sources to successfully infiltrate various-sized narcotics enterprises via intelligence gathering, participation in consensual recordings, and the monitored purchase of a controlled substance.  I have also participated in debriefings of cooperating defendants.  I have executed search warrants for controlled substances and I have conducted physical and electronic surveillance in connection with narcotics investigations.  I have also conducted investigations in which I have used Global

Positioning System (GPS) information to locate and track persons who are the subjects of criminal investigations.

10.     Based on my experience and training with the FBI, I am familiar with the methods utilized in narcotics-trafficking operations and the trafficking patterns employed by narcotics organizations. I have also spoken with agents, as well as other law enforcement officers, about their experiences and the results of their investigations and interviews. I am knowledgeable in the methods and modes of narcotics operations and the language patterns of narcotics trafficking. I have become familiar with the methods of operation typically used by narcotics traffickers. I know that narcotics traffickers often require the use of one or more telephone facilities to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing controlled substances and for arranging the disposition of proceeds from the sale of controlled substances. I know that professional narcotics operations depend upon maintaining timely long-distance and local contacts with the original suppliers and those down the organizational chain to the local traffickers. The telephone enables narcotics traffickers to maintain contact with narcotics associates, narcotics suppliers, and narcotics customers. I also know that narcotics traffickers often use fraudulent information to subscribe to communication facilities, especially cellular telephones, and frequently change communications facilities to thwart law enforcement efforts to intercept their communications. I also know that narcotics traffickers frequently use pre-paid telephones with misleading subscriber information as a way of insulating themselves from criminal liability.

11.     Based on my training, experience, my conversations with other law enforcement officers, and my knowledge of this investigation and others, I am aware of the following:

a.     Individuals involved in narcotics trafficking often use various locations to serve different functions so that customers, thieves, and law enforcement do not learn about any one location where large quantities of narcotics, money, and/or other drug-related assets are stored. Therefore, one or more locations are often used to store lesser amounts of narcotics, money, and/or drug-related assets, and additional locations are used to meet customers.

14

b.   Narcotics traffickers often continue their criminal activity indefinitely. Narcotics traffickers begin trafficking in small quantities of narcotics. As they develop their customer base and their supply contacts, they are able to deal in larger quantities of narcotics. Thus, those who are trafficking in large quantities of narcotics (i.e. pounds of methamphetamine) are not new to the business, but have established their contacts and customers over months or years.

c.   Drug trafficking is an ongoing or continuing criminal enterprise and narcotics traffickers will frequently keep records, documents, and other evidence pertinent to their drug trafficking activities at their residence and areas associated with their residence, even if they do not keep narcotics at these locations.

d.   Individuals involved in narcotics trafficking often conceal evidence of their drug trafficking in their residences, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings. They also conceal evidence in vehicles, including vehicles outside of their residences, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.

e.   Individuals involved in narcotics trafficking often use vehicles to hide and transport narcotics and/or narcotics proceeds, as well as using them to conduct their narcotics and/or narcotics proceeds transactions. It is common practice for narcotics traffickers to install hidden compartments in their vehicles in order to store and transport narcotics and/or narcotics proceeds.

f.   Individuals involved in narcotics trafficking will sometimes rent storage lockers to store narcotics. These traffickers often have in their immediate possession or in their residences, keys, receipts, and other documents evidencing the rental of said storage lockers.

g.   Individuals involved in narcotics trafficking often keep quantities of narcotics and/or narcotics proceeds in their residences, garages, outbuildings, storage areas, carports, and in the residences of friends or relatives, in their vehicles, and in other areas to which the traffickers have ready access.

h.      Individuals involved in narcotics trafficking commonly use certain paraphernalia to package and prepare controlled substances for distribution (such as tupperware, cellophane, heat sealers, gylcine or plastic baggies, latex gloves, cutting agents and dilutents, chemical testing devices, triple beam scales and other weighing devices, measuring devices, strainers, compression devices, etc.). Individuals involved in narcotics trafficking commonly store these items in their residences, garages, outbuildings, storage areas, carports, and in the residences of friends or relatives, in their vehicles, and in other areas to which the traffickers have ready access.

i.      Individuals involved in narcotics trafficking commonly provide narcotics to trusted distributors in their organization on credit, and commonly obtain narcotics from their suppliers on credit. Therefore, I am aware that individuals involved in narcotics trafficking maintain books, records, customer lists, receipts, notes, ledgers and other papers relating to the transportation, receipt, ordering, sales, and distribution of narcotics, narcotics proceeds, and equipment, and that such documents may be in code to thwart law enforcement detection. The aforementioned books, records, receipts, notes, ledgers, correspondence, etc., are commonly maintained where the narcotics traffickers have ready access to them, i.e., homes, offices, and automobiles.

j.      Individuals involved in narcotics trafficking frequently continue their criminal activity indefinitely. Narcotics traffickers keep records of their illegal activities for a period of time extending beyond the time during which they actually possesses controlled substances, in order to maintain contact with criminal associates for future narcotic transactions, and to have records of prior transactions for which, for example, they might still be owed narcotics proceeds, or might owe someone else money.

k.      Individuals involved in narcotics trafficking use telephones, portable cellular telephones, pagers and other communication devices, and maintain in their residences or vehicles telephone and address books, telephone bills, and other books and papers which reflect, among other things, the names, addresses, and/or telephone numbers of their customers, co-conspirators, and associates in the Drug Trafficking Organization, even if said items are in code.

16

l.     Narcotics traffickers possess DMV registration and ownership records of "load cars" used to transport narcotics; and that these items are maintained and kept by the narcotics trafficker in much the same way legitimate businesses will maintain their "tools of the trade," whether or not there is contraband in the vehicle on a given day.

m.     Individuals involved in narcotics trafficking sometimes have in their possession, that is, on their persons, at their residence and/or at their stash houses, firearms, including handguns, pistols, revolvers, rifles, shotguns, machine guns and/or other weapons, as well as ammunition and ammunition components, that are used to protect and secure the narcotic traffickers' property.

n.     Individuals involved in narcotics trafficking generally sell narcotics for cash proceeds.  Therefore, narcotics traffickers typically may have thousands of dollars in cash on hand both as proceeds of sales, to purchase their own supplies, and profits from their narcotics trafficking activities (such as profits from sales or profits from the transportation of narcotics or narcotics proceeds).  In addition, narcotics traffickers often have other assets generated by their narcotics business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.  Narcotics traffickers often keep these items, and records reflecting their purchase or sale such as automobile titles or deeds to property, as well as evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in drug trafficking activities in their residences, offices, garages, storage buildings, automobiles, and safe deposit boxes.

o.     Individuals involved in narcotics trafficking often launder money obtained through illegal drug transactions through legitimate businesses.  Traffickers who are involved in such money laundering often structure financial transactions to avoid reporting requirements, and often keep records of their activities and financial transactions.  To escape detection, however, they mix and intermingle those records with records of lawful transactions.  In such instances, it is necessary to analyze the entire record to isolate the records of unlawful transactions, and is not feasible to extract the records of unlawful activities without such analysis.

p. Additionally, when narcotics traffickers amass large quantities of cash from the sale of narcotics, they will sometimes attempt to legitimize these profits through the use of banks and financial institutions and their services, including accounts, securities, traveler's checks, cashiers' checks, money orders, wire transfers, certificates of deposit, and safe deposit boxes. Records from such transactions are often maintained in residences, offices, garages, storage buildings, automobiles, and safe deposit boxes.

q. Unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

r. Individuals involved in narcotics trafficking organizations that operate both in the United States and Mexico, will frequently transport bulk quantities of their illicit proceeds from the United States into Mexico. Narcotics traffickers will commonly use vehicles with hidden compartments to transport their narcotics proceeds from the United States into Mexico. Additionally, I have also learned from other law enforcement personnel who are experienced in narcotics investigations that narcotics traffickers will also transfer large amounts of their illicit proceeds onto one or more stored-value cards so that they can inconspicuously transport these large sums in the United States and from the United States to Mexico.

s. Individuals involved in narcotics trafficking often place assets in names of relatives and close friends in order to avoid detection of those assets by law enforcement; and that even though these assets are in other persons' names, the narcotics traffickers retain records, documents, and deeds reflecting the purchase of those assets, while continuing to use those assets and exercise dominion and control over them.

t. It is common practice for narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking; after purchasing narcotics, narcotics traffickers will transport or cause to be transported narcotics and/or narcotics proceeds for further distribution; methods of transportation include rental and private automobiles, and government and contract mail carriers.

u. Narcotics traffickers typically will obtain and distribute controlled substances on a regular basis, much as any distributor of a legitimate commodity would purchase

18

stock for sale such narcotics traffickers will also have an "inventory" which will fluctuate in size depending on the demand for the product.

        v.      Narcotics traffickers will often secret controlled substances and narcotics proceeds in hidden compartments or manufactured spaces, to include within the walls of their residences and garages, within furniture contained in their residences, etc.

## PROBABLE CAUSE

### I.    Overview of the Drug Trafficking Organization

      12.    Based on my training, experience, and my knowledge of this investigation, I believe the following regarding the Jesus Marquez-Marquez, aka Don Chuy, Drug Trafficking Organization (hereinafter "DON CHUY DTO") described in this affidavit:

      13.    MARQUEZ is a large-scale Mexico-based methamphetamine source of supply and the overall leader of the DON CHUY DTO.  MARQUEZ primarily coordinates for the transportation, importation, and delivery of methamphetamine to distributors located in the United States.  MARQUEZ also coordinates for the collection, transportation, and exportation of narcotics proceeds from the United States to Mexico.  MARQUEZ is assisted with the Mexico side of the DON CHUY DTO operations by ISAIAS.

      14.    As leader of the DON CHUY DTO, MARQUEZ coordinates with DON CHUY DTO narcotics transporters or contract narcotics transporters for the importation of DON CHUY DTO methamphetamine from Mexico to DAVID and/or JOSELITO in the United States.  The narcotics transporters used by the DON CHUY DTO include, but are not limited to:

      15.    The Sergio Enrique Beltran, aka Kique, Narcotics Transportation Organization (hereinafter "KIQUE NTO") is lead by BELTRAN, and is further comprised of at least SARABIA, FELIX, and ROMERO.  The KIQUE NTO is responsible for the transportation of methamphetamine from Mexico to the United States for MARQUEZ.  I also believe that the KIQUE NTO was responsible for the transportation of cocaine for at least one other DTO. Seizures and intercepted communications in this investigation have revealed that the KIQUE NTO used vehicle batteries containing hidden compartments to transport narcotics, to include at least methamphetamine and cocaine, across the U.S. / Mexico border.

16.     ALONSO and CARPIO are narcotics transporters used by the DON CHUY DTO to transport multi-kilogram quantities of methamphetamine from Mexico into the United States.

17.     Around December 2009, due to law enforcement's cumulative actions taken against the KIQUE NTO, ALONSO, and CARPIO, MARQUEZ began to coordinate with a second DTO that was comprised of at least PACHECO and ERIKA, to import DON CHUY DTO methamphetamine on behalf of MARQUEZ and deliver the methamphetamine to DAVID and JOSELITO.

18.     The DON CHUY DTO also used CHECO on at least one occasion to transport methamphetamine within the United States.

19.     DAVID was the primary distributor of DON CHUY DTO methamphetamine in the United States. DAVID oversaw the receipt of methamphetamine loads in the United States that are sent by MARQUEZ from Mexico. DAVID oversaw the distribution of the methamphetamine to DON CHUY DTO secondary distributors / distribution cells. DAVID also oversaw the receipt of narcotics proceeds from secondary distributors / distribution cells, and coordinated with MARQUEZ for the transportation of such narcotics proceeds back to Mexico for MARQUEZ. DAVID was assisted in his narcotics trafficking activities by his brother, JOSELITO, who manages the DON CHUY stash locations. However, in January 2010, DAVID was arrested attempting to enter the United States with a fake Visa. JOSELITO subsequently took over DAVID's role as the primary distributor for the DON CHUY DTO in the United States.

20.     Furthermore, DAVID's significant other, ALMA, was aware of DAVID and JOSELITO's narcotics trafficking activities and helped to facilitate such activities.

21.     Once DON CHUY DTO methamphetamine was received by DAVID and/or JOSELITO in the United States from DON CHUY DTO narcotics transporters or contract narcotics transporters, DAVID and JOSELITO would distribute the methamphetamine to secondary distributors / secondary distribution cells to include, but not limited to:

22.     The one to two pound methamphetamine distribution cell lead by BARRAZA, which also includes at least one other co-conspirator and is based out of the Southern California

area.  On at least one occasion, BARRAZA also intended on supplying methamphetamine to CRUZ.

23.     The multi-pound methamphetamine distribution cell led by MARTIN and CHON, which also includes at least one other co-conspirator and is based out of the Southern California area.

24.     The multi-pound/kilogram methamphetamine distribution cell led by PRIETO, which also includes MATA-GARCIA, FARIAS, MARGARO, and other co-conspirators and is based out of Washington State.

25.     The kilogram to multi-kilogram methamphetamine distribution cell lead by JORJON, which also includes at least one other co-conspirator and is based out of the Southern California area.  Furthermore, in addition to being a member of the DON CHUY DTO, JORJON was also supplied with methamphetamine by a second Drug Trafficking Organization, which included NUNEZ.

26.     The half-pound to multi-pound methamphetamine distribution cell lead by RODELA, which also includes ALVAREZ and is based out of the Bakersfield, California area.

27.     The multi-pound methamphetamine distribution cell, which includes CHILO.

28.     The multi-pound/kilogram distributor JAVIER, who is based out of the Fresno/Turlock, California, area.

29.     As part of the on-going conspiracy, the secondary distributors / distribution cells, to include those listed above, and others, would in turn deliver narcotics proceeds to DAVID and/or JOSELITO as payment for DON CHUY DTO methamphetamine previously distributed to such distributors / distribution cells.  DAVID and/or JOSELITO would then coordinate with MARQUEZ and DON CHUY DTO narcotics proceeds transporters, to include but not limited to the following, to export the narcotics proceeds into Mexico:  CHECO, PULIDO, CHENTE, and GALLEGOS.

II.     **Basis for Facts set Forth in this Affidavit**

30.     I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation.

Conclusions I have reached are based on my training, experience, and upon information I believe to be reliable from the following sources:

    a.  Oral and written reports about this and other investigations, which I have received from federal agents and local law enforcement officers;

    b.  Physical surveillance conducted by federal agents and/or local law enforcement officers, the details of which have been reported to me either directly or indirectly;

    c.  Telephone records, including toll records, and subscriber information;

    d.  Law enforcement and public databases and records;

    e.  Interviews;

    f.  Statements of a co-conspirator;

    g.  GPS information; and

    h.  Wire intercepts.

31.    Unless otherwise noted, when I assert that a statement was made, I have personal knowledge of the information or I received the information from a law enforcement officer who provided the information to me, either verbally or in a written report. The officer had personal knowledge of the information or received it from another law enforcement officer with personal knowledge of the information.

32.    Based on my training, experience, and knowledge of this investigation and others, I am aware that narcotics traffickers often use coded language to refer to narcotics, the quantity of narcotics, the quantity per unit of narcotics, the quality of narcotics, stash locations, narcotics proceeds and/or the quantity of narcotics proceeds in an attempt to thwart law enforcement wiretap operations. Members of the DON CHUY DTO, the KIQUE NTO, and other co-conspirators, commonly used vague or coded terms in their conversations to discuss their narcotics trafficking activities. In describing the conversations contained in this affidavit, I have provided explanations for such terms or phrases in parentheses. The parenthetical explanations are based on my training, experience, knowledge of this investigation and others, a review of transcribed wire intercepts or summaries of them, and/or the training, experience, and knowledge of other law enforcement members.

### III.   Identification of Target Subjects

33.     Discussed in detail below are various intercepted calls made by the Target Subjects. The intercepted calls were assigned to a particular Target Subject through (a) voice identification and (b) repeated use of telephones associated with a particular Target Subject. The Target Subjects discussed below were further identified and linked to intercepted calls through a variety of means, to include, but not limited to: physical surveillances, traffic stops, identification by surveillance officers and sources of information, Department of Motor Vehicle records, public database records, wire intercepts, business records, analysis of telephone records, GPS information, interviews, and the following investigative means:

34.     ALMA was identified through wire interception indicating that ALMA lived with DAVID at 1550 RIMPAU; wire interception indicating that the user of the telephone that ALMA was intercepted using was named "Alma"; and the Costco membership of ALMA and DAVID associated with 1550 RIMPAU, which contained ALMA's photograph. Probable cause to arrest ALMA is set forth in Section V(D) and (I) below;

35.     ALONSO was identified through GPS information from a telephone that ALONSO was intercepted using that led to a CHP traffic stop involving ALONSO on December 2, 2009, which resulted in the seizure of 8,917g of methamphetamine from the vehicle in which ALONSO was a passenger. As a result of the traffic stop, ALONSO was identified through identification cards. Probable cause to arrest ALONSO is set forth in Section V(L) and (M) below;

36.     ALVAREZ was identified through a voice comparison conducted by DEA SA Jay Both. On December 19, 2009, as referenced below, ALVAREZ was intercepted talking with MARQUEZ over 117*493*691. In February 2010, Sprint Nextel subscriber information associated 117*493*691 with telephone number 661-343-6552 and indicated that the account was activated on December 12, 2009. Also in February 2010, based on my conversations with SA Both, I learned that ALVAREZ was a target of a narcotics investigation including a California Wire intercept in 2006, for which ALVAREZ was eventually arrested. On March 4, 2010, SA Both called ALVAREZ's telephone number (661) 343-6552 and, through voice

23

comparison, confirmed that user of the phone was ALVAREZ. Probable cause to arrest ALVAREZ is set forth in Section V(N) below;

37.    BARRAZA was identified through a surveillance operation paired with GPS information from Target Telephone #2, which resulted in surveillance photographs of BARRAZA; surveillance operations where BARRAZA was driving the vehicle bearing California license plate 6HEK357, which was registered to Humberto H. Barraza and Norberta P. Barraza; and wire interception paired with surveillance of activity discussed on intercepted calls which resulted in the CHP traffic stop of BARRAZA on September 30, 2009, which resulted in the seizure of 27.5g of methamphetamine, during which BARRAZA provided a California identification card and was found to be in possession of Target Telephone #5. Probable cause to arrest BARRAZA is set forth in Section V(D) and (H) below;

38.    BELTRAN was identified through surveillance operations, paired with GPS information from a telephone that BELTRAN was intercepted, in which law enforcement identified the user of the telephone as using the vehicle bearing California license plate 8V53151, which was registered to Sergio Enrique Guerrero, and GPS information from a telephone that BELTRAN was intercepted using paired with surveillance operations on August 14, 2009 that resulted in the photographic identification of BELTRAN by a law enforcement surveillance officer on August 17, 2009. Probable cause to arrest BELTRAN is set forth in Section V(A), (B), and (G) below;

39.    CARPIO was identified through border crossing information associated with the narcotics transportation vehicle bearing California license plate 5KSR526, which was registered to Lizeth CarpioHernandez, and a CHP traffic stop of the same vehicle on December 2, 2009. The CHP positively identified the driver as CARPIO by the Texas driver's license that she presented and the fact that the car she was driving was registered to her. Law enforcement seized 8,917g of methamphetamine from her vehicle. Probable cause to arrest CARPIO is set forth in Section V(M) below;

40.    CHECO was identified through wire interception paired with GPS information from a telephone that CHECO was intercepted using that resulted in the CHP traffic stop of

24

CHECO on November 11, 2009, which resulted in the seizure of 4,968g of methamphetamine and $4,980 U.S. Currency. As a result of the traffic stop, CHECO was identified through an interim driver license document and a Social Security card. Probable cause to arrest CHECO is set forth in Section V(L) below;

41.     CHENTE was identified through wire interception paired with surveillance of activities discussed on intercepted calls on December 14, 2009, which resulted in surveillance photographs of CHENTE, and through GPS information from a telephone that CHENTE was intercepted using paired with surveillance operations that resulted in the CHP traffic stop of CHENTE on February 17, 2010, which further resulted in the seizure of $39,800 U.S. Currency. As a result of the traffic stop, CHENTE was identified based on a California driver's license provided by CHENTE. Probable cause to arrest CHENTE is set forth in Section V(Q) and (R) below;

42.     CHILO was identified through wire interception paired with surveillance operations that led to the San Bernardino County Sheriff traffic stop of CHILO on September 9, 2009, which resulted in the seizure of 2,237g of methamphetamine. As a result of the traffic stop, CHILO was identified based on a California driver's license provided by CHILO and was found to be in possession of a telephone that CHILO was intercepted over. Probable cause to arrest CHILO is set forth in Section V(F) below;

43.     CHON was identified through GPS information from a telephone that CHON was intercepted using paired with surveillance operations that identified CHON as living at 421 S. FERRIS; surveillance operations conducted at 421 S. FERRIS paired with GPS information that resulted in a surveillance photograph of CHON, and through surveillance operations paired with a traffic stop of the same individual (CHON) on December 14, 2009. As a result of the traffic stop, CHON identified himself as Jose Ascencion Garcia and signed the citation as Jose G. Aispuro. Probable cause to arrest CHON is set forth in Section V(K) below;

44.     CRUZ was identified through wire interception of telephone number 714-404-9283 that CRUZ was intercepted using indicating that the user was named "Janelle" and lived in the vicinity of Lampson Avenue and Beach Boulevard; Sprint Nextel subscriber information

25

from 714-404-9283 identifying the subscriber as Joan Dela Cruz at 8331 Lampson Ave #19,
Garden Grove, CA; database research; utility information for 8331 Lampson Ave #19, Garden
Grove, CA, identifying the subscriber as Jonelle De La Cruz and the primary phone number as
714-404-9283; the California driver's license for Joanelle Mirasol Dela Cruz associating her with
an address of 8331 Lampson Ave #19, Garden Grove, CA; and a telephone conversation I had
with the user of telephone number 714-788-7937, where the user indicated that she was the
cousin of Joanelle Dela Cruz. Probable cause to arrest CRUZ is set forth in Section V(H) below;

45.     DAVID was identified through GPS information from telephones used by DAVID
paired with surveillance operations which resulted in surveillance photos of DAVID on two
occasions; the Costco membership of ALMA and DAVID associated with 1550 RIMPAU, which
included a photograph of DAVID; and wire interception paired with DAVID's arrest at the San
Ysidro Port of Entry on January 15, 2010, for attempting to enter the United States with a
counterfeit Visa. Probable cause to arrest DAVID is set forth in Section V(A), (B), (C), (D), (F),
(I), (J), (K), and (L) below;

46.     ERIKA was identified through GPS information from a telephone that ERIKA
was intercepted using indicating that ERIKA lived at 10733 BREEZY MEADOW; wire
interception indicating the user of the telephone that ERIKA was intercepted using was named
"Erika"; and a California driver license photographic identification made by a law enforcement
surveillance officer during surveillance operations at 10733 BREEZY MEADOW on March 9,
2010. Probable cause to arrest ERIKA is set forth in Section V(P) below;

47.     FARIAS was identified through wire interception paired with surveillance
observations; AM/PM security camera footage which captured FARIAS; and a California
driver's license photographic identification made by law enforcement surveillance personnel
pertaining to the seizure of methamphetamine on October 26, 2009. Probable cause to arrest
FARIAS is set forth in Section V(J) below;

48.     FELIX was identified through an analysis of border crossing information
associated with FELIX, ROMERO, and the vehicle bearing Mexico license plate BN-35-217;
wire interception paired with surveillance of activity discussed on intercepted calls that resulted

26

in the CHP traffic stop of the vehicle bearing Mexico license plate BN-35-217 on August 11, 2009, which FELIX was found to be a passenger of and that led to the seizure of 3,185g of methamphetamine.[1]   Probable cause to arrest FELIX is set forth in Section V(B) below;

49.   GALLEGOS was identified through wire interception paired with surveillance of activity discussed on intercepted calls that lead to the CHP traffic stop of GALLEGOS on February 1, 2010, which lead to the seizure of $65,810.  As a result of the traffic stop, GALLEGOS was identified based on a California driver's license provided by GALLEGOS. Probable cause to arrest GALLEGOS is set forth in Section V(Q) below;

50.   ISAIAS was identified through a wire intercept on November 29, 2009.  During the wire intercept, a third party asked if the user of the phone was "Isaias Serrano" and ISAIAS confirmed.[2]   Probable cause to arrest ISAIAS is set forth in Section V(L) below;

51.   JAVIER was identified through wire interception paired with surveillance of activities discussed on intercepted calls that lead to the Turlock Police Department traffic stop of a vehicle occupied by JAVIER on December 15, 2009, during which JAVIER was identified by a Mexico driver's license.  JAVIER's identification was also corroborated by a prior Sacramento Police Department traffic stop of JAVIER on October 15, 2009, during which JAVIER was identified by a Mexico driver's license.  Probable cause to arrest JAVIER is set forth in Section V(L) below;

52.   JOSELITO[3] was identified through wire interception paired with surveillance of activities discussed on intercepted calls; wire intercepts indicating that the user of telephones

---

[1.]  Based on border crossing information, I obtained a photograph of FELIX.  The photograph was subsequently emailed to the CHP Officer's present during the stop of ROMERO and FELIX.  Officer Blaine, who conducted the stop, advised that he believed the photo was that of the occupant of the vehicle that was traffic stopped.  Officer Carrera, who assisted Officer Blaine, did not believe that the photo was that of the occupant of the vehicle that was traffic stopped.  Consequently, neither Officer could positively make a positive or negative identification.  However, based on information developed pursuant to the traffic stop that the occupant was named Octavio Felix and a border crossing analysis associated with FELIX, ROMERO, and the vehicle bearing Mexico license plate BN-35-217, I believe that FELIX was the passenger in the vehicle bearing Mexico license plate BC-35-317 on August 11, 2009.

[2.]  SERRANO has yet to be positively identified through photographic identification based on a government issued photographic identification card or a law enforcement traffic stop.  SERRANO is believed to primarily reside in Mexico.  However, for the reasons mentioned, I currently believe that SERRANO is named Isaias Serrano

[3.]  JOSELITO has yet to be positively identified through photographic identification based on a government issued photographic identification card or a law enforcement traffic stop.  However, for the reasons mentioned, I currently believe that JOSELITO is named Jose Alfredo Jimenez, aka Jose Alfred Jimenez.

used by JOSELITO was named "Jose" and was the brother of DAVID; subscriber information for Target Telephone #8 (used by JOSELITO) indicating that the phone was subscribed to Jose Alfred Jimenez; and the DMV registration for the vehicles bearing California license plate 6FXA749 and 4CVU622 indicating that the vehicles are registered to Jose Alfredo Jimenez. Probable cause to arrest JOSELITO is set forth in Section V(B), (F), (I), (J), (K), (L), (P), (Q), and (R) below;

53.     JORJON was identified through wire interception of activities discussed on intercepted calls, which led to the Fontana Police Department traffic stop of JORJON on February 25, 2010. As a result of the traffic stop, JORJON was identified by Fontana PD as Jorge Luis Villanueva. Probable cause to arrest JORJON is set forth in sections L and O below;

54.     MARGARO was identified through a wire intercept on October 23, 2009, where MARGARO self-identified himself to MARQUEZ as "Margaro." Probable cause to arrest MARGARO is set forth in Section V(J) and (Q) below;

55.     MARQUEZ was identified through wire interception indicating that MARQUEZ was related to Gonzalo Marquez and PULIDO; Gonzalo Marquez's California Department of Corrections Pelican Bay Inmate Visitor's Log listing MARQUEZ as a brother and PULIDO's wife (Yluminda M. Pulido) as a sister; wire interception and GPS information indicating that MARQUEZ took a flight from Tijuana to Michoacan in Mexico on August 25, 2009, at approximately 0140 hours, with his mother; and the flight manifest from Volaris Airlines Flight 801 from August 25, 2009, that identified a Jesus Marquez and Maria De La Luz Marquez as passengers. Probable cause to arrest MARQUEZ is set forth in Section V(A), (B), (C), (D), (E), (F), (I), (J), (K), (L), (M), (N), (P), (Q), and (R) below;

56.     MARTIN was identified through GPS information from a telephone that MARTIN was intercepted using; database research associated with GPS information indicating that MARTIN lived at 19974 JUSTICE MILL; wire interception indicating that MARTIN was named "Martin;" wire interception indicating that MARTIN was the brother of CHON; interviews conducted by Riverside County Sheriff's Corporal Kenneth Zunker indicating that MARTIN lived at the 19974 JUSTICE MILL on February 15, 2010; and a positive photographic

identification made on February 18, 2010, by Cpl. Zunker based on a prior booking photograph of MARTIN. Probable cause to arrest MARTIN is set forth in Section V(K) below;

57.     MATA-GARCIA was identified through wire interception paired with surveillance of activity discussed on intercepted calls that resulted in the CHP traffic stop of MATA-GARCIA on October 26, 2009, which resulted in the seizure of 11.14kg of methamphetamine. As a result of the traffic stop, MATA-GARCIA was identified by a Washington driver's license.    Probable cause to arrest MATA-GARCIA is set forth in Section V(J) below;

58.     NUNEZ was identified through wire interception paired with surveillance of activity discussed on intercepted calls that resulted in the Fontana Police Department traffic stop of NUNEZ on December 31, 2009, which resulted in the seizure of $22,420 U.S. Currency. Probable cause to arrest NUNEZ is set forth in Section V(O) below;

59.     PACHECO was identified through database research, DMV records checks, and GPS information from a telephone that PACHECO was intercepted using paired with a CHP traffic stop of PACHECO on February 28, 2010, which resulted in the seizure of methamphetamine as part of an independent investigation. As a result of the traffic stop, PACHECO was identified through a California driver's license that identified PACHECO as Jose Pacheco Duran. Probable cause to arrest PACHECO is set forth in Section V(P) and (Q) below;

60.     PULIDO was identified through wire interception paired with surveillance of activity discussed during intercepted calls, which resulted in the CHP traffic stop of PULIDO on September 1, 2009, and the seizure of $443,930. As a result of the traffic stop, PULIDO was identified through a California driver's license. Probable cause to arrest PULIDO is set forth in Section V(D) below;

61.     PRIETO was identified through wire interception of telephone number 509-331-3754 paired with the photo identification of the user of telephone number 509-331-3754 by a co-conspirator involved in the narcotics trafficking conspiracy under investigation.    Probable cause to arrest PRIETO is set forth in Section V(J) below;

62.     RODELA (Jairo RODELA) was identified through wire intercepts indicating the user of the phone was named "Jairo," as well as GPS information from a telephone that RODELA was intercepted using that the Bakersfield Police Department used to locate RODELA for the purposes of interviewing RODELA.   Probable cause to arrest RODELA is set forth in Section V(E) and (N) below;

63.     ROMERO was identified through border crossing information and wire interception paired with surveillance of activity discussed during intercepted calls that resulted in the CHP traffic stop of ROMERO on August 11, 2009, which led to the seizure of 3,185g of methamphetamine, and by the presentation of her identification when she went to retrieve the vehicle registered in her name. Probable cause to arrest ROMERO is set forth in Section V(B) below;

64.     SARABIA was identified through surveillance of activity discussed during intercepted calls paired with border crossing information; a driver's license photographic identification made by a law enforcement surveillance officer on August 25, 2009; and wire interception paired with SARABIA's arrest at the Calexico East Port of Entry on September 18, 2009, which resulted in the seizure of 8,018g of cocaine.   Probable cause to arrest SARABIA is set forth in Section V(A) and (G) below;

## IV.    Wire Interception[4]

65.     As part of this investigation, wire interception was utilized to put law enforcement in a better position to uncover the on-going narcotics trafficking conspiracy involving the DON CHUY DTO, the KIQUE NTO, and other co-conspirators. As such, wire communications were intercepted pursuant to court orders from approximately August 2009 to January 2010.

---

[4] Conversations over each of the Target Telephones were primarily conducted in Spanish and sometimes in English. The intercepted calls were monitored by Metropolitan Contract Linguists who are fluent in both English and Spanish. Most of the intercepted calls used in this affidavit have since been transcribed in draft form by FBI Spanish Linguists. Where I describe the content of certain wire intercepts in this affidavit, such description is based on my review of the draft transcripts prepared by the FBI Spanish Linguists. A final transcription will be completed by FBI Spanish Linguist if necessary for trial.

V.     **The Narcotics Trafficking Conspiracy**

66.     In general, the narcotics trafficking conspiracy of the DON CHUY DTO are evidenced by the surveillance observations, GPS information, wire intercepts, narcotics and narcotics proceeds seizures described below.

A.     **August 10, 2009 Delivery of 6,650g of Methamphetamine (Probable Cause for 1550 RIMPAU, MARQUEZ, DAVID, BELTRAN, and SARABIA)**

67.     In general, based on my training, experience, and knowledge of this investigation, I believe that MARQUEZ, BELTRAN, and DAVID coordinated for the delivery of methamphetamine shipments from Mexico into the United States. On August 10, 2009, I believe that SARABIA delivered 6,650 grams of methamphetamine to DAVID at 5627 34th Street, Riverside, California.

68.     On August 10, 2009, at approximately 0910 hours, law enforcement saw a Toyota Sienna Minivan, bearing California license plate 6GOW813 (hereinafter, the "SIENNA MINIVAN"), back out of garage of 1550 RIMPAU and go to 5627 34th Street, Riverside, California (hereinafter, the "5627 34th address"). (Based on my knowledge of this investigation, I am aware that on September 1, 2009, law enforcement seized $443,190 from a hidden compartment inside the SIENNA MINIVAN.)

69.     At approximately 1015 hours, law enforcement saw DAVID'S TRUCK (see full description of truck in Purpose of Affidavit Section (II)(4)(q) above) back up to the SIENNA MINIVAN in the front yard.

70.     At approximately 1030 hours, law enforcement saw a green Dually truck later determined to be registered to SARABIA ("SARABIA'S DUALLY") arrive at the 5627 34th address and pull down the driveway to the garage. Law enforcement observed the Ford then pull forward in what law enforcement believed was an attempt to block the view of driveway from the street. The information and calls described below show that SARABIA was driving SARABIA'S DUALLY and arrived at the 5627 34th address to deliver methamphetamine stored in SARABIA'S DUALLY.

31

71.     Based on a database check, FBI SA David Gates informed me that August 10, 2009, (1) a vehicle with the same CLP as SARABIA'S DUALLY crossed into the US from Mexico; and (2) Sergio Beltran Sarabia was likely located in the vehicle.[5]

72.     On August 10, 2009, at approximately 1121 hours, MARQUEZ called DAVID and, using coded language, asked DAVID if "the guy" (SARABIA) had arrived "there."   "Yes, he's arriving right now, yes, about 20 to 30 minutes."   (I believe that the DAVID advised MARQUEZ that SARABIA arrived approximately 20 to 30 minutes ago with the load of narcotics.)

73.     On August 10, 2009, at approximately 1423 hours, DAVID called MARQUEZ. During the conversation, DAVID told MARQUEZ that a prior delivery by SARABIA ("the one that the old man (SARABIA) brought on Saturday") was "short."   MARQUEZ asked about SARABIA'S most recent delivery ("what about the one for today?")   DAVID replied that SARABIA's August 10, 2009 delivery was 6 kilograms of methamphetamine ("six complete ones") and 650 grams of methamphetamine (and "one of 650"), totaling 6,650g of methamphetamine.

**B.     August 11, 2009 Seizure of 3,185g of Methamphetamine (Probable Cause for MARQUEZ, DAVID, BELTRAN, JOSELITO, FELIX, and ROMERO)**

74.     In general, based on my training, experience, and knowledge of this investigation, I believe that MARQUEZ, BELTRAN, and DAVID coordinated for the delivery of methamphetamine shipments from Mexico into the United States.   On August 11, 2009, law enforcement seized 3,185 g of methamphetamine from ROMERO and FELIX that I believe was intended to be delivered to DAVID and JOSELITO.

---

5 Unless a vehicle is searched at the border, database checks cannot positively confirm who was in it when it crossed the border because no records are kept regarding who crossed in a particular vehicle. However, law enforcement has access to records of the date, time, and description of a crossing vehicle and, separately, the date, time and name of individuals who crossed the border. Thus, when I state in this affidavit that a person was "likely" in a vehicle that crossed the border, this is because law enforcement has come to this conclusion based on a combination of factors, including but not limited to the following: whether the date and time of the vehicle crossing was within three or four minutes of the date and time that an individual crossed; whether the registered owner of the vehicle matched the individual crossing at that time; whether the vehicle and the individual crossed in the same lane; and whether, on other dates, the same vehicle and the same individual crossed at approximately the same time and in the same lane.

75.    Based on a database check, FBI SA Gates informed me that on August 10, 2009, the vehicle bearing Mexico license BN-35-217 (later determined to be a silver Dodge Ram) crossed into the US at the Otay Mesa Port at 1105 hours and that Ancelma Vega Romero was likely located in the vehicle.

~~76.    On August 10, 2009, at approximately 1124 hours, DAVID called BELTRAN.~~ Using coded language, BELTRAN told DAVID a narcotics transport vehicle carrying methamphetamine, specifically a "grey color truck" (subsequently identified as a silver Dodge Ram), would arrive shortly. BELTRAN told DAVID that he should go to the Shell Gas Station near the 5627 34th address ("a gas station . . . a Shell there") to meet the narcotics transport vehicle.

77.    At approximately 1340 hours, law enforcement saw a silver Dodge Ram truck (hereinafter the "Dodge Ram") arrive at the Shell Gas Station. Shortly after, the Dodge Ram followed DAVID'S TRUCK back to the 5627 34th address. (Based on the call described above and the evidence set forth in this affidavit regarding the use of the 5627 34th address as a stash location, I believe that the Dodge Ram was taken to the 5627 34th address to deliver the methamphetamine being transported in the vehicle.) The Dodge Ram parked in the driveway and DAVID'S TRUCK parked behind the Dodge Ram blocking the view of the driveway from the street. (Based on my training and experience, I believe DAVID'S TRUCK is again being used to block the view while the methamphetamine is unloaded from the Dodge Ram.)

78.    At approximately 1405 hours, law enforcement observed the Dodge Ram back out of the driveway and depart the location. (Based on the call described above and the evidence set forth in this affidavit regarding the use of the 5627 34th address as a stash location, I believe that a methamphetamine delivery had been completed at the delivery of methamphetamine to the 5627 34th address.)

79.    As mentioned above, on August 10, 2009, at approximately 1423 hours, DAVID called MARQUEZ. During the conversation, MARQUEZ also said, "Did you talk to . . . the guy (BELTRAN), right? The one – the son of the guy (SARABIA) there, at the yard" (the 5627 34th address). DAVID said, "Yes, yes there, we drank some beers with him (BELTRAN, but making

33

reference to a BELTRAN NTO narcotics transporter) just now." (DAVID advised that DAVID had just received a methamphetamine delivery from one of BELTRAN's narcotics transporters. Based on the RMTF's surveillance observations at 1405 hours, I believe that DAVID was referring to methamphetamine delivery that was made by the vehicle bearing Mexico license plate BN-35-217 (the Doge Ram).)

80.     On August 10, 2009, at approximately 1528 hours, BELTRAN called MARQUEZ. During the conversation, MARQUEZ confirmed with BELTRAN that MARQUEZ wanted "the young guy" (later determined to be FELIX) to make the narcotics delivery tomorrow and confirmed that FELIX would only be delivering "half the day" (3.5 kilograms of methamphetamine, as opposed to the nearly seven kilograms that SARABIA delivered on August 10, 2009, described above in Section A.

81.     On August 11, 2009, at approximately 0917 hours, JOSELITO called DAVID. During the conversation, DAVID asked, "Has your uncle (FELIX) arrived?" (DAVID asked JOSELITO if FELIX had arrived with the narcotics delivery.) JOSELITO advised DAVID that FELIX had not yet arrived but that he (JOSELITO) was ready and waiting for FELIX.

82.     Based on a database check, FBI SA David Gates informed me that on August 11, 2009, the vehicle bearing Mexico license BN-35-217 (the Dodge Ram) crossed into the US at the Otay Mesa Port of Entry at 1148 hours. Based on the database check, SA Gates was able to determine that Ancelma Vega ROMERO was likely located in the vehicle.

83.     Based on a database check, FBI SA David Gates informed me that on August 11, 2009, Octavio FELIX Gonzalez crossed into the US at the San Ysidro Port of Entry at 1212 hours in the pedestrian lane.

84.     At approximately 1415 hours, the California Highway Patrol (CHP) Officer Mike Blaine conducted a traffic stop on the Dodge Ram, bearing Mexico license plate BN-35-217, for traveling in excess of the posted speed limit. Pursuant to the traffic stop, the driver of the vehicle was identified as VEGA, the right front passenger of the vehicle was identified as FELIX, and there were three young teenagers seated in the back seat. VEGA was found to be an

34

unlicensed and uninsured driver. Therefore, VEGA, FELIX, and the rest of the passengers were driven off the freeway by a CHP unit and the Dodge Ram was impounded.

85.    Officer Blaine's narcotics K-9, "Rex;" alerted on the vehicle. Members of RMTF and the CHP searched the vehicle and found methamphetamine in the vehicle's battery which contained a hidden compartment. A DEA Southwest Laboratory report indicated that law enforcement seized approximately 3,185 grams of methamphetamine that was approximately 97.6% pure.

86.    While at the Moreno Valley Police Department, law enforcement seized the battery with the hidden compartment and replaced it with a new legitimate battery. The vehicle was subsequently turned over to the tow company.

87.    I have obtained a photo for Octavio FELIX Gonzalez. Officer Blaine (who conducted the stop) advised that he believes the photo is that of the occupant of the Dodge Ram; however, Officer Carrera (who assisted Officer Blaine) does not believe that the photo is that of the occupant. However, based on information developed pursuant to the traffic stop and a border crossing analysis associated with FELIX, ROMERO, and the vehicle bearing Mexico license plate BN-35-217 (the Dodge Ram), I believe that FELIX was the passenger in the vehicle bearing Mexico license plate BC-35-217 (the Dodge Ram) on August 11, 2009.

88.    On August 11, 2009, at approximately 1549 hours, MARQUEZ called DAVID. During the call, DAVID said, "It seems the guy (FELIX) was pulled over some place and they (law enforcement) fucking confiscated the truck (the Dodge Ram)." Later, MARQUEZ asked, "How can they go without license the sons of bitches? I don't understand that." (MARQUEZ cannot understand why they would transport methamphetamine without valid driver's licenses given the risks of law enforcement intervention.) Thereafter, using coded language, DAVID and MARQUEZ continued to discuss the traffic stop and vehicle confiscation.

89.    Based on an interview of an innocent party conducted by your affiant, I learned that on August 12, 2009, the 2003 Dodge Ram was picked from the tow yard by Anselma Vega ROMERO. ROMERO presented a Mexico driver's license as identification. ROMERO was the registered owner of the vehicle. ROMERO picked up the vehicle quietly (was not asking a lot of

questions or talking very much).  Present with ROMERO were two other females, one male, and two small children.  ROMERO did not leave a contact number.

90.     On August 12, 2009, at approximately 1504 hours, MARQUEZ called DAVID. During the conversation, DAVID told MARQUEZ that the methamphetamine was stolen from the Dodge Ram ("at the tow yard . . . they stole the battery, man.")  Using coded language, DAVID and MARQUEZ then discussed whether FELIX and ROMERO took the methamphetamine.  MARQUEZ said, "No, well they (FELIX and ROMERO) knew it, man. (That the methamphetamine was located in the battery.)  They already knew.  That's a plan with a dirty trick."  MARQUEZ later stated that he would contact BELTRAN to "to see what happened there."  (MARQUEZ advised he (MARQUEZ) would call BELTRAN to get further details on the missing methamphetamine.)

## C.     August 31, 2009 Delivery of 7 kgs of Methamphetamine (Probable Cause for MARQUEZ, DAVID, and SARABIA)

91.     In general, in August, 2009, MARQUEZ, Ponchin, and SARABIA coordinated to import 7 kilograms of methamphetamine into the United States from Mexico.  The methamphetamine was ultimately delivered by SARABIA and received by DAVID on August 31, 2009.

92.     On August 30, 2009, at approximately 1341 hours, MARQUEZ called Ponchin. Using coded language, Ponchin told MARQUEZ that some of the methamphetamine ("gum") had already been produced and was high quality ("coming out good").  Ponchin told MARQUEZ that he had "a tripe" (3 kilograms of methamphetamine) that he wanted "the guy" (later determined to be SARABIA) to transport to the United States.  Later in the conversation, Ponchin said, "No, but it came out nice.  The son of a bitch came out like a white guy (a reference to the methamphetamine looking very white as opposed to discolored)."

93.     On August 30, 2009, at approximately 1350 hours, SARABIA called MARQUEZ. During the conversation, MARQUEZ said that he would give SARABIA transportation costs owed by MARQUEZ to SARABIA for transporting DON CHUY DTO methamphetamine into the United States  ("to take you . . . the letter (money) that I . . . have pending for you there.")

MARQUEZ also inquired about transporting methamphetamine into the United States the following day ("if you want to do me a big favor . . . to work things out for tomorrow."). Using coded language, SARABIA agreed to transport narcotics early the following morning.

94.     On August 30, 2009, at approximately 1700 hours, Ponchin called MARQUEZ. During the conversation, using coded language, MARQUEZ told Ponchin that they would meet with SARABIA early the following day. During the conversation, MARQUEZ said, ". . . El Senor (SARABIA) is taking only number seven. The number seven polo." (seven kilograms of methamphetamine). Based on my training, experience, and my knowledge of this investigation, I believe that SARABIA's transport vehicle is only capable of transporting approximately seven kilograms of methamphetamine. After finding out that SARABIA could only transport seven kilograms of methamphetamine, Ponchin asked MARQUEZ how they were going to divide space up between the two of them, Ponchin and MARQUEZ ("So how would we do it there, or what?") MARQUEZ said, ". . . if you want to throw in your number seven (seven kilograms of methamphetamine belonging to Ponchin) there, or if you want to throw in the number three and my number four (three kilograms belonging to Ponchin and four kilograms of DON CHUY DTO methamphetamine), however it is, we'll do it Ponchin." Later in the conversation, MARQUEZ said "I really have a lot of faith in the . . . friend (SARABIA). Because he has been working (transporting narcotics) for a while . . ."

95.     On August 31, 2009, at approximately 1019 hours, MARQUEZ called SARABIA. During the conversation, SARABIA told MARQUEZ to tell "those guys" (DAVID and JOSELITO) that SARABIA would "be at the guy's house" (the 5627 34th address, a DON CHUY DTO stash location) by noon (to deliver the seven kilograms of methamphetamine) "because sometimes I go and I don't find them there."

96.     On August 31, 2009, at approximately 1312 hours, MARQUEZ called DAVID. During the conversation, DAVID said, "Oh, eh... El Senor (SARABIA) already got there (delivered the methamphetamine), it's just that he made a hell of a mess; a... some bottles (kilograms of methamphetamine) came with a different color. (some of the kilograms of methamphetamine were a different color.) And... and he mixed up a little bit there. (SARABIA

37

mixed up the two different qualities of methamphetamine (Ponchin's methamphetamine and the DON CHUY DTO methamphetamine). . . . those of a different color are the other guy's (Ponchin's), . . . or are those ours?" (DAVID is trying to determine what methamphetamine belongs to Ponchin and what belongs to the DON CHUY DTO.) MARQUEZ said, "Yes, no, ours are the ones that have a more or less good presentation (good quality and a nice color). . . . it's four liters (code for four kilograms because one liter equals 1,000 milliliters as 1 kilogram equals 1,000 grams). And the others belong to the other friend (Ponchin)." Later, DAVID criticized SARABIA'S transportation of the methamphetamine ("El Senor (SARABIA) blew it. . . he added a... fucking mess on top, and the whole thing got mixed up.") DAVID asked, "So, there are three that belong to the other guy (Ponchin) and four are ours, right?" (DAVID is confirming that three kilograms are Ponchin's and four kilograms are DON CHUY DTO's.) MARQUEZ confirmed.

### D.   Distribution of 2 lbs of Methamphetamine in August 2009; Seizure of $443,190 on September 1, 2009 (Probable cause for 1049 N. ORANGE BLOSSOM, MARQUEZ, DAVID, BARRAZA, PULIDO and ALMA)

97.   In general, on September 1, 2009, law enforcement seized $443,190 in narcotics proceeds from PULIDO. PULIDO was in the process of transporting the money to MARQUEZ in Mexico. The money was collected by PULIDO and DAVID. PULIDO collected approximately $400,000 in narcotics proceeds for MARQUEZ. I also believe that DAVID collected and provided PULIDO with approximately $44,800, which was collected from BARRAZA, Tocayo, and Leandro. Specifically, $12,700 was provided by BARRAZA to DAVID for the distribution of one pound of methamphetamine that was coordinated through MARQUEZ. ALMA knowingly assisted this narcotics trafficking conspiracy by obtaining the tape to package the narcotics proceeds collected by DAVID.

98.   On August 12, 2009, at approximately 1555 hours, MARQUEZ called BARRAZA. During the conversation, BARRAZA said, ". . . I don't know if we could do something (conduct a narcotics transaction) . . . about those girls (units of methamphetamine) that you and I usually work with." (BARRAZA is asking to be supplied with methamphetamine from MARQUEZ.) MARQUEZ said, "Yes, of course, Beto." Later in the conversation,

BARRAZA asked MARQUEZ about the price per pound of methamphetamine ("... how things are going to be there.") MARQUEZ said, "... the number I have there is 12.7" ($12,700 per pound of methamphetamine). BARRAZA said, "That's fine ... I'm ready with the [unintelligible] to go eat (conduct a narcotics transaction, in this case, to pick up methamphetamine) with those people ..." (BARRAZA advised MARQUEZ that he (BARRAZA) was ready to pick up methamphetamine and told MARQUEZ to tell him (BARRAZA) when to go meet DAVID).

99.   On August 12, 2009, at approximately 1600 hours, MARQUEZ called DAVID. Using coded language, MARQUEZ told DAVID that BARRAZA wanted to pick up a pound of methamphetamine.

100.   On August 13, 2009, at approximately 0858 hours, DAVID called ALMA. During the conversation, DAVID asked if ALMA had any money. ALMA confirmed. DAVID then said, "... so you can bring me some tapes, from the ... from the store right there." ALMA said, "That I should bring you what?" DAVID said, "Some tapes ... About three – three tapes, please." ALMA said, "What color?" DAVID said, "Of – if there's brown, then brown (brown tape). If not, the – the guy's... Um, you've already seen what kind I use here (referring to the type of tape that DAVID uses to package narcotics proceeds), right?" ALMA said, "Huh? Yeah." ALMA later said, "I'll drop by right now." (Based on the seizure below, I believe that ALMA subsequently purchased the brown tape for DAVID that was found to be used to wrap the narcotics proceeds associated with the name "Humberto," "Tokayo," and "Liandro".)

101.   On August 13, 2009, at approximately 0950 hours, MARQUEZ called DAVID. During the conversation, using coded language, DAVID advised MARQUEZ that BARRAZA picked up the methamphetamine.

102.   On August 23, 2009, at approximately 1359 hours, DAVID called MARQUEZ. During the conversation, MARQUEZ said, "Have any of those fuckers around there gotten mail?" (MARQUEZ asked DAVID if anyone else had turned over narcotics proceeds to DAVID.) DAVID said, "No, no one, dude." MARQUEZ said, "Uh, didn't you tell me...? I got confused dude. That Humberto (BARRAZA) had paid you for one hour of work (one pound of

methamphetamine) and had taken another hour (taken another pound of methamphetamine)?" DAVID said, "Yes, yes, that's here (referring to the narcotics proceeds turned over by BARRAZA), dude. And that other fucker also . . . paid me for two hours or three (two or three pounds of methamphetamine) -- I think it was 29, 6 ($29,600) . . ." MARQUEZ said, "Who, dude?" DAVID said, "Leandro." MARQUEZ again asked if "Humberto" (BARRAZA" gave DAVID the narcotics proceeds ("the note . . . the receipt"). DAVID said, "Yes, yes, he did pay me for the hour he worked and he took another hour." (DAVID confirmed that BARRAZA provided DAVID with payment for one pound of methamphetamine and was distributed another pound of methamphetamine.)

103. On August 29, 2009, at approximately 1105 hours, MARQUEZ called Unidentified Male-1756 (hereinafter "UM-1756"). During the conversation, using coded language, UM-1756 told MARQUEZ that Tocayo had "correspondence (narcotics proceeds) there." MARQUEZ said, "All right, I'll tell DAVID to go by there (referring to where Tocayo has the narcotics proceeds)."

104. On August 30, 2009, at approximately 1111 hours, DAVID called PULIDO. During the conversation, PULIDO said, ". . . don't you want to come over here to –? (PULIDO asked if DAVID wanted to come over to PULIDO's location, likely referring to 1049 N. ORANGE BLOSSOM.) I think I'm going to pick up the fat donkey" (referring to the transportation vehicle with the large hidden compartment). DAVID said, "Which one?" PULIDO said, "The big one." (PULIDO advised that he would pick up the transportation vehicle with the large compartment.)

105. On August 30, 2009, at approximately 1133 hours, MARQUEZ received an incoming call from DAVID. During the conversation, DAVID said, "Uh, fucking Chespiro (PULIDO) called me to tell me he needs the donkey (referring to a narcotics/narcotics proceeds transportation vehicle). Do you want me to saddle it (load the transportation vehicle) with the [unintelligible] I have here, or let him (PULIDO) saddle it (load it) over there?" DAVID and MARQUEZ continued to discuss loading the narcotics proceeds into the vehicle. Later during the conversation, MARQUEZ said, "Yeah, mark it for me with a—a—some type of mark – a

40

number so that – that there are no mistakes." (MARQUEZ told DAVID to mark the packages of narcotics proceeds, so there is no confusion on the amount of narcotics proceeds being transported to MARQUEZ in Mexico.) DAVID said, "Yeah, yeah, I'm going to – to arrange them nicely because you know – the situation is critical." Later during the conversation, DAVID said, ". . . I'm going to write down . . . the number more or less . . . David's (Tocayo's) part (narcotics proceeds turned over by Tocayo) and . . . that fucker, Humberto (BARRAZA) and a little bit that was left over from Leandro."

106.    Based on the subsequent money seizure and this investigation to date, I believe that DAVID advised MARQUEZ that he (DAVID) would load the transportation vehicle with narcotics proceeds from Tocayo, Leandro, and BARRAZA prior to turning the vehicle over to PULIDO.  Based on the subsequent money seizure and the markings found on the packages, I believe the following amounts from the following individuals were narcotics proceeds turned over to DAVID: $12,700 from BARRAZA, $27,500 from Tocayo, and $4,600 from Leandro. Furthermore, based on the wire intercepts discussed above, I believe that the $12,700 from BARRAZA was provided to DAVID for the distribution of one pound of methamphetamine.

107.    On August 31, 2009, at approximately 1439 hours, Jorgito called MARQUEZ. During the conversation, MARQUEZ asked Jorgito "if – if – if any mail (narcotics proceeds) came for me over there at – over there at your dad's (PULIDO's residence, referring to 1049 N. ORANGE BLOSSOM)?"  Jorgito said, "Yes, uncle, you got four letters, four of those large envelopes ($400,000 in narcotics proceeds)."

108.    On August 31, 2009, at approximately 1000 hours, law enforcement saw the SIENNA MINIVAN parked on the lawn at 1049 N. ORANGE BLOSSOM.

109.    At approximately 2313 hours, the SIENNA MINIVAN was driven out of the garage of 1049 N. ORANGE BLOSSOM.  Law enforcement subsequently followed the SIENNA MINIVAN to a "Unocal 76" gas station at San Angelo and Valley Boulevard and confirmed that PULIDO was driving it.  PULIDO was eventually followed in the SIENNA MINIVAN to the "El Aquila" bar in El Monte, California.

41

110.    At approximately 0415 hours, CHP Officer Jennifer A. Aquiningoc conducted an enforcement stop on the vehicle driven by PULIDO for a possible DUI. During the stop, Officer Aquiningoc determined that PULIDO was not driving under the influence. However, it was determined that PULIDO was driving on a suspended driver's license. Therefore, PULIDO's vehicle was subsequently impounded. During the vehicle inventory, Officer Aquiningoc noted that the vehicle's dashboard had been removed. Officer Aquiningoc's narcotic K-9, "Dawson" alerted to the glove box area. Officer Aquiningoc subsequently located a hidden compartment that contained 35 packages of U.S. currency, totaling $443,190.

111.    Based on a review of the 35 packages of U.S. currency, law enforcement saw four of the bundles to be packaged in brown tape with the following markings: one package had "Humberto" and "12.7" written on it; one package had "Tokayo" and "7.5" written on it; one package had "Tokayo" and "10" written on it; and one package had "Liandro 4.6" and "Tokayo 10" written on it. Based on wire interception, I believe that these were the narcotics proceeds packaged by DAVID and placed in the hidden compartment in the SIENNA MINIVAN by DAVID. I further believe that the brown tape that was used to package the U.S. Currency was the tape purchased by ALMA at DAVID's direction.

112.    Furthermore, based on wire interception and the markings contained on some of the bundles of currency, I believe that the $443,190 in U.S. Currency was comprised of approximately $400,000 that was collected by PULIDO and $44,800 that was collected by DAVID ($12,700 from BARRAZA, $27,500 from Tocayo, and $4,600 from Leandro).

113.    On September 1, 2009, at approximately 0547 hours, PULIDO called MARQUEZ and told MARQUEZ that he was stopped by the CHP and that his vehicle was seized.

114.    On September 1, 2009, at approximately 0551 hours, DAVID called MARQUEZ. MARQUEZ told DAVID that PULIDO had been stopped by the Highway Patrol and that his vehicle had been seized. MARQUEZ then told DAVID, ". . . since it's there under CHECO's address, in case you have [unintelligible] anything there at CHECO's, . . . you should move it right now, before anything happens, man." (MARQUEZ believed that the vehicle was registered to CHECO's address, 4948 Rutile, so MARQUEZ advised DAVID that if DAVID currently had

any narcotics or narcotics proceeds stored at 4948 Rutile, DAVID should move it because the vehicle registration may lead law enforcement to that location.)  DAVID said, "No, no, it's not under his address (CHECO's address).  It's under another address (the transportation vehicle was registered to another address) . . . there's no problem, man."  (DAVID advised that there would be no problem at the 4948 Rutile address because the transportation vehicle was registered to another address.)

115.    On September 1, 2009, at approximately 1231 hours, MARQUEZ called DAVID. MARQUEZ explained to DAVID that law enforcement would only release the vehicle to the registered owner, not to PULIDO.  DAVID and MARQUEZ discussed how to get the vehicle back.

116.    On September 23, 2009, PULIDO arrived at the El Cajon CHP office to retrieve the SIENNA MINIVAN.  At approximately 1500 hours, Officers Aquiningoc and Azcaiturrieta interviewed PULIDO, who denied knowing of the currency and disclaimed ownership of it.

### E.    Seizure of 208.2 grams of methamphetamine on September 5, 2009 (Probable cause for MARQUEZ and RODELA)

117.    In general, on September 5, 2009, members of the Bakersfield Police Department seized 208.2g of methamphetamine from Alejandro Felipe Ojeda ("Ojeda").  In a post arrest interview, Ojeda admitted under Miranda to picking up the methamphetamine that was to be delivered to several customers; however, Ojeda refused to identify his source for the methamphetamine that he was found to be in possession of.  In a custodial interview, after being Mirandized, RODELA admitted that the half pound of methamphetamine that Ojeda was stopped with on 09/05/2009 belonged to him (RODELA).

118.    On August 9, 2009, at approximately 2000 hours, MARQUEZ called RODELA. During the conversation, using coded language, RODELA complained to MARQUEZ that the DON CHUY DTO methamphetamine recently distributed to RODELA was not the same quality of methamphetamine of DON CHUY DTO methamphetamine that RODELA had received in the past ("not the same thing that you used to send us before").  RODELA stated that the methamphetamine smelled like "urine."  MARQUEZ offered to let RODELA return the

43

methamphetamine. MARQUEZ and RODELA continued to discuss the quality of the methamphetamine. Later during the conversation, MARQUEZ said, "Yes, there is – the is some of both types (MARQUEZ said there is methamphetamine of both qualities) . . . put that one wherever you want, cousin, put it under the light, put it in chlorine … (the customer) will have a longer lasting high with that one." (MARQUEZ advised RODELA to test the methamphetamine in any way and RODELA will see that the methamphetamine that RODELA had would produce a longer high.) MARQUEZ and RODELA continued to discuss the quality of the methamphetamine and that RODELA's customers don't like the methamphetamine because, RODELA said, "they come down from the high quickly."

119.    After members of the Bakersfield Police Department received information from a Bakersfield Police Department confidential source, who is not in a position to testify, that Ojeda was transporting methamphetamine from RODELA's residence, Bakersfield Police Officers arrested Ojeda on September 5, 2009, after Officer Beagley saw Ojeda drop into a trash can a small wooden box containing a "Supreme Weigh" black digital scale, a spoon believed to contain methamphetamine residue, green plastic wrap, and several clear plastic baggies. Several of the baggies were found to contain methamphetamine. A DEA Southwest Laboratory report indicated that the packages contained 208.2 grams of methamphetamine. The laboratory report also indicted that one of the packages contained 110.7 grams of methamphetamine that was approximately 98.6% pure, which was the purest of the methamphetamine seized.

120.    On September 6, 2009, at approximately 1341 hours, based on coordination with the BPD and GPS information from RODELA's telephone, Officers located RODELA in the parking lot of a restaurant in Bakersfield. RODELA was detained and searched at the scene; however, no contraband was located. RODELA was also found to have a misdemeanor warrant for traffic violations. RODELA was subsequently transported to the Bakersfield Police Department pending further investigation.

121.    On September 6, 2009, at approximately 1730 hours, DEA SA James B. Bugda and I conducted an interview of RODELA at a Bakersfield Police Department Facility. During the interview, RODELA advised that the half pound of methamphetamine that Alejandro Felipe

44

Ojeda was stopped with on September 5, 2009 belonged to him (RODELA). RODELA advised that he was storing the methamphetamine at Ojeda's residence.

> **F.** **Collection of approximately $40,000 on September 8, 2009 & Seizure of 2,237g Methamphetamine on September 9, 2009 (Probable Cause for 1550 RIMPAU, 2275 E. LAKESIDE, MARQUEZ, DAVID, JOSELITO, and CHILO)**

122.    In general, on September 8, 2009, CHILO provided DAVID with approximately $40,000 in narcotics proceeds. Then MARQUEZ, DAVID, JOSELITO, and CHILO coordinated for the distribution on 5 pounds of methamphetamine to CHILO on September 8, 2009, which was ultimately provided to CHILO by JOSELITO and seized by law enforcement on September 9, 2009.

123.    On September 8, 2009, at approximately 1225 hours, CHILO called DAVID. During the conversation, using coded language, DAVID and CHILO discussed meeting at 1550 RIMPAU. Based on a review of GPS information from Target Telephone #4 and Target Telephone #6, which were being used by DAVID, I believe that DAVID was in the vicinity of 1550 RIMPAU during this time.

124.    On September 8, 2009, at approximately 1321 hours, MARQUEZ called DAVID. Using coded language, DAVID advised MARQUEZ that he sent narcotics proceeds to MARQUEZ in Mexico. During the conversation, DAVID said, "the one I did check was CHILO's. You know, it was, like, 4-0." (DAVID advised MARQUEZ that CHILO provided DAVID with approximately $40,000 in narcotics proceeds.) MARQUEZ said, "Yeah." Using coded language, DAVID and MARQUEZ also discussed the distribution of "a handful" (5 pounds of methamphetamine) to CHILO.

125.    On September 8, 2009, at approximately 1346 hours, DAVID called CHILO. DAVID advised CHILO that they would conduct the methamphetamine transaction "over there again . . . by the 60 (Freeway 60) and Rubidoux" (the 5627 34th address).

126.    On September 8, 2009, at approximately 1349 hours, JOSELITO called DAVID. During the conversation, DAVID advised JOSELITO that they were going to put "5 beers there so we can gulp them." (DAVID advised JOSELITO that they were going to distribute 5 pounds

of methamphetamine.  The 5 pounds of methamphetamine was to be distributed to CHILO, as evidenced by the seizure discussed below.)  DAVID again advised JOSELITO "five, man" and advised JOSELITO that they were "the kind from here" (the United States, referring to pounds).

127.    On September 8, 2009, at approximately 1519 hours, CHILO called DAVID. During the conversation, DAVID told CHILO to meet him at the Shell gas station near the freeway exit.

128.    At approximately 1705 hours, members of RMTF observed a Mazda Sport Utility Vehicle back out of the drive of the 5627 34th address and drive to the Shell Gas Station on Rubidoux Boulevard near the 60 Freeway.  At the Shell Gas Station, surveillance observed the driver, JOSELITO, meet up with a Hispanic male, CHILO, driving a red Ford Explorer, bearing California license plate 5PCT179.

129.    At approximately 1710 hours, members of RMTF observed both vehicles exit the Shell Gas Station and return to the 5627 34th address.  The Mazda pulled in first and the Explorer parked behind the Mazda in the driveway. The driver of the Explorer, CHILO, opened the rear hatch for a short time then closed it.  Based on law enforcement's location, surveillance did not have a clear view to observe what the driver, CHILO, was doing in the rear of the vehicle.

130.    At approximately 1715 hours, members of RMTF observed the Explorer back out of the driveway and travel to the intersection of 34th Street and Rubidoux Boulevard.  RMTF surveillance followed the vehicle to the Deerwood Apartment complex. The driver, CHILO, parked and went inside 2275 E. LAKESIDE.  A short time later, CHILO exited the apartment, opened the rear hatch of the vehicle, removed a plastic bag containing unknown contents, and then ran back to the apartment.

131.    Twice during the morning of September 9, 2009, law enforcement observed CHILO open the hood of a white Dodge Caliber, bearing Nevada license plate 252UXV.  The vehicle was registered to Dollar Rental.  Both times, law enforcement observed CHILO doing something under the hood near the cowl area of the vehicle.

132.    At approximately 1016 hours, law enforcement observed CHILO leave the apartment complex in the Caliber.

133.    At approximately 1100 hours, San Bernardino County Sheriff's High Intensity Criminal Interdiction Team Detective J. Hoffman conducted a traffic stop on the Caliber for violation of California Vehicle Code 21703 (following too close) and CVC 22356(b) (speeding). The driver of the vehicle was identified as CHILO. CHILO provided Det. Hoffman consent to search the vehicle. As a result of the search, Det. Hoffman located 5 plastic bags containing methamphetamine located in the cowl area of the vehicle. A DEA Southwest Laboratory report indicated that law enforcement seized approximately 2,237 grams of methamphetamine that was approximately 98.8% pure.

134.    Subsequent to CHILO's arrest, CHILO was found to be in possession of a Sprint Nextel cellular telephone assigned S/N 364VKCY8LG. Subscriber information for the Sprint Nextel cellular telephone assigned S/N 364VKCY8LG indicated that the telephone is assigned (323) 641-1293 and UFMI 124*487*6475; the same telephone being used by CHILO in the intercepts above.

### G.    Partial Delivery of 16 kgs Cocaine on September 18, 2009 (Probable Cause for BELTRAN and SARABIA)

135.    In general, on September 17, 2009, BELTRAN and Nano coordinated for the delivery of 16 kilograms of cocaine by the KIQUE NTO to Nano. On September 18, 2009, SARABIA was arrested at the United States/Mexico border trying to transport 8,013 grams (8.013 kilograms) of cocaine across the border, and BELTRAN delivered 8 kilograms of cocaine to Nano at 23205 Wildwood Lane, Perris, CA (hereinafter the "23205 Wildwood address").

136.    On September 17, 2009, at approximately 1948 hours, Nano called BELTRAN. Using coded language, BELTRAN and Nano discussed where BELTRAN was going to deliver narcotics to Nano the next day. Nano advised BELTRAN to take Interstate 15 to Interstate 215 and that "it" (Nano's stash location, which based on subsequent surveillance operations I believe to the 23205 Wildwood address) was "off of the Cajalco exit." During the conversation, Nano asked, "How many – how many cars are you bringing?" BELTRAN said, "Well, I'm going – I'm going to . . . to take two trucks (2 narcotics load vehicles; believed to be one vehicle driven by BELTRAN and the other being driven by SARABIA) and um, we're (BELTRAN and

SARABIA) going to see if . . . we can load the 16 pa – the 16 pans (16 kilograms of cocaine)." (BELTRAN advised Nano that they would be delivering 16 kilograms of cocaine.)

137. Based on a database check, FBI SA David Gates informed me that on September 18, 2009 the vehicle bearing California license 8V153151 crossed into the US at the Calexico Port of Entry at 0514 hours. Based on the database check, SA Gates was able to determine that Sergio Enrique Beltran Guerrero (BELTRAN) was likely located in the vehicle.

138. On September 18, 2009, at approximately 0530 hours, SARABIA applied for admission into the United States from Mexicali, Baja California, Mexico at the Calexico Port of Entry. SARABIA was the driver and registered owner of a red Dodge Ram bearing California license plates 8V63069. While applying for entry, a Customs and Border Patrol narcotics canine alerted to SARABIA's vehicle for the detection of narcotic odors, during a pre-primary roving operation. Pursuant to a search of SARABIA's vehicle, law enforcement located two vehicle batteries in the vehicle, which were each found to contain four kilograms of cocaine totaling eight kilograms of cocaine. SARABIA was subsequently arrested.

139. On September 18, 2009, at approximately 0757 hours, Nano called BELTRAN. During the conversation, BELTRAN advised Nano that he (BELTRAN) had arrived with "the work" (cocaine; more specifically eight kilograms of cocaine). Using coded language, BELTRAN and Nano agreed that BELTRAN wanted to use the stash location, the 23205 Wildwood address, to remove the narcotics from BELTRAN's narcotics transportation vehicle.

140. At approximately 0835 hours, RMTF detectives observed a vehicle matching the description of BELTRAN's vehicle, bearing California license plate 8V53151 (registered to Sergio Enrique Guerrero), at the 23205 Wildwood address. (BELTRAN was at the location to deliver 8 kilograms of cocaine.)

141. At approximately 0838 hours, GPS information from Target Telephone #7 indicated that BELTRAN was in the vicinity of the 23205 Wildwood Address.

142. On September 18, 2009, at approximately 1009 hours, BELTRAN called NANO. During the conversation, using coded language, BELTRAN advised Nano that he (BELTRAN) had not heard from SARABIA. (BELTRAN told Nano this because SARABIA was supposed to

be delivering the second half (eight kilograms) of the 16 kilograms of cocaine to Nano.) During the conversation, BELTRAN said, "Yes, yes, well, I was thinking of calling you, I said, right now, I remembered that I had told you it'd be half an hour (till SARABIA's arrival to deliver the eight kilograms of cocaine), but . . . I've been calling him, and I'm really worried, man." (I believe that, in part, BELTRAN was worried that SARABIA was intercepted by law enforcement transporting the cocaine.)

### H.  Seizure of 27.5g methamphetamine on September 30, 2009 (Probable Cause for BARRAZA and CRUZ)

143.   In general, on September 30, 2009, BARRAZA coordinated with CRUZ for the distribution of one ounce of methamphetamine from BARRAZA to CRUZ, which was seized by law enforcement.

144.   On September 30, 2009, at approximately 1005 hours, BARRAZA called CRUZ. During the conversation, BARRAZA said, "I saw – saw that you want to pick up a whole (one ounce of methamphetamine)?" CRUZ said, "Yeah. Is that okay?" Using coded language, BARRAZA and CRUZ then discussed how long it would take CRUZ to distribute the methamphetamine and provide BARRAZA with the money for the one ounce. CRUZ said, "By then it – well, you'd have it (money/narcotics proceeds) by the end of – by the end of to – today or tonight, you'll have – I'm going – I'm going to flip it (sell the methamphetamine)." (CRUZ advised BARRAZA that she would have the narcotics proceeds for him by today or tonight because CRUZ was going to sell.) Using coded language, BARRAZA and CRUZ continued to discuss the pending transaction, and BARRAZA agreed to meet CRUZ "within 30 minutes."

145.   On September 30, 2009, at approximately 1024 hours, BARRAZA called CRUZ at 714-404-9283. Using coded language, CRUZ asked if BARRAZA wanted to go to CRUZ's apartment to conduct the one-ounce methamphetamine transaction. CRUZ advised that she was located "right off the 22 off Beach." BARRAZA said, "Off Beach?" CRUZ further clarified "Beach and Lampson." (CRUZ was directing BARRAZA to the area of 8331 Lampson Avenue Apt. 19, Garden Grove, California, which is the address listed on CRUZ's California driver's license.) BARRAZA and CRUZ eventually agree to meet at around 12:00.

146.   Sprint Nextel subscriber information for telephone number 714-404-9283 indicated that the telephone was subscribed to Joan Dela Cruz at 8331 Lampson Avenue Apartment 19, Garden Grove, California.

147.   On September 30, 2009, at approximately 1100 hours, members of RMTF initiated surveillance on BARRAZA. The CHP was contacted shortly after.

148.   At approximately 1130 hours, CHP Officer R.A. Adelmann observed the silver Lincoln traveling at a high rate of speed, which Officer Adelmann visually estimated to be 80mph. A short time later, Officer Adelmann observed the silver Lincoln traveling at approximately 70 mph and moving at about 10 feet behind the vehicle in front of it. Officer Adelmann conducted a traffic stop of the vehicle.

149.   Officer Adelmann identified the sole occupant of the vehicle as Humberto Hubert BARRAZA. BARRAZA provided Officer Adelmann with his California Identification Card which identified him as Humberto Hubert P. BARRAZA. CHP Dispatch confirmed that BARRAZA's driving status was suspended and Officer Adelmann subsequently requested a tow truck for impound.

150.   While waiting for the tow truck, Officer Adelmann asked BARRAZA where he was going. BARRAZA placed his hands in his pockets and shuffled away from Officer Adelmann without answering. Shortly after, Officer Adelmann then asked BARRAZA to remove his hands from his pockets for Officer Adelmann's safety and BARRAZA stared at Officer Adelmann blankly without removing them. BARRAZA was then asked again to remove his hands from his pockets and he took them out. Officer Adelmann asked BARRAZA if he had any weapons because BARRAZA wasn't answering Officer Adelmann and BARRAZA said no, while looking down. BARRAZA's slow answers began to concern Officer Adelmann, so Officer Adelmann decided to perform a Terry Pat Down to make sure that there were no weapons present. While performing the pat down, Officer Adelmann felt a bulge in BARRAZA's left front pocket. Officer Adelmann asked BARRAZA what was in his pocket and BARRAZA eventually said, "methamphetamines." Officer Adelmann then proceeded to pull out a clear plastic zip lock baggie containing a white crystalline substance, which was found to be

50

methamphetamine. A DEA Southwest Laboratory report indicated that law enforcement seized approximately 27.5 grams of methamphetamine that was approximately 98.8% pure

151.   Subsequent to the traffic stop, BARRAZA was found to be in possession of a cell phone assigned S/N 364VKJM9DB. Sprint Nextel subscriber information indicated that the phone assigned this S/N was assigned 909-634-9551, which BARRAZA was intercepted using.

152.   On October 8, 2009, at approximately 1922 hours, BARRAZA called MARQUEZ. During the conversation, using coded language, BARRAZA and MARQUEZ discussed his arrest, and MARQUEZ asked whether BARRAZA thought that law enforcement was now following him. (Based on my training and experience, and my knowledge of this investigation, I believe that BARRAZA reported his arrest to MARQUEZ, as MARQUEZ is BARRAZA's organizational leader and source of methamphetamine supply. I also believe that BARRAZA is being forth coming about his arrest, so that MARQUEZ does not have any concerns about supplying methamphetamine to BARRAZA in the future.)

### I.   Distribution of approx. 3 lbs of Methamphetamine on October 22, 2009 (Probable Cause for 1550 RIMPAU, MARQUEZ, DAVID, JOSELITO and ALMA)

153.   In general, on October 22, 2009, Julio coordinated with MARQUEZ for the distribution of 3 pounds of methamphetamine. DAVID and JOSELITO distributed three pounds of methamphetamine at the direction of MARQUEZ to Tocayo, who was accompanied by Arbitro.

154.   On October 22, 2009, at approximately 1228 hours, MARQUEZ called Julio. Using coded language, Julio told MARQUEZ that Tocayo was going to have some narcotics proceeds delivered for MARQUEZ in the United States. Using coded language, Julio also told MARQUEZ that Tocayo would like to pick up "a trio" (three pounds of methamphetamine) from MARQUEZ to make the trip to deliver the narcotics proceeds worthwhile. MARQUEZ agreed to provide the "trio."

155.   On October 22, 2009, at approximately 1231 hours, DAVID called MARQUEZ at Target Telephone #9. Using coded language, MARQUEZ advised DAVID that Tocayo wanted

three pounds of methamphetamine, and told DAVID to call Tocayo to coordinate the narcotics transaction.

156.    On October 22, 2009, at approximately 1238 hours, JOSELITO called DAVID. Using coded language, DAVID told JOSELITO that Tocayo needed three pounds of methamphetamine. JOSELITO agreed to prepare the methamphetamine for Tocayo.

157.    On October 22, 2009, at approximately 1242 hours, Tocayo called DAVID. During the conversation, Tocayo said, "Did they tell you that... that we're going to do tripe (three pounds of methamphetamine), right?" (Tocayo advised DAVID that they (Tocayo et al) wanted 3 pounds of methamphetamine.) DAVID said, "Of course, of course. Just, ah... it would be a matter of knowing what time it'll be ready (referring to when the 3 pounds of methamphetamine will be ready for distribution)." DAVID and Tocayo then coordinated where to meet to conduct the transaction. Tocayo referred to "an electronic store before the 605" (Based on subsequent surveillance activities, I believe that Tocayo was referring to the Fry's Electronics at 13401 Crossroads Parkway North, City of Industry, California.) DAVID said, "Ah... yes, yes. In other words, the – the sound system (referring to a hidden compartment used to transport narcotics/narcotics proceeds)... you know that either way you need... you need a garage or something, but... we'll find a way to see how – how we can do it." (DAVID advised that you need a garage or safe place to unload the methamphetamine from the hidden compartment. DAVID further advised that they would find a way to conduct the transaction.) DAVID and Tocayo continued to discuss the logistics of the transaction. They eventually agreed to meet later that afternoon.

158.    On October 23, 2009, at approximately 1308 hours, DAVID called JOSELITO. During the conversation, JOSELITO said, "Or, fool, should I put them (narcotics proceeds) in the car so you can take them over there, or... should I leave them in the car." DAVID advised that Tocayo was not going to be ready (referring to being ready to conduct the methamphetamine transaction) until around 3:30 to 4. JOSELITO said, "Then I'm going to – to leave them (the three pounds of methamphetamine for Tocayo) here (at the 5627 34th stash location) and... and I'll throw the documents (narcotics proceeds) in the car and I'll take off with you, no? Or, how

should we do it?" DAVID said, "If you want, put them there. (DAVID advised JOSELITO to put the narcotics proceeds in the transportation vehicle.) We'll go and take them to the house (DAVID's residence, 1550 RIMPAU) and we leave the car to the wife (ALMA)... and then... she can come, or whatever." JOSELITO said, "All right. Then... I'll put the documents (narcotics proceeds) in and I'll pass by for you right now. DAVID said, "And put the – the... tripe (three pounds of methamphetamine) for the fucking guy too." (DAVID again advised JOSELITO to also put the three pounds of methamphetamine in the vehicle also.) JOSELITO said, "Everything fits, right?" (JOSELITO asked if the 3 pounds of methamphetamine and the narcotics proceeds will fit in the hidden compartment in the transportation vehicle.) DAVID said, "Yes, of course." JOSELITO said, "All right. I'm taking... this number, eight-two ($82,000 in narcotics proceeds)." (JOSELITO advised DAVID that JOSELITO would be taking $82,000 in narcotics proceeds, referring to taking the $82,000 in narcotics proceeds to DAVID's residence, 1550 RIMPAU.) DAVID said, "Yes, yes. I think so." JOSELITO said, "All right, then. I need to... get the tripe (three pounds of methamphetamine) ready, so they can be crunchy for right now." (JOSELITO advised DAVID that JOSELITO needs to get the 3 pounds of methamphetamine ready for distribution.)

159.    On October 22, 2009, at approximately 1437 hours, DAVID spoke with ALMA. During the conversation, ALMA informed DAVID that she was "at the house" (referring to 1550 RIMPAU). DAVID informed ALMA that he was on his way over there (1550 RIMPAU) "to drop a truck off" (based on the context of the call to follow, a truck containing narcotics proceeds). DAVID continued, "But I'm going to get there and... I'm going to drop off the truck for you... and I'm going to drop off something (narcotics proceeds) and I'm leaving right away." (DAVID explained that after he drops off the truck, he is leaving with "Chepin" (JOSELITO)). ALMA asked where they were going. DAVID said, "I'm barely on my way. But I'm taking... a paper (narcotics proceeds), which I have to drop off at home (1550 RIMPAU). And I'm leaving from there." DAVID then instructs ALMA to have JOSELITO go in the garage, "...since he has the car. He'll leave that there (JOSELITO will leave the narcotics proceeds at 1550 RIMPAU)

53

and he should get out right away (leave 1550 RIMPAU quickly after dropping off the narcotics proceeds)."

160.   On October 22, 2009, at approximately 1448 hours, DAVID called ALMA and continued the above conversation. DAVID said, "Do you want to pick up David (ALMA and DAVID's son)? ALMA said, "Well, didn't you say you were dropping by?" DAVID said, "Yes, but... it... Chepin (JOSELITO) brought me a paper (narcotics proceeds) and I left it in the fucking truck and I barely remembered that it's (the narcotics proceeds) in the back of the seat." (DAVID is asking ALMA if she will pick up David from school because DAVID currently has narcotics proceeds in the vehicle and does not want to use that vehicle to pick up their son.) ALMA said, "What does it have to do with that?" DAVID said, "Huh?" ALMA said, "What paper?" DAVID said, "ALMA, what do you mean what paper?  You know what paper I'm talking about. (DAVID advised ALMA that she knows that DAVID is referring to narcotics proceeds.) DAVID continues, "And right now, Chepin (JOSELITO) is in the front and... he's going with another paper (narcotics proceeds) along with... tools (narcotics). (DAVID advised ALMA that JOSELITO was arriving with a vehicle containing narcotics proceeds and narcotics.  I further believe that DAVID was referring to the three pounds of methamphetamine as the "tools".)  And from there, we have to take it to the old man over there. (DAVID and JOSELITO advised that they had to deliver the narcotics to the old man.)  If you want, get ready.  We're (DAVID and JOSELITO) are going to go in right now.  I'll just drop off the truck for you and... I'll take off to over there. (DAVID advised ALMA that he (DAVID) will drop the truck off with ALMA and take off with JOSELITO to deliver the methamphetamine.)  DAVID told ALMA to get ready.  ALMA said, "And what's going to happen?" DAVID said, "I told you I'm going to take that" (referring to the pending delivery of the three pounds of narcotics).  ALMA said, "Hmm. Who and who is going?" (ALMA asked who was going with DAVID to deliver the narcotics.) DAVID said, "Chepin (JOSELITO) and I (DAVID).  Chepin (JOSELITO) is in front of me in the car.  I'm in back of him in the truck." ALMA said, "Hmm." DAVID said, "If not, I'll go in there right now and I'll tell him to go to the gas station and I'll give him (JOSELITO) that (the narcotics proceeds located in the truck that DAVID is driving).  And I'll have him go inside with

54

everything (DAVID will have JOSELITO take all of the narcotics proceeds to 1550 RIMPAU).
And I'll go right now (DAVID will go pick up David) – but I'm going to pass by right now and
I'm going to drop off the truck for you (DAVID is going to drop of the truck to ALMA, so
ALMA can pick up David because DAVID is driving by 1550 RIMPAU) and I'll go with Chepin
(JOSELITO)." ALMA said, "I don't know." DAVID said, "Huh?" ALMA said, "I don't
know." DAVID said, "All right, then. I'll drop off... [the vehicle] right now."

161.    Based on my training and experience, I believe DAVID is transporting narcotics
proceeds and does not want to pick up his son in a vehicle containing evidence of his illicit
operation. Consequently, I believe DAVID wants ALMA to pick up his son after DAVID is able
to drop the proceeds off at 1550 RIMPAU or to transfer the narcotics proceeds to JOSELITO.
This would leave DAVID / ALMA with a safe vehicle (free of contraband) to pick up their son –
David. I further believe this call demonstrates that ALMA is aware that DAVID and JOSELITO
are involved in narcotics trafficking.

162.    At approximately 1525 hours, members of the Regional Methamphetamine Task
Force located DAVID in the mobile home park containing 1550 RIMPAU.

163.    At approximately 1535 hours, law enforcement observed DAVID drive away from
1550 RIMPAU in a pewter colored Nissan Altima, bearing California license plate 6FXA749,
which was registered to Jose Alfredo Jimenez (JOSELITO). (Based on this investigation to date
and the search of the Nissan Altima on November 11, 2009, I am aware that Nissan Altima
contained a hidden compartment that was used for the transportation of narcotics on November
11, 2009. Consequently, I believe that DAVID and JOSELITO were using the Nissan Altima to
transport the three pounds of methamphetamine.) (Although it was not mentioned in the
surveillance report, based on my conversations with RMTF Detective Brad Powers, who was
present during the surveillance, Det. Powers advised me that JOSELITO was also in the Nissan
Altima with DAVID.)

164.    At approximately 1609 hours, law enforcement observed the Altima exit Freeway
60 at the Crossroads exit, enter into the Fry's Electronics parking lot, and park.

165.    On October 22, 2009, at approximately 1611 hours, Tocayo called DAVID. During the conversation, DAVID informed Tocayo that he had arrived. Tocayo said, "The referee (Arbitro) is here with me. This way he can go with you and you and you guys can load the... speakers (referring to the 3 pounds of methamphetamine)." (Tocayo advised that Arbitro would receive the 3 pounds of methamphetamine from DAVID.) DAVID said, "Done deal." Tocayo said, "It's tripe again, right?" (Tocayo asked to confirm that it was 3 pounds of methamphetamine.) DAVID said, "Yes, I'm at the front."

166.    At approximately 1615 hours, law enforcement observed a blue Jeep Cherokee, bearing California license 'LILSARA', park near DAVID in the Altima. The driver of the Jeep Cherokee, an unidentified Hispanic male adult (Based on the call above, I believe that the driver of the Jeep was Arbitro), made contact with DAVID. It appeared that DAVID handed an unknown object to the driver of the Jeep. (Based on wire interception and this investigation to date, I believe that DAVID provided Arbitro with the 3 pounds of methamphetamine.)

### J.    Seizure of 11.14 kgs Methamphetamine on October 26, 2009 (Probable Cause for MARQUEZ, DAVID, JOSELITO, FARIAS, MATA-GARCIA, PRIETO and MARGARO)

167.    In general, in October 2009, Fabian and MARGARO conspired to receive methamphetamine in Washington State from MARQUEZ and DAVID. MARQUEZ subsequently coordinated with PRIETO for the transportation of the above mentioned shipment of drugs through narcotics transporters FARIAS and MATA-GARCIA. That shipment of drugs was subsequently seized by law enforcement on October 26, 2010.

168.    On October 16, 2009, at approximately 1222 hours, MARQUEZ spoke with Fabian. Using coded language, Fabian agreed to pay MARQUEZ $11,000 per pound of methamphetamine if MARQUEZ transported the methamphetamine to Washington State. MARQUEZ advised Fabian that he (MARQUEZ) would bring up approximately 20 pounds of methamphetamine ("I'll bring up a – 'ventiladorcito' (code for venti = 20) or something like that with you"). Using coded language, MARQUEZ also told Fabian that he would coordinate with PRIETO for the delivery.

169.    On October 20, 2009, at approximately 0938 hours, MARQUEZ spoke with PRIETO. During the conversation, MARQUEZ asked, "when can your brother-in-law go up there" (make a delivery of methamphetamine to Washington State), "to see if we can put a coin in the machine, pardon me, a quarter (25 pounds of methamphetamine)." (MARQUEZ asked PREITO when his brother-in-law could transport 25 pounds of methamphetamine to Washington State.) PRIETO indicated, "...well on the weekend." PRIETO further described that, "I think by Saturday he will come back down (to the Los Angeles area from Washington State), then we give him something and he can come back with a "quarter" (25 pounds of methamphetamine). MARQUEZ said, "That's it, man, we're set like that." Based on this call and my training and experience, I believe MARQUEZ and Fabian are coordinating for the delivery of 25 pounds of methamphetamine to Washington State which would ultimately be seized by law enforcement on October 26, 2009.

170.    On October 23, 2009, at approximately 1229 hours, MARQUEZ spoke with MARGARO. During the conversation, MARGARO asked "how much are you going to give them to me" (what is the price per pound of methamphetamine). MARGARO then asked, "The same as you are giving them to Fabi (Fabian), well, for 'Tamalito' (likely Tavo)?" (MARGARO wants to know if MARQUEZ will charge MARGARO the same price for methamphetamine as he charges Fabian.) MARGARO goes on to explain, "and to start well, with – with a little hand" (MARGARO wants to purchase 5 pounds of methamphetamine). MARQUEZ subsequently agreed to provide the methamphetamine to MARGARO at the same price.

171.    On October 23, 2009, at approximately 1422 hours, DAVID spoke with MARQUEZ. Using coded language, MARQUEZ advised DAVID to distribute 5 pounds of methamphetamine to MARGARO.

172.    On October 23, 2009, at approximately 1528 hours, DAVID spoke with JOSELITO. DAVID confirmed that he (DAVID) wanted JOSELITO to distribute 5 pounds of methamphetamine to MARGARO.

173.    On October 23, 2009, at approximately 1548 hours, DAVID spoke with MARGARO. During the conversation, MARGARO and DAVID discussed directions to the

vicinity of the 5627 34th address. (I believe that MARGARO was confused during this call because DAVID and MARQUEZ thought that MARGARO was located in the Los Angeles area; however, I believe that MARGARO was located in Washington State during this conversation.)

174.    On October 23, 2009, at approximately 1619 hours, MARQUEZ spoke with Fabian. During the conversation, Fabian said that DAVID told MARGARO to come over, "but he (MARGARO) says he doesns't understand if it's going to happen here where I am (Washington State) or down there (the Los Angeles area)." (Fabian advised MARQUEZ that MARGARO is confused on where the narcotics transaction is going to take place - in Washington State or the Los Angeles area.) At the end of the conversation, MARQUEZ confirmed with Fabian "on Monday cousin, we'll go up on Monday. From Sunday to Monday." (I believe that MARQUEZ advised Fabian that the methamphetamine for MARGARO would be sent to Washington State sometime between Sunday and Monday. I believe that MARQUEZ intends on sending the methamphetamine for Fabian and MARGARO together through PRIETO's transporters. In effect, of the 25 pounds of methamphetamine being sent, 5 are destined for MARGARO and the remaining 20 pounds for Fabian.)

175.    On October 25, 2009, at approximately 1416 hours, DAVID spoke with MARQUEZ. During the conversation, MARQUEZ asked if "El Prieto" (PRIETO) called DAVID. DAVID affirmed and said that PRIETO, "wants me to call his brother-in-law (MATA-GARCIA) to come to an agreement there." DAVID adds that PRIETO, "...wants me to put the little bottles there (deliver the methamphetamine to MATA-GARCIA). MARQUEZ explained that they (MARQUEZ and PRIETO) had agreed that the same woman (FARIAS) "was going to go" (pick up the methamphetamine).

176.    On October 25, 2009, at approximately 1424 hours, DAVID spoke with MARQUEZ. Using coded language, MARQUEZ told DAVID that FARIAS would pick up the 25 pounds of methamphetamine from DAVID and take it to MATA-GARCIA.

177.    On October 25, 2009, at approximately 1614 hours, DAVID spoke with FARIAS. During the conversation, FARIAS introduced herself and said that he (PRIETO) "asked me to pick up and order tomorrow" (referring to the 25 pounds of methamphetamine). FARIAS asked,

"At what time can you have it ready tomorrow?" DAVID asked if FARIAS would be coming tomorrow, and directed her to a Shell gas station near the 5627 34th stash location the following morning.

178.    On October 26, 2009, at approximately 0546 hours, DAVID spoke with FARIAS. During the conversation, FARIAS told DAVID she was already here at the "Shell" (Shell gas station). DAVID asked what car FARIAS had. FARIAS responded "a Nissan Quest - a van." (I believe that DAVID asked FARIAS what car she was driving to facilitate the linkup between JOSELITO and FARIAS for the narcotics transaction.)

179.    On October 26, 2009, at approximately 0548 hours, DAVID spoke with JOSELITO. During the conversation, DAVID informed JOSELITO to meet FARIAS, and that she had a Nissan Quest. JOSELITO acknowledged and asked for her name. DAVID responded, "Liana" (FARIAS).

180.    At approximately 0550 hours, surveillance observed a Hispanic female, later identified as FARIAS, driving a silver Nissan Quest bearing California license plate 5YND818, in the parking lot of the Shell Gas Station. FARIAS was accompanied by an unidentified Hispanic male (UHM-1), who was sitting in the front passenger seat. Law enforcement then observed a Hispanic male (based on wire interception, I believe that Hispanic male was JOSELITO) enter the back of the Nissan Quest via the right side slider door. The vehicle then departed the Shell Gas Station heading towards the 5627 34th Street residence. Within a minute, the Nissan Quest arrived at the 5627 34th Street residence. JOSELITO got out of the Nissan Quest. The Nissan Quest remained in front of the driveway facing westbound with the lights turned off. A short time later, an individual, who could not be identified due to the darkness, walked back out to the Nissan Quest carrying an unknown object. The unknown object was placed into the right side slider of the Nissan Quest. Afterwards, the Nissan Quest made a u-turn and headed back to Rubidoux Boulevard.

181.    At approximately 0748 hours, the Nissan Quest arrived in the area of 12th Street and Soto Street in the Boyle Heights area of Los Angeles, California. The area was observed to have several tractor trailers parked along 12th Street. The Nissan Quest was observed to pull up

59

along the left side of a red Volvo tractor and a trailer. The tractor and trailer had Washington license plates.

182.    A Hispanic male, later identified as MATA-GARCIA, exited the cab of the tractor. MATA-GARCIA subsequently made contact with the occupants of the Nissan Quest, FARIAS and UHM-1. Investigator Acevedo observed MATA-GARCIA reach into the right side slider door of the Nissan Quest and pull out a box. MATA-GARCIA then placed the box into the cab of his tractor.

183.    At approximately 1000 hours, law enforcement observed MATA-GARCIA drive away westbound on 12th Street. From this time until approximately 1420 hours, law enforcement saw MATA-GARCIA visit three produce businesses. At the first business, law enforcement saw MATA-GARCIA's tractor trailer being loaded. At the second two businesses, law enforcement saw MATA-GARCIA open the back doors to the trailer and back it up to a loading dock.

184.    Surveillance was maintained on MATA-GARCIA until CHP Officer Darren Long conducted an enforcement stop of MATA-GARCIA in the vicinity of I-5 and Copus Road in Kern County, California for a violation of Vehicle Code 22406(a), driving in excess of maximum speed for combination vehicles. As a result of the stop the driver was positively identified as Jose Luis MATA-GARCIA. MATA-GARCIA provided Officer Long with a valid Washington driver's license.

185.    MATA-GARCIA granted consent for officer Long and his narcotics canine to search his vehicle. At this point, CHP Officer Pratt continued writing the vehicle code citation, while Officer Long prepared a CHP-202D consent to search form. Officer Long asked MATA-GARCIA if he preferred to read in English or Spanish and MATA-GARCIA requested Spanish. MATA-GARCIA read the form and signed it. Officer Long retrieved his departmental narcotics canine, "T'lajo" (KM04103). T'lajo alerted to one of the boxes in the vehicle, tearing it open. Officer Long opened the box more and observed what he immediately recognized as what he believed to be crystal methamphetamine inside taped tupperware style containers. MATA-GARCIA was placed under arrest.

186.   Officer Long searched the vehicle and located a cellular phone in addition to the one on MATA-GARCIA's person. The phone found to be in MATA-GARCIA's possession was a yellow AT&T cellular Samsung telephone with a SIM card assigned #89014102232418982261. Based on subscriber information, I am aware that the telephone assigned SIM card assigned #89014102232418982261 was telephone number (509) 750-8899, which is the number over which MATA-GARCIA was intercepted.

187.   At the Buttonwillow CHP Office, the two cardboard boxes containing the suspected methamphetamine were further searched. The two cardboard boxes were found to contain a total of nine taped Tupperware style containers of various sizes containing suspected methamphetamine. Three of the Tupperware containers were of a larger size and marked with "2" and "Litros" on the lids. Five of the Tupperware containers were of a medium size and marked with "Litro" on the lids. One of the Tupperware containers was of a smaller size and contained no markings. The total weight of the nine taped Tupperware containers was approximately 12,690 grams (27.9 pounds).

188.   MATA-GARCIA was advised of his Miranda rights per an FD-395 "Advice of Rights" form in English, and was asked if he understood each of his rights. MATA-GARCIA stated that he understood his rights and then agreed to waive them and speak without an attorney present. MATA-GARCIA admitted that he knew there were drugs inside the boxes, but stated that he did not know what kind of narcotics it was nor how much narcotics was in the boxes.

**K.   Distribution of approx. 5lbs Methamphetamine on November 7, 2009 (Probable Cause for 19974 JUSTICE MILL, MARQUEZ, DAVID, JOSELITO, CHON, and MARTIN)**

189.   In general, on November 6, 2009, MARTIN asked CHON to see if MARQUEZ could provide CHON with 5 pounds of methamphetamine. On November 7, 2009, CHON and Antonio picked up 5 pounds of methamphetamine from DAVID and JOSELITO at the 5627 34th address. CHON and Antonio then transported the methamphetamine to MARTIN to the area of 19974 JUSTICE MILL.

190.   On November 6, 2009, at approximately 0845 hours, CHON spoke with MARTIN. During the conversation, MARTIN said, "See if they'll lend you a hand (5 pounds of

methamphetamine), all right?" (Based on subsequent wire intercepts, I believe that MARTIN asked CHON to see if MARQUEZ would provide CHON 5 pounds of methamphetamine through DAVID.) CHON acknowledged and said he would call MARTIN back.

191.    On November 6, 2009, at approximately 0858 hours, CHON spoke with Antonio. Using coded language, CHON asked Antonio if he (Antonio) was going to be going towards the Riverside, California, area. I believe that CHON wanted to know if Antonio is traveling to the Riverside area because the DON CHUY DTO stash location at the 5637 34th address is located in Riverside, California. Antonio said he was. CHON said that, "the brother (MARTIN) called me right now saying that he needed some (methamphetamine) after all for the guys there (methamphetamine customers)." CHON then asked Antonio, "would you go over there?" (CHON asked if Antonio would go the 5627 34th address to pick up the methamphetamine for MARTIN.) Antonio agreed. CHON said, "I'm going to call the guys (DAVID/JOSELITO) first to see if they're ready (ready for Antonio to pick up the methamphetamine) and then I'll give you a call." Antonio acknowledged.

192.    On November 6, 2009, at approximately 0859 hours, CHON spoke with DAVID. During the conversation, in coded language, CHON asked if methamphetamine could be picked up for MARTIN. DAVID said, "Yes, of course...it's just that he (MARTIN) hadn't told me how many (units of methamphetamine) he'd be picking up." CHON said, "...it's going to be one – one hand (a reference to five fingers; five pounds of methamphetamine), listen, one hand, if you can." (CHON is requesting five pounds of methamphetamine from DAVID.) DAVID said, "That's fine...Just let me get my stuff together quickly (prepare the methamphetamine for distribution) and I'll call you in right now in about 10 to 15 minutes." CHON said, "It's that I'm a bit far away here, and the – the guy that's always with me (Antonio) is going to go visit you." (Antonio will be picking up the methamphetamine.)

193.    On November 6, 2009, at approximately 0904 hours, CHON spoke with Antonio. Using coded language, CHON and Antonio agreed that they would pick up the methamphetamine the following day.

194.    On November 6, 2009, at approximately 1318 hours, CHON spoke with MARQUEZ. Using coded language, CHON advised MARQUEZ that they would pick up five pounds of methamphetamine from DAVID the following day.

195.    On November 7, 2009, at approximately 0845 hours, DAVID spoke with JOSELITO. During the conversation, DAVID said, "Well, hurry up because Cheche (CHON) is going out there." (DAVID advised JOSELITO that CHON is on his way to the 5627 34th address to pick up 5 pounds of methamphetamine for MARTIN.) JOSELITO acknowledged and advised DAVID that "everything is ready" (the 5 pounds of methamphetamine is ready to be distributed to CHON). At the end of the conversation, DAVID advised JOSELITO that he (DAVID) would see JOSELITO "at your house" (the 5627 34th address) right now. JOSELITO acknowledged. (DAVID and JOSELITO are going to meet at the 5627 34th address to distribute five pounds of methamphetamine to CHON.)

196.    At approximately 0922 hours, law enforcement observed DAVID arrive at the 5627 34th address driving a pewter colored Nissan Altima, bearing California license plate 6XFA749.

197.    On November 7, 2009, at approximately 0923 hours, DAVID spoke with CHON. During the conversation, CHON said "We're here – we're already here at the off-ramp." (CHON and Antonio are at the Rubidoux exit from the 60 Freeway, which is used to travel to the 5627 34th address.) CHON the says, "We'll drop by right now, so that you'll open the door." (CHON advised DAVID that they were about to arrive at the 5627 34th address, so that DAVID could open the gate to the driveway.) DAVID said, "Come by, come by."

198.    On November 7, 2009, at approximately 0925 hours, DAVID spoke with CHON. During the conversation, CHON said, "There's – there's a car there, have you seen it?" (CHON believes he sees a possible law enforcement vehicle. Based on my training and experience, I am aware that narcotics traffickers are aware that law enforcement conducts surveillance operations and that narcotics traffickers are typically always on the lookout for law enforcement while conducting their illicit activities. I believe this further demonstrates that CHON was about to conduct a narcotics transaction with DAVID.)

199.   Four minutes later, at approximately 0929 hours, law enforcement observed a white Nissan Altima arrive at the 5627 34th address and drive down the driveway. (CHON and Antonio arrived in the white Nissan Altima to pick up 5 pounds of methamphetamine.)

200.   On November 7, 2009, at approximately 0938 hours, CHON spoke with MARTIN. During the conversation, CHON said, "…we already saw this guy (DAVID) here. We're heading out there." (CHON advised MARTIN that CHON and Antonio picked up the five pounds of methamphetamine from DAVID at the 5627 34th address, and were about to deliver the drugs to MARTIN at 19974 JUSTICE MILL.) MARTIN acknowledged and said he would be waiting.

201.   At approximately 0939 hours, law enforcement observed the white Nissan Altima, bearing California license 5ZFE469 depart the 5627 34th address. (CHON and Antonio picked up the 5 pounds of methamphetamine and departed the location with the methamphetamine in the white Nissan Altima for delivery to MARTIN.)

202.   At approximately 1010 hours, law enforcement observed the white Nissan Altima make a right turn on Justice Mill Road in the unincorporated area of Perris. There were two addresses at the roadways edge. The addresses read 19995 and 19974. Due to the geographic location of MARTIN's residence on Justice Mill Road, law enforcement did not follow the Nissan Altima up Justice Mill Road so as not to compromise their surveillance operation and the overall investigation. (Based on my training, experience, and my knowledge of this investigation, I believe that CHON and Antonio transported the five pounds of methamphetamine to MARTIN to the area of 19974 JUSTICE MILL.)

203.   At around this time, GPS information from Target Telephone #15 indicated that CHON was in the area of MARTIN's residence at 19974 JUSTICE MILL. Based on GPS information from Target Telephone #15, I believe that CHON remained in the area of the 19974 JUSTICE MILL until at least 1147 hours.

204.   On November 7, 2009, at approximately 1227 hours, CHON spoke with MARQUEZ. During the conversation, CHON said, "I just wanted to tell you that we (CHON and Antonio) went…DAVID, and he gave me "a hand" (five pounds of methamphetamine).

Based on my training and experience, I believe this further demonstrates that CHON picked up five pounds of methamphetamine for MARTIN on November 7, 2009.

205.    On February 15, 2010, Corporal Zunker went to 19974 JUSTICE MILL to confirm the location to be the residence of Martin Angulo GARCIA ("MARTIN").

206.    While at the location, Corporal Zunker spoke with Lupita Garcia. Lupita advised that she lived at 19974 JUSTICE MILL with her husband, "Fernando", their six children, and approximately five dogs. Lupita provided Corporal Zunker with telephone number 951-940-8392 as the hard line telephone for the residence. Lupita also advised that the address numbers to the second residence were 19975. Corporal Zunker noted that "Fernando" was very quiet.

207.    On February 18, 2009, I emailed Corporal Zunker a photograph of Martin Angulo GARCIA. Corporal Zunker positively identified "Fernando" as GARCIA.

> **L.    Seizure of 4,968g of Methamphetamine on November 11, 2009 a $4,980 on November 17, 2009 (Probable Cause for 1094 W. 15TH STREET, MARQUEZ, DAVID, JOSELITO, CHECO, JAVIER, JORJON, ISAIAS, and ALONSO)**

208.    In general, in November 2009, ALONSO coordinated with DAVID for the delivery of methamphetamine to 1094 W. 15TH STREET. Also in November 2009, JAVIER coordinated with DAVID, CHECO, MARQUEZ, and ISAIAS for the distribution and transportation of 4,968 grams of methamphetamine to the Fresno, California, area, which was seized by law enforcement from CHECO on November 11, 2009. On November 17, 2009, $4,980 was subsequently located in the hidden compartment of CHECO's transportation vehicle.

> **i.    ALONSO Coordinates Delivery of Methamphetamine to 1094 W. 15TH STREET**

209.    On November 9, 2009, at approximately 1931 hours, DAVID called MARQUEZ. Using coded language, MARQUEZ told DAVID that "I got a handful of . . . some bottles (kilograms of methamphetamine) that were of dough (referring to a different type of methamphetamine, likely a lower quality methamphetamine), and some others of the original bucanas that we have always worked with (referring to the type of methamphetamine that DAVID and MARQUEZ usually distribute)." Using coded language, MARQUEZ told DAVID

that MARQUEZ gave a "tooth" (10 kilograms of methamphetamine) of the lower quality methamphetamine ("dough") to ANDRES, which ANDRES was going to return because ANDRES did not like the quality. During the conversation, MARQUEZ said ". . . so, that guy is going to give you back a tooth (10 units of methamphetamine), remember, and it's of dough (lower quality), so write 'dough' on it with a . . . marker, and the other ones that this guy . . . ALONSO went with, they're also of dough" (I believe that MARQUEZ is referring to a previous methamphetamine delivery to the 1094 W. 15TH STREET stash house, which was coordinated with ALONSO).

210.   On November 11, 2009, at approximately 1221 hours, ALONSO called DAVID. During the conversation, DAVID said, ". . . I'm here . . . I wanted to invite you to go eat." (DAVID was advising ALONSO that he (DAVID) was ready to receive the methamphetamine load.) ALONSO said, "Listen, listen, I'm taking the kids out for a ride." (ALONSO advised that he (ALONSO) was still transporting the methamphetamine.) During the conversation, DAVID said, ". . . I'll be there at the restaurant (the stash location)." (1094 W. 15TH STREET stash location.) ALONSO said, "All right, then. All right." (Based on my training, experience, and my knowledge of this investigation, including the surveillance discussed in the next paragraph, I believe that ALONSO and DAVID were coordinating for the delivery of methamphetamine to DAVID.)

211.   On November 11, 2009, from approximately 1320 hours, RMTF Deputy Anthony Juarez made multiple observations at 1094 W. 15TH STREET. Deputy Juarez saw a Nissan Altima arrive at the 1094 W. 15TH STASH LOCATION and park on the street. (Based on a review of GPS information and surveillance observations, I believe that DAVID arrived at the 1094 W. 15TH STASH LOCATION in the Nissan Altima.) Law enforcement also saw a green Volkswagen, bearing California license plate 5KSR526, (the "Green Volkswagen") that was parked in front of the residence backed into the garage. (As described below, based on the CHP traffic stop of CARPIO and ALONSO on December 2, 2009, I am aware that the Green Volkswagen has been used by CARPIO and ALONSO as a methamphetamine transportation vehicle. Based on my training, experience, my knowledge of this investigation, the call between

DAVID and ALONSO described in the preceding paragraph, and the traffic stop on December 2, 2009, I believe that methamphetamine was delivered to the 1094 W. 15TH STASH LOCATION on November 11, 2009 in the Green Volkswagen.)

### ii.    CHECO Transports 4,968g of Methamphetamine

212.    On November 11, 2009, at approximately 1331 hours, CHECO called DAVID. During the conversation, using coded language, DAVID told CHECO to come to the 1094 W. 15TH STASH LOCATION, and to call JOSELITO for directions.

213.    As Deputy Juarez's surveillance continued, Deputy Juarez also saw a Mazda SUV, bearing California license plate 3CPH775 (registered to PULIDO), arrive and park in front of the residence. Officer Juarez saw CHECO exit the vehicle and walk to the residence. A silver Ford F-150 and the the Green Volkswagen were seen departing.

214.    On November 11, 2009, at approximately 1505 hours, ISAIAS called JAVIER. During the conversation, JAVIER said, ". . . Chuchin (MARQUEZ) called me, . . . they're (CHECO) already on their way here?" ISAIAS said, "Who is this?" JAVIER said, "Oh, from over here, . . . the cousin from . . . Turlock (Turlock, California)."

215.    On November 11, 2009, at approximately 1506 hours, JAVIER called ISAIAS. ISAIAS and JAVIER continued the conversation from above. During the conversation, JAVIER said, "This is . . . Antunes (JAVIER)." ISAIAS said, "Did you agree to meet somewhere?" (ISAIAS asked JAVIER if JAVIER and CHECO agreed on where they were going to meet, referring to a location to meet to conduct the narcotics transaction.) JAVIER said, "Yes. . . did Chuchin (MARQUEZ) talk to you?" ISAIAS said, ". . . yes, I'm going to talk to him (MARQUEZ) now. . .What should I say? That you're ready at that place?" (ISAIAS asked JAVIER what ISAIAS should report to MARQUEZ with regard to the narcotics transaction.) JAVIER said, "Yes . . .there at the same place . . . he's around – around Delano (Delano, California), he (CHECO) should give me a call so I can go over there . . . to where the tree is (referring to Fresno, California)." (JAVIER advised ISAIAS that CHECO would call JAVIER when CHECO reached Delano, California, and that JAVIER would then leave to meet CHECO in Fresno, California.)

216.   On November 11, 2009, at approximately 1545 hours, DAVID received an incoming call from MARQUEZ.  During the conversation, DAVID said, ". . . that guy (CHECO) went up there already (went up to deliver the methamphetamine to JAVIER in the Fresno area), a while ago, and so did Loncho (ALONSO) too.  They're (the narcotics transporters) already on their way back (to Mexico)."  MARQUEZ said, "Oh, good.  Good, man."  DAVID and MARQUEZ then began to discuss narcotics proceeds that DAVID sent to MARQUEZ.  At the end of the conversation, DAVID said, "Well, the rest is . . . almost gone (referring to methamphetamine almost being gone), you see, Antunes (JAVIER) took a "tooth" ("diente," referring to 10 pounds of methamphetamine)..."  (DAVID sent CHECO with approximately 10 pounds of methamphetamine to deliver to JAVIER.)

217.   On November 11, 2009, at approximately 1910 hours, Officer Long initiated a traffic stop of a Nissan Altima, bearing California license plate 6FXA749 (registered to Jose Alfredo Jimenez (JOSELITO)) in the vicinity of the Clovis Avenue exit near Fresno, California.  Officer Long initiated the stop for a violation of expired registration and for displaying a fraudulently obtained registration tab.

218.   Officer Long contacted the driver, subsequently identified as Sergio Chavez Pulido (CHECO) and advised CHECO of the reason for the stop.  Officer Long saw CHECO to be extremely nervous and noted that CHECO was stuttering as they spoke.  CHECO stated that the vehicle belonged to his brother-in-law and that he was borrowing the vehicle to drive to Turlock to visit his sick uncle.  Eventually, CHECO changed his statement, claiming that he owned the Altima, though it was in his brother-in-law's name.

219.   Officer Long asked if CHECO would allow Officer Long to search CHECO's vehicle with Officer Long's narcotic canine and CHECO agreed and signed a consent form.

220.   Officer Long's departmental canine, T'Lajo, alerted to the middle front of the dash board.  Officer Long advised CHECO that T'Lajo had alerted to the vehicle.  CHECO blurted out that it was a salvaged vehicle.

221.    Officer Long saw what appeared to him to clearly be a manufactured compartment with the dash area of the vehicle.  Officer Long was able to look through the windshield near the firewall.  Officer Long could see plastic packaging inside the dash area through the defrost vents.

222.    CHECO was arrested.  CHECO and the vehicle were subsequently transported to the CHP Central Division Office.  At the Central Division Office, Officer Long and CHP Sergeant Todd Spino conducted a further search of the vehicle.  During the search, Officer Long located what appeared to be a non-factory wire under the dash.  Officers then jumped the wire, and the actuator opened the manufactured compartment.  The entire section of the dash came loose and was removed, which provided access to the carpeted compartment.  Inside the compartment, law enforcement located 10 individually wrapped packages.  The packages were each shrink wrapped in a food saver vacuum pack.  A DEA Southwest Laboratory report indicated that the packages contained approximately 4,968 grams of methamphetamine that was approximately 95.3% pure.

223.    Officers opened one of the packages and found that the package contained what appeared to be crystal methamphetamine.  Officer Long conducted a presumptive test on the substance which resulted in a positive reaction for methamphetamine.  Subsequent lab tests revealed that these packages contained a total of 4,968 grams of methamphetamine that was 95.3% pure.

224.    Officer Long subsequently conducted an interview of CHECO.  During the interview, CHECO continued to deny any knowledge of the drugs.  CHECO also advised that the vehicle actually belonged to him even though it was registered in his brother-in-laws name.  CHECO stated that he had had complete control of the vehicle for the last few months.  CHECO also advised that he had made several trips to Mexico and back in the vehicle.  CHECO further stated that every time he comes back into the country (the United States) he gets searched.  He stated that Customs always pulls him into secondary and searches his vehicle, but that they let him go.  CHECO could not explain how the vehicle came to be loaded with drugs.

225.    Subsequent to the traffic stop and the investigation, CHECO was found to be in possession of a Motorola i465 Boost Mobile cellular telephone, the subscriber information for

which indicated that the telephone was assigned telephone number 951-258-6163. Furthermore, law enforcement also located a Boost Mobile Re-Boost receipt of $50.00 for cellular telephone number 951-258-6163. In an intercepted call between DAVID and JAVIER described in the following paragraph, DAVID told JAVIER that CHECO's number was 951-258-6163.

### iii.   Discussions Regarding CHECO'S and ALONSO'S Whereabouts

226.   On November 11, 2009, at approximately 1950, DAVID called JAVIER. During the conversation, DAVID said, "But the guy's (CHECO's) not answering the fucking radio, that phone that I told you." DAVID and JAVIER continued to discuss their inability to get a hold of CHECO. During the conversation, JAVIER asked DAVID to confirm that CHECO's number was 951-258-6163 and DAVID confirmed. JAVIER said that he would keep calling CHECO.

227.   On November 11, 2009, at approximately 2147 hours, MARQUEZ called DAVID. During the conversation, MARQUEZ said, "…if his … phone is not working… by this time he should have already gone to a pay phone or something." (MARQUEZ advised that if CHECO's phone wasn't working, by now CHECO should have gone to a pay phone to call someone.) DAVID said, "Yes . . . it's already been over two hours. He (CHECO) should have – he should have been able to work it out." MARQUEZ said, "Yes, and the other friend (ALONSO) hasn't arrived either … ALONSO." (MARQUEZ advised DAVID that ALONSO has not arrived in Mexico either, referring to returning to Mexico after making the methamphetamine delivery to the 1094 W. 15TH STASH LOCATION earlier in the day.) DAVID said, "Oh, he (ALONSO) hasn't arrived (in Mexico) either? And he hasn't answered you, or has he?" MARQUEZ advised DAVID that ALONSO answered his phone about half an hour ago. MARQUEZ and DAVID continued to discuss the whereabouts of ALONSO and CHECO.

228.   On November 11, 2009, at approximately 2152 hours, JORJON called DAVID. At the beginning of the conversation, DAVID and JORJON spoke about CHECO's trip to the Fresno area and that they haven't heard from CHECO. Then DAVID said, "I hope so, I hope so, God willing, well …the frickin' sound (referring to the hidden compartment in the Nissan Altima

70

containing the methamphetamine that CHECO was driving) is fine, it's not…broken…" (DAVID advised JORJON that the hidden compartment was working fine and had no problems). DAVID also advised JORJON to put all narcotics related items away at 4948 Rutile ("put away everything over there"), CHECO's residence, which is where JORJON was staying. (DAVID is worried that law enforcement may conduct follow-on operations to possibly include a search warrant at CHECO's residence if CHECO was stopped with the methamphetamine. Therefore, DAVID is advising JORJON to move any narcotics-related items from 4948 Rutile.) JORJON said, "…everything is fine here. There was just a little swing (referring to a scale) there, but it's no good (doesn't work) …" JORJON later said "everything is clean" (referring to the 4948 Rutile address as being clean of narcotics-related items).

229. Based on GPS information from the telephone being used by JORJON, I believe that JORJON was in the vicinity of 4948 Rutile at approximately 0312 hours on November 11, 2009 and 0411 hours on November 12, 2009.

230. On November 11, 2009, at approximately 2211 hours, DAVID called JOSELITO at Target Telephone #21. During the conversation, JOSELITO said, "Should I bury the whole thing (referring to burying the methamphetamine)?" DAVID said, "Yes, bury all of it, the hell with it, it's better to be safe than sorry." (DAVID advised JOSELITO to bury all of the methamphetamine.) DAVID and JOSELITO discussed how and where JOSELITO should bury the methamphetamine.

231. On November 17, 2009, the Central Division Auto Technician (AT) assisted in removing the compartment from the Nissan Altima seized from CHECO. While removing the carpet lining, the AT pulled out a plastic wrapped bundle of U.S. Currency. Sgt. Spino took possession of the currency and counted it. The currency totaled $4,980.

232. On November 20, 2009, at approximately 2158 hours, CHECO called MARQUEZ. During the conversation, MARQUEZ said, "…How could that accident happen (referring to CHECO being arrested and the methamphetamine seized) –?" CHECO said, "No, the guy (referring to the law enforcement officer) said that the tags… were expired." (CHECO advised MARQUEZ that law enforcement said CHECO was pulled over because of expired

tags.) MARQUEZ asked, " . . . Did he (law enforcement officer) go straight to the... stereo box (referring to the hidden compartment in the Nissan Altima), or what, or how did that happen?" CHECO said, "No, he brought out the dog (drug detection K-9) right away, man, and he (the K-9) went straight there" (the law enforcement officer and the K-9 went straight for the hidden compartment containing the methamphetamine). MARQUEZ said, "Yes, well, someone ratted you out, man, because how could he (law enforcement officer) go straight there? ... and for that, the tags, they only give you a ticket." (MARQUEZ advised CHECO that CHECO was likely informed on.) MARQUEZ and CHECO continued to discuss the arrest and seizure.

233.    On November 22, 2009, at approximately 1648 hours, ISAIAS called MARQUEZ. During the conversation, MARQUEZ said, "...what's up with Chetes (CHENTE)?" ISAIAS said, "He's there watching football." (I believe that subsequent to CHECO's arrest and release, CHECO went to Mexico to avoid further law enforcement action and was staying with ISAIAS.) The call continued.

### M.    Seizure of 8,917g of Methamphetamine on December 2, 2009 (Probable Cause for MARQUEZ, CARPIO, and ALONSO)

234.    In general, on December 2, 2009, law enforcement seized 8,917 g of methamphetamine from a vehicle being driven by CARPIO and occupied by ALONSO. Pursuant to subsequent wire interception, MARQUEZ provided details of the loss of the methamphetamine.

235.    Based on my training, experience, knowledge of this investigation, wire intercepts and surveillance activities, I believe that ALONSO was a narcotics transporter for the DON CHUY DTO. For instance, as described above in section L, I believe that on November 11, 2009, DAVID and ALONSO coordinated for the delivery of methamphetamine to 1094 W. 15TH STREET, a DON CHUY DTO stash location.

236.    Furthermore, on November 11, 2009, based on wire interception and surveillance conducted by members of RMTF, law enforcement believed that the Volkswagen bearing California license plate 5KSR526 was the vehicle used to facilitate the delivery of methamphetamine coordinated with ALONSO.

237.     Based on a database check, FBI SA David Gates informed me that on November 11, 2009, the vehicle bearing California license plate 5KSR526 (the "Green Volkswagen") crossed into the US at the San Ysidro Port of Entry at 1035 hours, and that Lizeth CARPIO was likely located in the vehicle.

238.     On November 13, 2009, the Honorable Andrew J. Wistrich, United States Magistrate Judge, signed warrant 09-2629M which authorized the disclosure GPS information from telephone number 626-262-6010, believed to be used by ALONSO, and another telephone.

239.     Based on a database check, FBI SA David Gates informed me that on November 27, 2009, the vehicle bearing California license plate 5KSR526 (the "Green Volkswagen") crossed into the US at the Otay Mesa Port of Entry at 1119 hours, and that Lizeth CARPIO was likely located in the vehicle.

240.     Based on a review of GPS information from telephone number 626-262-6010 on November 27, 2009, and my belief that ALONSO is a narcotics transporter for the DON CHUY DTO, I believe that a load of methamphetamine was likely transported from Mexico to the 5627 34th stash location.

241.     On December 2, 2009, at approximately 0954 hours, FBI SA David Gates received a TECS LBP Silent Hit for the vehicle bearing California license plate 5KSR526 (the "Green Volkswagen") indicating the vehicle was being used to attempt to enter into the United States.

242.     Based on a database check, FBI SA David Gates informed me that on December 2, 2009, the vehicle bearing California license plate 5KSR526 (the "Green Volkswagen") crossed into the US at the Otay Mesa Port of Entry at 0955 hours, and that Lizeth CARPIO was likely located in the vehicle.  Juan ALONSO Aispuro Chagoya crossed into the United States in the same lane as CARPIO one minute later.

243.     At approximately 1220 hours, based on GPS information from telephone 626-262-6010 and surveillance operations, members of RMTF located the vehicle bearing California license plate 5KSR526 (the "Green Volkswagen") traveling north on Interstate 215, just north of the Interstate 15 / Interstate 215 split.

244.    At approximately 1300 hours, CHP Officer Robert Adelmann executed a traffic stop on the Volkswagen bearing California license plate 5KSR526 (the "Green Volkswagen") for violation of California Vehicle Codes 21703 and 24603(B).  Officer Adelmann subsequently identified the driver of the vehicle as Lizeth CARPIO-Hernandez (CARPIO) and the passenger as Juan ALONSO Aispuro-Chagoya (ALONSO).  When asked, CARPIO provided Officer Adelmann with Texas driver's license 28230208, identifying her as CARPIO, and a California registration for the vehicle, identifying her as the owner.

245.    During the stop, CARPIO stated that she had been living in Spring Valley, California, for several months.  Officer Adelmann noted that the vehicle registration showed her as the owner since March 2009.  When asked why she didn't have a California driver's license, CARPIO stated that she hadn't had time to go and apply.

246.    Officer Adelmann subsequently requested a tow truck for violation of California Vehicle Code 12500(a) - an unlicensed driver. CARPIO and ALONSO were transported by Officer Adelmann off of the freeway, while CHP Officer Cichella waited for the tow truck.

247.    While Officer Cichella took an inventory of the vehicle, he smelled a strong odor of gasoline in the rear seat area.  Officer Cichella decided to utilize his departmentally issued K-9, "Hero", on the subject vehicle.  Officer Cichella advised that Hero alerted to the vehicle on the right rear side and inside of the vehicle at the rear seat.  Due to the close proximity of the passing traffic, Officer Cichella had the tow truck move the vehicle off the freeway.  A search of the vehicle resulted in law enforcement locating 18 packages of methamphetamine inside of the gas tank.  A DEA Southwest Laboratory report indicated that law enforcement seized approximately 8,917 grams of methamphetamine that was 95.2% pure.

248.    On December 3, 2009, CARPIO arrived at the CHP Division Office to claim the Volkswagen.  CARPIO was interviewed by CHP Officer Cichella.  CARPIO claimed to have no knowledge of the narcotics found in the Volkswagen, nor did she know how the narcotics got into the car.  She also made a statement to the effect that she would not have picked up the vehicle if she knew there were drugs in the car.

249.     On December 8, 2009, at approximately 1615 hours, MARQUEZ called Hugo
(likely Hugo Marquez).   Towards the end of the conversation, MARQUEZ said, "On this past
Wednesday (December 2, 2009), this past Wednesday, uh, there was a girl (CARPIO) going there
(referring to the United States), and she was bringing some fruit over there (CARPIO was
delivering methamphetamine in the United States), and uh – and she entered fine (crossed into
the United States with the methamphetamine with no problems), she entered fine in here, and at
the 215 (Interstate 215) and the 60 (Freeway 60), they (law enforcement) – they (law
enforcement) pulled her over and they took away the car (the transportation vehicle bearing
California license plate 5KSR526 (the "Green Volks005wagen")), and the next day (December 3,
2009) they (law enforcement) gave her the car.   And then – but without the fruit (the vehicle was
returned but the methamphetamine had been seized).   And this is not the only time, it's been like
three months ago, the same thing happened to another friend (referring to another enforcement
stop where narcotics and/or narcotics proceeds were seized).   Then, what they do, they fucking
keep that."   (I believe that MARQUEZ's was describing the stop above, on December 2, 2009,
involving ALONSO and CARPIO.)

250.     On December 12, 2009, at approximately 1651 hours, Fabian called MARQUEZ.
Toward the beginning of the conversation, MARQUEZ said, "Uh, it's just that I had – I had a
small problem there (referring to the loss of methamphetamine), cousin.   The other day, there
was a girl (CARPIO) that crash somewhere there, she crashed (CARPIO was interdicted by law
enforcement) and uh – and I was telling the guy, to Margaron (MARGARO) that uh – that if you
guys can wait for me couple days, cousin, to – uh – to get closer there."   (MARQUEZ was
referring to the seizure of methamphetamine from ALONSO and CARPIO on December 2,
2009.)

251.     Based on the above two calls and the belief that ALONSO is a narcotics
transporter for the DON CHUY DTO, I believe that ALONSO and CARPIO transported the
methamphetamine into the United States at the direction of MARQUEZ and that the
methamphetamine belonged to MARQUEZ.

75

252.     Furthermore, based on border crossing checks indicating that CARPIO was likely in the vehicle bearing California license plate 5KSR526 on November 11, November 27, and December 2 of 2009, and based on the two wire intercepts above where MARQUEZ made specific reference to "the girl" (CARPIO), I believe that CARPIO was a frequent narcotics transporter for the DON CHUY DTO.

253.     Lastly, CARPIO's criminal history indicates that she was arrested on December 17, 2009, for violation of California Health and Safety code 11359 (possession of marijuana for sale) and 11360(A) (sell/furnish/etc. marijuana).

**N.     Agreement to Distribute Additional Methamphetamine and Discussion regarding approx. $100,000 Narcotics Debt in December 2009 (Probable Cause for MARQUEZ, RODELA, and ALVAREZ)**

254.     In general, in December 2009, MARQUEZ, RODELA, and ALVAREZ discussed a narcotics debt of approximately $100,000 owed to MARQUEZ for the distribution of methamphetamine, and future purchases of methamphetamine using cash.

255.     On December 18, 2009, MARQUEZ called RODELA.  During the conversation, RODELA asked MARQUEZ, "How much do I owe you?"  (RODELA asked how much money RODELA owes MARQUEZ, referring to a narcotics related debt.)  MARQUEZ said, "the last thing you guys took was seven or eight (seven or eight pounds of methamphetamine), I don't remember how much."  RODELA said, "How much?"  MARQUEZ said, "it's about $100 dollars (approximately $100,000)."  RODELA said, "One hundred dollars ($100,000).  RODELA said, "My cousin, my uncle Chuy's son (ALVAREZ), he (ALVAREZ) also owes you some."  (RODELA advised MARQUEZ that ALVAREZ also owes a narcotics debt to MARQUEZ.)  MARQUEZ said, "You (RODELA) and him (ALVAREZ) shared the work" (shared the methamphetamine, and the subsequent burden to repay the debt).   MARQUEZ complained, "I honestly don't – don't know how uh – what's the deal with you guys (RODELA and ALVAREZ). They say it's you and you say it's them. And so, honestly I don't know." (MARQUEZ advised that RODELA and ALVAREZ shared the methamphetamine, so it is up to them to figure out who owes what, referring to the $100,000 narcotics debt.)  RODELA went on to explain, "I have papers (law enforcement reports) that show everything that happened

regarding that." (likely referring to a seizure of methamphetamine by law enforcement and the consequent reason that RODELA and ALVAREZ now owe a narcotics debt to MARQUEZ). RODELA goes on to say, "Don't worry about that." (RODELA wants to show MARQUEZ legal papers that describe a legitimate seizure of methamphetamine by law enforcement so that MARQUEZ does not have to worry about RODELA being a law enforcement informant.) But I also want... I have some money there and I'm saving up more so I can give you some, at least 10 dollars ($10,000)." (RODELA is trying to repay the debt.)   MARQUEZ told RODELA to "save it up" and "once you have that" (referring to the $10,000 to pay MARQUEZ) we'll talk." RODELA acknowledged and asked MARQUEZ if he remembered a time when RODELA owned MARQUEZ money, "but still would go and buy some (drugs) from you in cash. Do you remember?" MARQUEZ acknowledged. RODELA asked, "You don't want to work with me even if it is in cash, or what?" (RODELA is asking if he can get methamphetamine now by paying cash even though he still owes a debt.) MARQUEZ answered yes, but complained that "you guys" (RODELA and ALVAREZ) never call." MARQUEZ went on to say that, "you (RODELA and ALVAREZ), "were buying from me in cash... But then at the end, you just fucking disappeared and you guys don't call to tell me what's going on. In other words, to say, you know what? I'm going to pay in a year, 6 months, 3 months or whatever. You guys (RODELA and ALVAREZ) just disappeared and never call. So that's why I sent a guy and told – told him, go look for Don Chuy (believed to be ALVAREZ's father) and tell him to call me." (MARQUEZ advised RODELA that even with the debt pending, MARQUEZ continued to supply RODELA with methamphetamine on cash, but that RODELA and ALVAREZ just disappeared and didn't call to update MARQUEZ when the debt was going to be paid off.) RODELA explained that he tried to call but MARQUEZ had his phone off.

256.    Based on my training and experience, I believe the above call demonstrates that RODELA and ALVAREZ are involved in an ongoing conspiracy to receive methamphetamine from MARQUEZ, and send a portion of the proceeds from that sale of that methamphetamine back to MARQUEZ in Mexico.

257.   On December 19, 2009, at approximately 0942 hours, MARQUEZ called
ALVAREZ.  During the conversation, ALVAREZ asked, "Can we talk?"  MARQUEZ affirmed,
and then added, "but don't be too obvious."  (MARQUEZ advised yes, referring to it being okay
to discuss narcotics trafficking activities, but to use coded language to conceal the true nature of
their conversation.)  ALVAREZ asked, "How much (price) is the ticket (for a unit of
methamphetamine)?"  MARQUEZ explained that, "Jairo" (RODELA) called yesterday
(reference to the above described call, and that he (RODELA) was the one I used to talk to about
the number (price for methamphetamine).  MARQUEZ said, "There's no problem; that I just
need to cover the expenses and that's all."  (MARQUEZ is explaining that he can continue to
supply RODELA and ALVAREZ with methamphetamine, but he usually discusses price with
RODELA.)  MARQUEZ then suggests that ALVAREZ call RODELA and "come to an
agreement."  (MARQUEZ advised ALVAREZ to coordinate with RODELA in furtherance of a
narcotics transaction with MARQUEZ.)  ALVAREZ said he would call him (RODELA) right
now "because some friends (ALVAREZ's drug customers) of mine have some money… and they
want to spend some money."  (ALVAREZ has methamphetamine customers ready to make a
purchase.)  MARQUEZ said, "That's possible."  ALVAREZ explained that, "right now, all my
buddies (drug customers) have money and so I wanted to help them a little bit.  (ALVAREZ
wants to supply his cash paying customers with methamphetamine.)  ALVAREZ said, "Tell me
how much for the ticket (price per unit of methamphetamine) and we'll see – we'll see if we can
do something over here" (conduct a methamphetamine transaction).  MARQUEZ said, "It's
cheap cousin, around 11 ($11,000)."  (MARQUEZ advised that MARQUEZ could supply
ALVAREZ at approximately $11,000 per pound of methamphetamine.)  ALVAREZ asks, "And
is it good stuff or what?"  (ALVAREZ asked if the methamphetamine was good quality.)
MARQUEZ said, "Yes, yes, it's good (the quality of methamphetamine)."  MARQUEZ then
asked, "How much is it going for around your area?"  (MARQUEZ asked ALVAREZ how much
methamphetamine was selling for in ALVAREZ's area, likely referring to the Bakersfield,
California, area.)  ALVAREZ answered, "11-5 and 12, over here" ($11,500 to $12,000 per pound
of methamphetamine.)  What we (ALVAREZ and likely RODELA) want to do right now is to

look for the cheapest price, uh – so we can work, you see what I mean?  So we all can get something (referring to making a profit)."  (ALVAREZ advised MARQUEZ that they were looking for the cheapest priced methamphetamine, so that they (ALVAREZ and likely RODELA) can make a profit.)  MARQUEZ advised to work hard and, "As you get going (in the narcotics trade) I'll make it better" (lower the price per unit of methamphetamine).  ALVAREZ acknowledged.

258.    Based on my training, experience, the wire intercepts above, and knowledge of this investigation, I believe RODELA and ALVAREZ are methamphetamine customers of MARQUEZ, who currently owe a narcotics debt.  However, they have agreed to pay down a portion of their debt, while at the same time purchasing methamphetamine from MARQUEZ for cash for resale in the Bakersfield, CA area.

### O.    Seizure of $22,420 on December 31, 2009, Which was JORJON's Payment Toward a Narcotics Debt owed for 1 kg and 1 lb of Methamphetamine (Probable Cause for 1006 LANG, 8970 SPOHN, JORJON, and NUNEZ)

259.    In general, JORJON and Manolo coordinated the repayment of a narcotics debt owed by JORJON to Manolo.  On December 31, 2009, JORJON delivered the money owed to NUNEZ for Manolo.  After the delivery, law enforcement conducted a traffic stop of NUNEZ's vehicle.  NUNEZ consented to a search of his vehicle where law enforcement subsequently found $22,420.

260.    On December 22, 2009, Manolo called JORJON.  During the conversation, Manolo asked JORJON how much do you have for me?  (Based on my training, experience, and my knowledge of this investigation, I believe that JORJON was supplied with methamphetamine by a Drug Trafficking Organization lead by Manolo, and owes Manolo money for methamphetamine previously sent to JORJON.)   JORJON said, "Well, I don't know, maybe – maybe 2000 pesos ($2,000)."  Manolo acknowledged and added that JORJON could, "send my cousin 1000 ($1,000)."  (Manolo advised JORJON to provide $1,000 to Manolo's cousin.) JORJON acknowledged.  JORJON went on to say that he would send the money tomorrow."

261.    On December 23, 2009, at approximately 1240 hours, Manolo called JORJON. During the conversation, using coded language, JORJON told Manolo that he was going to send Manolo $800 to repay part of a narcotics debt owed to Manolo.

262.    On December 23, 2009, at approximately 1320 hours, Manolo called JORJON. During the conversation, Manolo and JORJON further coordinated what I believe is a wire transfer of money from JORJON to Manolo. JORJON eventually provided Manolo with the number 14298729593, which I believe was the money transaction ID number for the money sent from JORJON. Manolo said, "For how much is it?" JORJON said, "It's, uh 1,000 ($1,000) – 12,000 – 12,201." (Based on my training, experience, my knowledge of this investigation, and currency exchange rates, I believe that JORJON first advised Manolo that he sent $1,000 or 12,201 pesos." Manolo said, "Twelve thousand two hundred one?" JORJON said, "Yeah." Manolo acknowledged.

263.    On December 24, 2009, at approximately 1013 hours, JORJON called Manolo. During the conversation, JORJON said, "And – and I think that by Sunday or… We'll settle accounts. (JORJON was referring to settling his narcotics debt with Manolo.)   Manolo acknowledged. JORJON said, "Yeah and that I might give you everything –everything – everything." (JORJON advised that he (JORJON) might provide Manolo with all of the money owed for the narcotics debt.) Manolo said, "And are you going to need anything?" (Manolo asked if JORJON was going to need to be supplied with methamphetamine.) JORJON said, "Yes. The same thing (referring to the usual amount of methamphetamine that JORJON was supplied with by Manolo)." Manolo said, "How many?" JORJON said, "The same thing - a small liter (one kilogram of methamphetamine), all right?" Manolo said, "How many?" JORJON said, "Just a small liter (one kilogram of methamphetamine), all right?" Manolo asked, "One?" JORJON said, "No, a liter (one kilogram), like over there (referring to kilogram measurements as in Mexico as opposed to pound measurements in the United States)." Manolo said, "Oh. Ah, one over here? Uh-huh." JORJON said, "Yeah."

264.    On December 26, 2009, at approximately 1001 hours, JORJON called Manolo. During the conversation, Manolo asked if JORJON's customers were going to bring the "ticket"

(narcotics proceeds). JORJON said, "Yeah, that will be settled tomorrow, all of it (referring to the narcotics debt)." Later Manolo said, "You're going to pay the whole thing from above (I believe that Manolo was referring to a debt owed for a kilogram of methamphetamine that Manolo previously supplied to JORJON and that JORJON distributed to his customer.), and the [unintelligible] - the "L" (referring a debt owed for a pound ('L', a play on 'libre' translated as pound in Spanish) of methamphetamine that JORJON owes) also? Everything? Tomorrow, or what?" (Manolo asked JORJON if JORJON was going to provide enough money to Manolo to cover JORJON's debt, believed to be a total debt for the distribution of one pound and one kilogram of methamphetamine.) Shortly after, JORJON clarified that Manolo was going to supply JORJON with a kilogram of methamphetamine ("you're going to bring that") and that JORJON was to give Manolo "the money until the day after tomorrow." JORJON further clarified that the JORJON's customers would be providing JORJON with narcotics proceeds and picking up a kilogram of methamphetamine and then JORJON would be ready to turn over the proceeds the following day. Manolo said, "The – the – the stuff for the 'L'." (Manolo asked if JORJON was referring to the money owed for a pound ('L', a play on 'libre' translated as pound in Spanish) of methamphetamine.) JORJON said, "No, he said the stuff for the 'K' (referring to narcotics proceeds pertaining to the distribution of one kilogram ('K') of methamphetamine)." Manolo said, "Oh." JORJON said, "The stuff for the 'K' (referring to narcotics proceeds for a kilogram of methamphetamine) and – and I'm almost going to give you all the stuff for the 'L' (referring to JORJON paying almost all of the debt owed for the pound of methamphetamine)." Consequently, based on this call, I believe that JORJON owed Manolo and was making payments to Manolo for the previous distribution of one pound and one kilogram of methamphetamine.

265.    On December 27, 2009, at approximately 1224 hours, JORJON called Manolo. During the conversation, JORJON asked Manolo, "Who's going to hand over the receipts, or what?" (JORJON is asking who he needs to turn the narcotics proceeds over to so that they can be delivered to Manolo.) Manolo provided JORJON with telephone number 323-707-3270 and explained, "The fool's name is Joe (subsequently identified as NUNEZ). Manolo instructed JORJON to tell NUNEZ he was calling on behalf of "Puebla." Based on Sprint Nextel

subscriber information, I am aware that telephone 323-707-3270 was subscribed to Jose L. Nunez at 1006 LANG.

266. On December 27, 2009, at approximately 1227 hours, JORJON called NUNEZ. During the conversation, JORJON explained that he was, "calling on behalf of Puebla." NUNEZ said, "Well, he (Manolo or an associate of Manolo) told me that you have some paper (narcotics proceeds) there for me?" JORJON acknowledged, and added that NUNEZ was, "going to give me something (referring to methamphetamine), right?" NUNEZ acknowledged, and confirmed, "One" (one unit of methamphetamine). That I was going to give you one (one unit of methamphetamine)." JORJON said, "No, a small liter (kilogram unit). Whole." NUNEZ said, "A small liter (kilogram unit). Well, whole, from over there (kilogram measurements from Mexico as opposed to pound measurements in the United States)." JORJON acknowledged.

267. On December 27, 2009, at approximately 1240 hours, JORJON called NUNEZ. During the conversation, NUNEZ and JORJON coordinated to meet in furtherance of the exchange of narcotics proceeds (from JORJON) for methamphetamine (from NUNEZ). Further coordinating calls occurred at 1521 hours and 1527 hours.

268. Based on GPS information from Target Telephone #17 at 1534 hours, I believe that JORJON met with NUNEZ to receive the methamphetamine in the vicinity of W. Francisquito Avenue in La Puente, CA.

269. On December 27, 2009, at approximately 1535 hours, JORJON called Manolo. During the conversation, JORJON said, "That shit's not good. It's real small, man. What's the deal?" (JORJON advised Manolo that JORJON did not like the quality of methamphetamine that NUNEZ had.) I believe this further demonstrates that JORJON has received methamphetamine from NUNEZ.

270. Based on my training, experience, my knowledge of this investigation, and wire interception, I do not believe that JORJON distributed the methamphetamine to his customers due to the poor quality and poor presentation of the methamphetamine. In fact, I believe that the methamphetamine was eventually returned to NUNEZ.

271.   On December 27, 2009, at approximately 1618 hours, JORJON called Manolo. During the conversation, using coded language, Manolo advised JORJON that Manolo's associate asked JORJON to pardon them (referring to being pardoned for trying to supply JORJON with poor quality and poorly presented methamphetamine) and that they are going to process the methamphetamine for distribution.

272.   On December 29, 2009, at approximately 1630 hours, JORJON called Manolo. During the conversation, JORJON said, "I sent $1000, either way. Write down the code." (JORJON advised Manolo that JORJON sent Manolo $1,000 and wanted Manolo to write down the money transaction ID number.) Shortly thereafter, Manolo said, "And, then, what about the rest?" (Manolo asked about the rest of the debt owed by JORJON.) JORJON said, "I'll send them tomorrow." (JORJON advised that he (JORJON) would send the rest of the debt owed the following day.) Later during the conversation, JORJON said, "Uh-huh. Hey, who am I going to give those papers (narcotics proceeds) to, then?" (JORJON asked who JORJON was to turn the rest of the narcotics proceeds over to.) Manolo said, "that Joe (NUNEZ) guy – that Joe guy." Manolo then asked, "How much is this guy (NUNEZ) thinking of taking right now? How much do you (JORJON) have right there?" JORJON answered, "around 23 or 24" ($23,000 to $24,000).

273.   On December 31, 2009, at approximately 0956 hours, NUNEZ called JORJON. During the conversation, NUNEZ said that he was, "available now" (referring to being available to conduct the narcotics proceeds transaction.) JORJON asked for NUNEZ to, "Give me a little time."

274.   On December 31, 2009, at approximately 1010 hours, JORJON called Manolo. During the conversation, JORJON said that he was, "going to see the guy (NUNEZ) right now here. I'm going to give him around 23 pesos (around $23,000)." (JORJON advised that he was going to provide JORJON with approximately $23,000.) JORJON and Manolo discussed how much of the narcotics debt JORJON has already paid. Subsequently, JORJON said, "And 23 ($23,000)... And 23... It's like I'm going to give you 23,300 ($23,300) over here." (JORJON

advised that he would be providing NUNEZ with $23,300 for Manolo). JORJON explained that NUNEZ was waiting for him right now (to conduct the narcotics proceeds transaction).

275.     On December 31, 2009, at approximately 1035 hours, NUNEZ called JORJON. During the conversation, NUNEZ and JORJON coordinated to meet in furtherance of the narcotics proceeds transaction. NUNEZ said, "I just arrived in a black truck. JORJON asked, "Which black truck? I'm right here in front of Sierra Mall."

276.     Subsequently, Fontana Police Department Sergeant Carlo Granillo observed a Hispanic male (JORJON) exit a silver Toyota Corolla, bearing California license plate 6JYJ498 (registered to Juan Carlos Verdusconunez), and walk toward a black GMC Yukon (subsequently discovered to be occupied by NUNEZ). JORJON got in the front passenger seat, and appeared to speak with the driver (NUNEZ). After speaking with NUNEZ for approximately one minute, Sergeant Granillo observed JORJON exit the passenger seat of the black GMC Yukon and walk back towards the silver Toyota Corolla. Thereafter, law enforcement observed the black GMC Yukon exit the parking lot and travel southbound on Sierra Avenue until it entered the westbound Interstate 10 freeway. Based on GPS information from Target Telephone #17, I believe that JORJON was located in Cardenas Market parking lot at the corner of Merrill Avenue and Sierra Avenue at approximately 1036 hours, as observed by surveillance.

277.     At approximately 1048 hours, Fontana Police Department Officer Peter Ryn conducted a traffic stop of the black GMC Yukon on Interstate 10 freeway and the 15 freeway interchange for a violation of California Vehicle Code Section 5200 – no license plates. Officer Ryn, contacted the driver, identified as Jose Luis NUNEZ and advised NUNEZ of the reason for the stop. NUNEZ proceeded to give Officer Ryn consent to search the vehicle.

278.     At approximately 1300 hours, Redlands Police Department Narcotics Officer D. Figgins, and his narcotics detection canine dog, "Radar," arrived at the location to conduct a K-9 search of the black GMC Yukon. "Radar" alerted to a red and white plastic bag located on the passenger floor just below the front seat. Based on the alert, law enforcement retrieved the bag, inside of which, was observed to be a large amount of U.S. currency, which was later confirmed to be $22,420 in U.S. Currency.

84

279. After JORJON met with NUNEZ at the Cardenas Market to conduct the narcotics proceeds transaction, Fontana PD Officer Andrew Vestey subsequently followed the silver Toyota Corolla, bearing California license plate 6JYJ498, being driven by JORJON to 8970 SPOHN.

280. Based on the above information and my training and experience, I believe JORJON provided narcotics proceeds to NUNEZ for methamphetamine previously distributed to JORJON by Manolo.

**P.     Delivery of approx. 10kg of methamphetamine on January 20, 2010; Narcotics Transportation Payment of $11,500 U.S. Currency on January 21, 2010 (Probable Cause for MARQUEZ, JOSELITO, PACHECO, and ERIKA)**

281. In general, January 20, 2010, PACHECO delivered approximately 10 kilograms of methamphetamine to the 5627 34th stash location. Subsequently, MARQUEZ, JOSELITO, and ERIKA coordinated to provide ERIKA with $11,500 in transportation costs on January 21, 2010, for PACHECO's delivery.

282. On January 20, 2010, at approximately 1229 hours, PACHECO called JOSELITO. During the conversation, PACHECO said, "Oh – oh. Listen, over here it it's just that your garage isn't working right, um, so right now – right now he's going – he's going to – he's going to go – they're going to go fix it for you. All right?" (PACHECO advised JOSELITO that a methamphetamine delivery was going to be made to JOSELITO.) JOSELITO acknowldeged. JOSELITO then gave PACHECO directions so that he could deliver drugs to the 5627 34th stash location.

283. On January 20, 2010, at approximately 1329 hours, PACHECO called JOSELITO. During the conversation, PACHECO said that he was, "right there" (the 5627 34th Street stash location – to deliver the drugs).

284. Based on GPS information from Target Telephone #23, I believe that JOSELITO was located at the 5627 34th stash location from at least 1312 hours to 1343 hours.

285. On January 20, 2010, at approximately 1341 hours, JOSELITO called MARQUEZ. During the conversation, JOSELITO said, "we were with this man right here

(PACHECO at the 5627 34th stash location), but he could no longer – well, he could no longer do anything, so he (PACHECO) already headed back." (JOSELITO is advising MARQUEZ that PACHECO had delivered the drugs and departed. JOSELITO is using code that describes PACHECO as a legitimate construction worker/repair man who arrived but could not work, then headed back.) MARQUEZ said, "Huh?" JOSELITO said, "– because of – because of the rain. He couldn't work for long. He only worked for a little while and already headed back." (JOSELITO reiterated that the guy wouldn't conduct legitimate work because of the rain, so he left, but is actually communicating that he delivered the shipment of drugs ("worked for a little while") and then left.) MARQUEZ said, "Oh. Which man?" JOSELITO explained, "the one with the tow truck" (PACHECO). JOSELITO said, "He (PACHECO) left just now. I'm closing the – the banquet, but it's done, everything is fine, thank God." (JOSELITO is advising that PACHECO successfully delivered the drugs.) MARQUEZ acknowledged and instructed JOSELITO that, "the guy's there, with the man. Um, will you please give some doughnuts (coded language referring to 2 units of methamphetamine) to, um – to Tocayo so he can have some coffee?" (Now that JOSELITO has received the methamphetamine load from PACHECO, MARQUEZ directed JOSELITO to distribute 2 units of methamphetamine to Tocayo.) JOSELITO acknowledged and reiterated, "Okay. To Tocayito (Tocayo), as always, doughnuts (2 units of methamphetamine) for the coffee." MARQUEZ confirmed. JOSELITO said, "Let me just get the stuff together (the methamphetamine organized) and – let's see."

286.    On January 20, 2010, at approximately 1432 hours, ERIKA called JOSELITO. During the conversation, ERIKA introduced herself and told JOSELITO that she was told to, "come over and pick up some "tickets" (transportation costs) on behalf of Mr. Jesus (MARQUEZ)." JOSELITO acknowledged but said that he (MARQUEZ) "hasn't told me anything" and that he was going to ask him.

287.    On January 20, 2010, at approximately 1430 hours, JOSELITO called MARQUEZ. (Due to unsynchronized Sprint Nextel time switches, the linesheet of this call indicated that the call occurred at 1430 hours; however, I am aware that the call actually occurred at approximately 1435 hours.) During the conversation, MARQUEZ explained that she (ERIKA)

is the sister of the guy with the tow truck (PACHECO). JOSELITO acknowledged. JOSELITO informed MARQUEZ that ERIKA just called and said she (ERIKA) was going to drop by to pick up some "tickets" (money). JOSELITO then asked MARQUEZ, "what the situation is." (PACHECO wants to verify that ERIKA is in fact calling on behalf of MARQUEZ and that he is in fact supposed to deliver money to her.) MARQUEZ said, "Yeah, man, it's true, that is true, yeah." JOSELITO said, "Okay. What tickets am I going to give her, then? All the tickets we have bought for the trip?" (JOSELITO asked MARQUEZ how much money he was supposed to provide to ERIKA for the "trip" (delivery of methamphetamine). MARQUEZ said no, "only those required for the tow truck (PACHECO), only those required for the tow truck, man." (MARQUEZ advised JOSELITO to only provide money to ERIKA to cover the transportation costs for the methamphetamine that PACHECO delivered, not to pay for the cost of the methamphetamine.) JOSELITO asked, "How many tickets are they? So I can count them." (JOSELITO asked MARQUEZ for the amount of money that JOSELITO was supposed to provide to ERIKA.) MARQUEZ said, "they're 11 – 11 – they're about 11½ ($11,500), man." (MARQUEZ advised JOSELITO to provide ERIKA with $11,500.) JOSELITO acknowledged.

288.   On January 20, 2010, at approximately 1437 hours, JOSELITO called ERIKA. During the conversation, JOSELITO explained that he spoke to the "man" (MARQUEZ) and he (MARQUEZ) said yes. (JOSELITO advised that JOSELITO spoke to MARQUEZ and MARQUEZ advised JOSELITO to provide the money to ERIKA.) JOSELITO asked, "How many tickets are they?" ERIKA responded, "Twelve ($12,000)." JOSELITO explained that he (MARQUEZ) told me "that – that it was 11½" ($11,500). ERIKA explained that she would call and then call JOSELITO back.

289.   Based on my training and experience, I believe that JOSELITO and ERIKA are coordinating for the delivery of narcotics proceeds pertaining to the delivery of methamphetamine made by PACHECO, and cannot agree on the amount to be turned over. On January 20, 2010, at approximately 1454 hours, JOSELITO at Target Telephone #23 received an incoming call from ERIKA at 951-867-6378. ERIKA called JOSELITO agreed to conduct the money transaction the following day.

290.     Subsequently, on January 20, 2010, at approximately 1851 hours, MARQUEZ called JOSELITO. During the conversation, MARQUEZ and JOSELITO discussed the pending distribution of 10 pounds of methamphetamine. JOSELITO advised MARQUEZ that "three little bottles from over here" (three pounds of methamphetamine) wouldn't fit, referring to three pounds of the 10 not fitting in the hidden compartment in the transportation vehicle. MARQUEZ then advised JOSELITO to give them "whatever fit," referring to JOSELITO distributing however much they could fit in the hidden compartment. MARQUEZ also advised JOSELITO to provide the methamphetamine transporter with $1,500, as opposed to $2,000, because the transporter would not be transporting the entire ten pounds. At the end of the conversation, MARQUEZ said, "Did the girl (ERIKA) go or not, man?" (MARQUEZ asked JOSELITO if ERIKA arrived to pick up the transportation costs.) JOSELITO said that he told her to come back in the morning. "Did she (ERIKA) tell you the number?" (MARQUEZ asked JOSELITO if ERIKA advised JOSELITO how much money she was expecting to pick up.) JOSELITO said, "Yeah, she said that – that it's one-two ($12,000). I said, 'No, but I was told it – it wasn't that much.'" (JOSELITO advised that ERIKA said she was to pick up $12,000.) MARQUEZ said, "Twelve ($12,000)? No, the bitch is crazy." JOSELITO said, "Yeah." MARQUEZ said, "Because – because it's easy, man, it's easy. Look – um, look, one (one kilogram of methamphetamine) is 150 ($1,150)." (MARQUEZ advised JOSELITO that the transportation cost was $1,150 per kilogram of methamphetamine.) JOSELITO acknowledged. MARQUEZ reiterated, "It's 150 ($1,150) per, um – per unit." (MARQUEZ again advised that the transportation cost was $1,150 per unit, referring to kilogram units.) JOSELITO acknowledged. MARQUEZ said, "So for ten –how much is it for ten (10 kilograms of methamphetamine)? Eleven and a half (10 x $1,150 = $11,500)." (Based on the calculation of the transportation costs for 10 kilograms of methamphetamine equaling $11,500, I believe that PACHECO delivered 10 kilograms of cocaine to JOSELITO at the 5627 34th address.) JOSELITO acknowledged. MARQUEZ confirmed. JOSELITO said she (ERIKA) thought it "was one-twelve" ($12,000), but that JOSELITO told her it was what MARQUEZ said ($11,500).

291.    On January 21, 2010, at approximately 0906 hours, ERIKA called JOSELITO. During the conversation, JOSELITO asked if she wanted to "come by" (referring to coming by to conduct the money transaction for the transportation costs)?" ERIKA said "Yes." JOSELITO then directed ERIKA to the 5627 34th address.

292.    On January 21, 2010, at approximately 1007 hours, JOSELITO called ERIKA. During the conversation, ERIKA and JOSELITO coordinated to meet each other. During the conversation, ERIKA advised that she was in "a grey Lincoln." Additionally, based on GPS information from Target Telephone #23, I believe that JOSELITO was located in the vicinity of the 5627 34th address at approximately 1014 hours, and that ERIKA arrived in the vicinity of the 5627 34th address to receive the $11,500 from JOSELITO to cover the transportation costs for the 10 kilograms of methamphetamine transported to JOSELITO by PACHECO on January 20, 2010.

**Q.    Collection of $28,000 on February 1, 2010; Seizure of $65,810 on February 1, 2010; Delivery of methamphetamine on February 1, 2010 (Probable Cause for 10430 54th STREET, MARQUEZ, JOSELITO, GALLEGOS, CHENTE, PACHECO, and MARGARO)**

293.    In general, on February 1, 2010, a narcotics proceeds transporter delivered $28,000 in narcotics proceeds to JOSELITO on behalf of MARGARO for MARQUEZ. On February 1, 2010, MARQUEZ, JOSELITO and GALLEGOS coordinated for the transportation of $65,810 in narcotics proceeds to MARQUEZ in Mexico, which was ultimately seized by law enforcement. On February, 1, 2010, PACHECO delivered methamphetamine to JOSELITO at the 10430 54th STREET stash location on behalf of MARQUEZ.

294.    On February 1, 2010, at approximately 0856 hours, MARQUEZ called JOSELITO. Using coded language, JOSELITO told MARQUEZ that MARGARO's runner delivered narcotics proceeds that MARGARO owed. In response, MARQUEZ asked, "What series is on the title?" (MARQUEZ is asking for the total of narcotics proceeds that MARGARO/MARGARO's runner turned over.) JOSELITO said, "You had told me it was 3-0 ($30,000), right?" MARQUEZ said, "That's what the man (MARGARO) said." JOSELITO said, "It's 2-8 ($28,000) man. Exactly 2-8. I counted it here in front of the guy, and it's 2-8."

(JOSELITO advised that he counted the narcotics proceeds in front of MARGARO's runner and it totaled $28,000.)" MARQUEZ also explained, "The guy with the tow truck (PACHECO) is going to go right now." (MARQUEZ advised that PACHECO was expected to deliver methamphetamine to JOSELITO shortly.) MARQUEZ then asked, "Has Mr. Eleazar (GALLEGOS) gotten there?" (MARQUEZ is asking if GALLEGOS had arrived at the 5627 34th address to pick up narcotics proceeds for return to MARQUEZ in Mexico.) JOSELITO responded, "Yeah, he (GALLEGOS) called me to tell me he's ready" (to transport the narcotics proceeds), but the guy here is working (JOSELITO is involved in another separate narcotics transaction with PACHECO). JOSELITO explained, "I'll wrap those fucking tickets (JOSELITO will package the narcotics proceeds) up for you (MARQUEZ) and send them to you over there (send the narcotics proceeds to MARQUEZ in Mexico via GALLEGOS)."

295.    Based on the calls above, I believe that JOSELITO and MARQUEZ are discussing the ongoing narcotics operations, to include the fact that a courier for MARGARO has delivered $28,000 in narcotics proceeds for MARGARO, PACHECO is about to deliver methamphetamine, and JOSELITO is about to send narcotics proceeds to MARQUEZ in Mexico.

296.    On February 1, 2010 at approximately 0900 hours, members of RMTF initiated surveillance at the 5627 34th address. While conducting surveillance, law enforcement observed a green Ford Explorer arrive and park in front of the 5627 34th address. Shortly thereafter, law enforcement observed a male Hispanic (subsequently identified as GALLEGOS) open the back hatch of the Explorer, take a tire out and hand it to a second male Hispanic, who had exited from the 5627 34th address. (Based on wire interception, I believe that the second Hispanic male was JOSELITO.) Thereafter, GALLEGOS backed the Explorer up into the driveway of the 5627 34th address.

297.    At approximately 0952 hours, law enforcement observed the Explorer with GALLEGOS and the second Hispanic male (believed to be JOSELITO) in the passenger seat depart the 5627 34th address and drive to a Shell gas station located at 3071 Rubidoux Boulevard, Riverside, CA. At approximately 1000 hours, law enforcement observed both Hispanic males at

the back of the Explorer (bearing California license plate 5ZYN471 registered to Elieser Ceja Gallegos (GALLEGOS)) cargo door putting air in a tire. (Based on the eventual seizure of narcotics proceeds, I believe that GALLEGOS and JOSELITO traveled to the gas station to put air into a tire that already contained narcotics proceeds.)

298.     On February 1, 2010, at approximately 1005 hours, MARQUEZ called JOSELITO. During the conversation, JOSELITO informed MARQUEZ that he "sent you a 12-pack of beer with the old man – Mr. Eleazar (GALLEGOS)." (JOSELITO sent MARQUEZ 12 packages of narcotics proceeds with GALLEGOS, referring to the 12 packages of U.S. Currency subsequently seized from GALLEGOS's Explorer)." MARQUEZ acknowledged and said, "That's good. I think that in the afternoon… that guy with the tow truck (PACHECO) is going to go and do some mechanical repairs there." (MARQUEZ advised JOSELITO that PACHECO was going to deliver methamphetamine to JOSELITO)." JOSELITO acknowledged.

299.     At approximately 1045 hours, California Highway Patrol (CHP) officers observed the Explorer (occupied by GALLEGOS) traveling southbound on Interstate Highway 15 south of Winchester Road at a high rate of speed. CHP officer A.J. Cichella conducted a traffic stop on the Ford Explorer for a violation of California Vehicle Code Section 22356(b) – driving a vehicle greater than 70 miles per hour, as posted. Officer Cichella contacted the driver, subsequently identified as Elieser Ceja GALLEGOS and advised GALLEGOS of the reason for the stop. GALLEGOS's subsequently granted Officer Cichella consent to searh the vehicle. Officer Cichella ran his narcotics K-9 ("Hero") around the vehicle. During the exterior walk around the vehicle, "Hero" alerted to the rear of the Explorer in the area of the spare tire. Officer Cichella searched the tire and discovered 12 bundles of U.S. currency totaling $65,810 U.S. currency.

300.     After being placed under arrest, GALLEGOS was read his Miranda Rights in Spanish by Officer Adelmann, which he waived and agreed to answer questions. GALLEGOS stated that he had no knowledge of anything illegal being inside the vehicle. GALLEGOS thereafter signed a CHP 304 form Disclaimer form and stated that he had no knowledge of the money.

301.   On February 1, 2010, at approximately 1137 hours, JOSELITO called MARQUEZ. During the conversation, MARQUEZ asked, "What time did the old man (GALLEGOS) head out here -- Mr. Eleazar (GALLEGOS)?" JOSELITO said, "It's been a little while, man. It's been about an hour." MARQUEZ said, "Oh, well, the old man (GALLEGOS) isn't answering." MARQUEZ then asked, "Did the donut fit all right there? (MARQUEZ is asking about the tire containing the narcotics proceeds.) JOSELITO answered that "everything was fine."

302.   On February 1, 2010, at approximately 1354 hours, PACHECO called JOSELITO. During the conversation, PACHECO said, "Listen, I'm coming over on behalf of Jesus (MARQUEZ)." JOSELITO acknowledged.   PACHECO further identified himself as the, "mechanic." JOSELITO confirmed that PACHECO was, "going to be bringing the car over here in order to fix it, right? With the tow truck." (JOSELITO asked to confirm that PACHECO was delivering the methamphetamine.) PACHECO acknowledged and said, "I'm bringing your parts now." JOSELITO then provided PACHECO with directions toward the vicinity of the 10430 54th STREET stash location so that PACHECO could deliver the methamphetamine.)

303.   On February 1, 2010, at approximately 1419, 1437, and 1449 hours, PACHECO and JOSELITO had telephonic conversations during which JOSELITO continued to direct PACHECO to the vicinity of 10430 54th STREET stash location.

304.   On February 1, 2010, at approximately 1451 hours, MARQUEZ called JOSELITO. During the conversation, JOSELITO informed MARQUEZ that "the tow truck guy (PACHECO) already arrived (delivered the methamphetamine) and that PACHECO was with JOSELITO at the moment. As the call continued, JOSELITO asked if MARQUEZ thought it was ok to, "fix the car here and go ahead (remove the methamphetamine from PACHECO's transportation vehicle)? Or what do you think?" MARQUEZ informed JOSELITO that GALLEGOS "didn't know that house" (referring to the 10430 54th STREET stash location), and went on to say that, "everything's fine" (go ahead and unload the drugs delivered by PACHECO.) MARQUEZ then instructed JOSELITO to, "not go to the house where the man (GALLEGOS) went (referring to the 5627 34th stash location) for two or three days, see what

happened to him." (MARQUEZ is advising JOSELITO that he (JOSELITO) should stay away from the 5627 34th address for two or three days until they find out what happened to GALLEGOS.)" JOSELITO acknowledged.

305.    Based on GPS information from JOSELITO's phone (Target Telephone #23) at approximately 1500 hours, the GPS data for JOSELITO placed his phone in the immediate vicinity of the 10430 54th STREET stash location. Consequently, based on this information, and the fact that JOSELITO gave PACHECO directions to the vicinity of the 10430 54th STREET stash location, I believe PACHECO delivered drugs to JOSELITO at this address on February 1, 2010.

### R.    Seizure of $39,800 U.S. Currency on February 17, 2010 (Probable Cause for MARQUEZ, JOSELITO, and CHENTE

306.    In general, February 17, 2010, law enforcement seized $39,800 in narcotics proceeds from a vehicle being driven by CHENTE. Based on surveillance operations and other investigation, I believe that CHENTE picked up the narcotics proceeds from the 5627 34th Street Stash location for delivery to MARQUEZ in Mexico.

307.    Based on a review of GPS information from telephone number 949-355-7314 on February 17, 2010, I believed that CHENTE traveled from Mexico into the United States between 0900 hours to 1000. Additionally, based on a database check, FBI SA David Gates informed me that on February 17, 2010, at approximately 0944 hours, Uriel Valdovinos (CHENTE) crossed into the US at the San Ysidro Port of Entry in a vehicle. Based on the database check, SA Gates was able to determine that CHENTE was likely located in a vehicle bearing California license plate 5HFB166 or 5LLM408 or possibly a vehicle bearing Mexico license plate BGB2863.

308.    Subsequently, members of the Regional Methamphetamine Task Force (RMTF) initiated surveillance at JOSELITO's known narcotics stash location at the 5627 34th Street address. At approximately 1218 hours, RMTF observed the black 2000 Honda Accord, bearing California license plate 5HFB166, arrive at 5627 34th Street, Riverside, California. RMTF observed the Honda pull onto the property of the 5627 34th address and the gate was closed

behind the vehicle. A short time later, RMTF observed the Honda depart the location with multiple occupants.

309.   RMTF followed the Honda as it traveled through and made stops in the Los Angeles area, during which CHENTE met with an unidentified subject in a blue Saturn vehicle. Eventually, the vehicle headed southbound toward Orange County. At approximately 1730 hours, CHP Officer C. Marzocca observed the Honda, bearing California license plate 5HFB166, traveling over the posted speed limit south of Avery Parkway on Interstate 5 heading southbound. Officer Marzocca subsequently conducted a traffic stop of the Honda for violation of California Vehicle Code 22349(a).

310.   Officer Marzocca asked CHENTE for consent to search the Honda. CHENTE agreed and gave signed, written consent along with a thumbprint on a CHP 202D Consent to Search form. Officer Marzocca then conducted a K-9 search of the vehicle with his narcotics K-9, "Daktor" (KM06114). "Daktor" alerted to the lower portion of the radio and the center console in front of the gear shift lever. Officer Marzocca searched the area where "Daktor" alerted and eventually located a manufactured compartment built into the center console with a solenoid latch controlling access to the compartment. Inside the compartment, Officer Marzocca located five vacuum sealed bags, with what appeared to be mustard inside cellophane that was wrapped around a rectangular object. Officer Marzocca opened one of the bags and observed a large amount of U.S. currency inside. Officer Wolter subsequently placed CHENTE under arrest for the manufactured compartment and the large amount of U.S. currency. CHENTE was then transported to the San Juan Capistrano CHP office for further questioning.

311.   While at the office, Officer Wolter and Sgt. Lugo counted the currency and found the packages to contain the following: Bundle 1: $3,260; Bundle 2: $15,000; Bundle 3: $11,740; Bundle 4: $5,800; and Bundle 5: $4,000. (Totaling $39,800 in U.S. currency.)

312.   At approximately 2030 hours, Officer Marzocca advised CHENTE of his Miranda Rights and CHENTE waived his rights and agreed to answer questions. CHENTE stated that he had no idea the currency was located in the car and that he does not know who owns the money. CHENTE signed a CHP304 Disclaimer of Ownership form for the currency. CHENTE stated

94

that he was not working right now and only made approximately $700 a month and rented an apartment in Santa Ana.

313.   Based on the above information, I believe that CHENTE received the narcotics proceeds from the 5627 34th stash location and intended on transporting the narcotics proceeds to MARQUEZ in Mexico.

## VI.   Additional Information Pertaining to SUBJECT PREMISES

314.   With regard to the SUBJECT PREMISES, I believe that the SUBJECT PREMISES are being used by the Target Subjects as residences, are associated with Target Subjects, and/or are used to further the narcotics trafficking conspiracy discussed in this Affidavit. Furthermore, at this point in the investigation, I do not believe that the Target Subjects of this investigation are aware that they have been subjects of a complex Title III Federal investigation. I am also not aware of any law enforcement activity that would have caused all of the Target Subjects to indefinitely suspend their narcotics trafficking activities. Consequently, based on my training, experience, the information found in Section (V) above, and the additional information pertaining to the SUBJECT PREMISES below, I believe that evidence pertaining to the narcotics trafficking conspiracy discussed in this affidavit can likely still be found at the SUBJECT PREMISES. In general, I believe this is true due to training and experience that has led me to believe that narcotics traffickers keep records of their illegal activities for a period of time extending beyond the time during which they actually possess controlled substances, in order to maintain contact with criminal associates for future narcotic transactions, and to have records of prior transactions for which, for example, they might still be owed narcotics proceeds, or relative to pending drug debts that the Target Subjects may have incurred themselves.

### A.   10430 54th STREET; Narcotics/narcotics proceeds stash location; JOSELITO's residence

315.   On March 16, 2010, based on GPS information from a telephone being used by JOSELITO indicating that JOSELITO was at 10430 54th STREET, RMTF Deputy Antonio Juarez conducted a drive-by surveillance of the location. During the drive-by surveillance, the

vehicle bearing California license plate 4CVU622, which is registered to Jose Alfredo Jimenez (JOSELITO) was parked in the driveway of the residence, along with the 1994 JEEP (see Purpose of Affidavit Section (II)(4)(w) above) parked on the property.

316.    The vehicle bearing California license plate 4CVU622 has previously been observed during surveillance at two other DON CHUY DTO stash locations, the 5627 34th address and 1094 W. 15TH STREET.

**B.    19974 JUSTICE MILL; Possible narcotics/narcotics proceeds stash location; MARTIN's residence**

317.    I believe that 5 pounds of methamphetamine was delivered to the area of 19974 JUSTICE MILL on November 7, 2009. I also believe that the methamphetamine was transported to 19974 JUSTICE MILL in the vehicle bearing California license plate 5ZFE469.

318.    On October 30, 2010, members of the DEA Airwing conducted aerial surveillance and captured a video recording in which the vehicle bearing California license plate 6HEV336 and a vehicle bearing California license plate 8T58291 were observed at the location. A DMV records check indicated that the vehicle bearing California license plate 6HEV336 was registered to Eduardo Martin Garcia at 19975 Justice Mill Road, Perris, California, and the vehicle bearing California license plate 8T58291 was registered to Martin Garcia at 19975 Justice Mill Road, Perris, California.

319.    On February 15, 2010, Riverside County Sheriff's Corporal Kenneth Zunker Corporal Zunker made contact with the residents at 19974 JUSTICE MILL. Corporal Zunker spoke with LUPITA Garcia who advised that she lived at the residence with her husband, "Fernando." LUPITA also identified the hard line telephone for the residence as 951-940-8392. Corporal Zunker also walked the property with LUPITA's 12 year old son, "DANIEL". DANIEL advised that the father, "Fernando", is actually known as "Martin."

320.    On February 18, 2010, Corporal Zunker photographically identified "Fernando" as "Martin."

321.    As of March 2010, Southern California Edison utility subscriber information for 19974 JUSTICE MILL indicated that the current service was established on 04/22/2004 under

the name Jorge Vega and listed the primary contact phone number as 951-940-8392, which is the telephone number LUPITA provided to Corporal Zunker.

322.    Verizon subscriber information for telephone number 951-940-8392 identified the subscriber as Lupita Garcia at 19974 JUSTICE MILL.

### C.    1550 RIMPAU; Possible narcotics/narcotics proceeds stash location; ALMA and DAVID's residence

323.    On March 3, 2010, RMTF Deputy Antonio Juarez observed the vehicle bearing California license plate 7S41892 observed at the residence, which was registered to David Jimenez (DAVID) at 1550 RIMPAU.

324.    On March 20, 2010, FBI SA Miner and I saw the 1994 JEEP (see Purpose of Affidavit Section (II)(4)(w) above) parked in the driveway.

325.    Furthermore, DAVID was arrested at the San Ysidro Port of Entry on January 15, 2010, for attempting to enter the United States with a counterfeit Visa. Therefore, I believe it is unlikely that DAVID believes that he was arrested due to his narcotics trafficking activities. Furthermore, I believe that DAVID was the primary U.S. based methamphetamine distributor for MARQUEZ prior to his arrest. Consequently, I believe that evidence pertaining to DAVID's narcotics trafficking activities, to include the records pertaining to DAVID's illicit narcotics operation, can likely still be found at 1550 RIMPAU.

326.    Additionally, I also believe that DAVID was arrested unexpectedly and has not been back to the location since. AUSA Sanneman advised me that DAVID has been sentenced to approximately nine months Federal custody. Therefore, based my training, experience, my knowledge of this investigation, my believe that ALMA and DAVID's children are residing at 1550 RIMPAU, and the relatively short time that DAVID is planning on serving in custody, I believe it likely that DAVID anticipates returning to the location and likely anticipates regaining control and continuing to run his narcotics trafficking operations for the DON CHUY DTO. Based on my training and experience, although I know that narcotics traffickers commonly use separate locations for the collection and storage of narcotics proceeds destined to be repatriated to Mexico, I also know that narcotics traffickers often store their personal portion of the profit of

narcotics sales at their personal residences.  Consequently, based on my beliefs above, I believe that if DAVID had a large amount of profits from the sale of narcotics proceeds secreted at 1550 RIMPAU at the time of his arrest that the proceeds are possibly still located at the residence for when DAVID returns.

### D.   The 1049 N. Orange Blossom address; Possible narcotics proceeds stash location; PULIDO's residence

327.    On March 9, 2010, members of the LAPD observed PULIDO exit the front door of the residence and enter a grey Toyota truck that was parked in the driveway of the residence.

### E.   2275 E. LAKESIDE; CHILO's residence

328.    On March 9, 2010, members of the LAPD observed CHILO inside 2275 E. LAKESIDE and also observed the vehicle bearing California license plate 5PCT179 at the apartment complex, which was registered to Basilio Maldonado (CHILO) at 2275 Lake Side Place Apt. 206, Corona, California.  I also believe that this was the vehicle that CHILO used to transport methamphetamine to 2275 E. LAKESIDE on September 8, 2009 (see section V(F) above).

### F.   1006 LANG; NUNEZ's residence

329.    On December 31, 2009, law enforcement seized $22,420 in U.S. currency from NUNEZ pursuant to a traffic stop.  NUNEZ was traffic stopped in the vehicle assigned California license plate 6HLW889, which was registered to Alicia G. Valdeznunez or Jose L. Nunez (NUNEZ) at 1006 Lang Avenue, P.O. Box 2212, Pomona, California.

330.    I am aware that NUNEZ was intercepted using telephone number 323-707-3270. Based on Sprint Nextel subscriber information, I am aware that telephone 323-707-3270 was subscribed to Jose L. Nunez at 1006 Lang Ave., La Puente, California 91744.

331.    Furthermore, DMV records checks indicated that the vehicle bearing California license plate 8C65838 is registered to Alicia Valdeznunez and Jose Nunez (NUNEZ) at the 1006 LANG ADDRESS and the vehicle bearing California license plate 8N58295 is registered to Jose

Luis/Nunez (NUNEZ) and Alicia Valdez/Glamur Nunez DBA All Transportation, at the 1006 LANG ADDRESS.

332.    As of March 27, 2010, based on GPS information from a telephone that NUNEZ was intercepted using, I believe that NUNEZ was in the vicinity of 1006 LANG.

### G.    10733 BREEZY MEADOW; ERIKA's residence

333.    On March 9, 2010, members of INCA observed ERIKA exit the residence and utilize the silver Lincoln bearing California license plate 4HMV158, which is registered to Erika C. Valdovino at 23787 Nanwood Drive, Moreno Valley, California.

334.    On March 18, 2010, INCA Investigator Fred Ruiz observed the silver Lincoln bearing California license plate 4HMV158, which was registered to Erika C. Valdovino at 23787 Nanwood Drive, Moreno Valley, California, and another vehicle, registered to Luis Valdovino at 10733 Breezy Meadow, Moreno, California, parked in the driveway.

335.    Furthermore, as mentioned above, on January 21, 2010, at approximately 1007 hours, JOSELITO at Target Telephone #23 placed an outgoing call from ERIKA at 951-867-6378.  During the conversation, ERIKA advised that she was driving a "gray Lincoln." Consequently, based on my training, experience, and my knowledge of this investigation, to include surveillance observations of ERIKA driving the silver Lincoln Navigator, I believe that ERIKA likely picked up the $11,500 in transportation costs from JOSELITO on January 21, 2010, in the silver Lincoln bearing California license plate 4HMV158.

### H.    126 LINDA WAY; BARRAZA's residence

336.    On September 30, 2009, law enforcement seized 27.5 grams of methamphetamine pursuant to a traffic stop of BARRAZA.  BARRAZA was driving the vehicle bearing California license plate 6HEK357, which is registered to Humberto H. Barraza (BARRAZA) and Norberta P. Barraza at the 126 LINDA WAY.

337.    On March 9, 2010, a member of the LAPD observed the vehicle bearing California license plate 6HEK357 parked in a parking space associated with the apartment complex containing the location.

99

### I.   421 S. FERRIS; CHON's residence

338.   On December 14, 2009, members of the Downey Police Department coordinated with the Monterey Park Police Department for the traffic stop of CHON who was driving a 2000 Dodge Caravan, bearing California license plate 6CBK589. Pursuant to the traffic stop, GARCIA was identified as Jose Ascencion Garcia with the address of 421 S. FERRIS.

339.   On March 17, 2010, Downey Police Detective Nate Weinrich conducted a drive-by surveillance of 421 S. FERRIS. During the surveillance, Det. Weinrich photographed a silver Dodge van parked in the driveway of the residence. From the photograph, Det. Weinrich was able to determine that the silver Dodge van was bearing a partial California license plate of 6CB. Additionally, Det. Weinrich advised me that the silver Dodge van was the van (referring to the 2000 Dodge Caravan, bearing California license plate 6CBK589) that members of the Downey Police Department have observed CHON in previously.

340.   A DMV record check indicated that the vehicle bearing California license plate 6CBK589 was registered to Adriana Cervantes at 421 S. FERRIS.

### J.   515 S. HOPE; GALLEGOS's residence

341.   On February 1, 2010, GALLEGOS was traffic stopped, which resulted in the seizure of narcotics proceeds. GALLEGOS was driving the vehicle bearing California license plate 5ZYN471, which was registered to Elieser Ceja Gallegos (GALLEGOS) at 515 S. HOPE.

342.   As of March 2010, Southern California Edison utility subscriber information for 515 S. HOPE indicated that utilities are subscribed to Maria Gallegos and that the current service was established on 04/16/1976.

343.   On March 9, 2010, LAPD Detective Arnulfo Valdez observed the vehicle bearing California license plate 5ZYN471, which was registered to Elieser Ceja Gallegos at 515 S. HOPE, and another vehicle, which was registered to Elieser Ceja Gallegos at 515 Hope Street, Ontario, California.

344.   Det. Valdez also observed a vehicle parked in a vacant lot north of 515 S. HOPE, which was registered to Elieser Ceja Gallegos at 515 S. Hope Street, Ontario, California. There

was a "For Sale" sign posted on the vehicle with the telephone number 909-282-5757.
Furthermore, I believe that GALLEGOS used the telephone assigned number 909-282-5757,
UFMI 126*289*318, and IMSI 316010154366767, to coordinate the collection and
transportation of narcotics proceeds to Mexico, which was ultimately seized from GALLEGOS
by law enforcement on February 1, 2010.

### K.     8970 SPOHN; JORJON's residence

345.    On December 31, 2009, law enforcement seized $22,420 in U.S. currency from
NUNEZ that I believe was provided by JORJON.  After JORJON met with NUNEZ at the
Cardenas Market to conduct the narcotics proceeds transaction, Fontana PD Officer Andrew
Vestey subsequently followed the silver Toyota Corolla, bearing California license plate
6JYJ498, being driven by JORJON to 8970 SPOHN.

346.    On March 18, 2010, Officer Vestey observed the same silver Toyota Corolla
parked at the location.

### L.     1215 W. DIAMOND; PACHECO's residence

347.    On February 10, 2010, members of the DEA Airwing conducted aerial
surveillance of 1215 W. DIAMOND.  Pursuant to the aerial surveillance, the vehicles bearing
California license plate 5NZF167 and 6CQW752 were observed in the vicinity of 1215 W.
DIAMOND.  The vehicle bearing California license plate 5NZF167 was registered to Carmelo
Camacho and Neffer Camacho at P.O. Box 1777, Anaheim, California.  The vehicle bearing
California license plate 6CQW752 was registered to Neffer Camacho and Jose Duran Pacheco
(PACHECO) at P.O. Box 1777, Anaheim, California.

348.    On February 28, 2010, PACHECO (identified as Jose Pacheco Duran) was traffic
stopped by the CHP, which resulted in the seizure of methamphetamine as part of a separate
investigation.  Based on my communications with the CHP officer that conducted the traffic stop,
I learned that PACHECO verbally provided his address as 1215 W. DIAMOND and that mail
was found in the vehicle addressed to PACHECO at 1215 W. DIAMOND.  Furthermore, I
learned from a CHP report that PACHECO was transporting the methamphetamine in the vehicle

bearing California license plate 5NZF167, which was observed as part of this investigation during the DEA aerial surveillance mentioned above.

349.    I am aware that PACHECO was arrested on February 28, 2010, pursuant to the traffic stop mentioned above.  I am also aware that PACHECO is still in custody pursuant to the arrest.  However, based on my training, experience, wire intercepts, and my knowledge of this investigation, I believe that PACHECO delivered methamphetamine to JOSELITO/DAVID on at least three occasions as part of this investigation.  Consequently, I believe that PACHECO was part of an on-going conspiracy to import large amounts of methamphetamine from Mexico and into the United States and subsequently to distribute methamphetamine within the Southern California area.  Therefore, based on my training, experience, and my knowledge of this investigation, I believe that PACHECO likely kept records, to include but not limited to records of narcotics distributed, documents containing the names and telephone numbers of co-conspirators, and registration documents pertaining to vehicles used by PACHECO to transport narcotics.

350.    On March 21, 2010, FBI SA Christopher Miner observed the vehicle bearing California license plate 6CQW752 parked in the alley behind the apartment complex in front of one of the apartment complex's garage doors.

## CONCLUSION

351.    I believe that the facts contained in this affidavit provide probable cause that:

352.    From a date unknown and continuing to on or about April 1, 2010, in the Counties of Riverside, San Bernardino, Los Angeles and elsewhere within the Central District of California, Jesus ALVAREZ Jr. ("ALVAREZ"); MARTIN Garcia Angulo, aka Fernando Garcia, aka King Midas ("MARTIN"); Humberto Hubert P. BARRAZA, aka Beto ("BARRAZA"); David Silva Benavides, aka PRIETO, aka El Negro, aka Tocayo ("PRIETO"); Juan ALONSO Aispuro Chagoya ("ALONSO"); Joanelle Mirasol DeLa CRUZ, aka Janelle ("CRUZ"); Jose PACHECO Duran ("PACHECO"); Iliana FARIAS ("FARIAS"); Octavio FELIX Gonzalez, aka Octavio Romero ("FELIX"); Elieser Ceja GALLEGOS ("GALLEGOS"); Jose Ascencion Garcia, aka Jose G. Aispuro, aka CHON ("CHON"); Jose Luis MATA-GARCIA (MATA-GARCIA);

Uriel Valdovinos Garcia, aka CHENTE ("CHENTE"); Sergio Enrique BELTRAN Guerrero, aka Kique ("BELTRAN"); Lizeth CARPIO Hernandez ("CARPIO"); Jose Alfredo Jimenez, aka Jose Alfred Jimenez, aka JOSELITO ("JOSELITO"); Basilio Maldonado, aka CHILO ("CHILO"); Alejandro Perez Manzo, aka JAVIER, aka Antunes ("JAVIER"); Jesus MARQUEZ-Marquez, aka Don Chuy, aka Chuchin ("MARQUEZ"); Jose Luis NUNEZ, aka Joe ("NUNEZ"); DAVID Jimenez-Pedroza, aka Oscar Manuel Guerrero ("DAVID"); Jose PULIDO Sanchez, aka Jose Sanchez Pulido, aka Chespiro ("PULIDO"); Sergio Chavez Pulido, aka CHECO ("CHECO"); Jairo Alejandro RODELA ("RODELA"); ALMA Rodriguez ("ALMA"); Anselma Vega ROMERO, aka Ancelma Vega Romero ("ROMERO"); Sergio Beltran SARABIA, aka El Senior ("SARABIA"); ERIKA Cecilia Valdovino ("ERIKA"); Jorge Villanueva, aka Jesus Verdusco-Nunez, aka JORJON ("JORJON"); Margaro LNU ("MARGARO"); and ISAIAS Serrano, aka Chaias ("ISAIAS"), and others, knowingly conspired to possess with intent to distribute and to distribute methamphetamine, in violation of 21 U.S.C. § 846, 841(a)(1).

353.    Contraband or evidence of violations of 21 U.S.C. §§ 846, 841(a)(1), and 843(b), will be found in the particular premises to be searched.

Bennett O. Scott

Special Agent, Federal Bureau of Investigation


Subscribed and sworn to before me

on this **3 0** day of March, 2010.

UNITED STATES MAGISTRATE JUDGE